IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PEABODY COAL COMPANY, LLC, *et al.*,     ) | |
|     ) | |
|     Plaintiffs,     ) | |
|     ) | |
|     v.     ) | |
|     ) | C.A. No. 05-671-SLR |
| JO ANNE B. BARNHART, Commissioner     ) | |
| of the Social Security Administration,     ) | |
|     ) | |
|     Defendant,     ) | |
|     ) | |
|     and     ) | |
|     ) | |
| MICHAEL H. HOLLAND, *et al.*, Trustees of     ) | |
| the UMWA Combined Benefit Fund,     ) | |
|     ) | |
|     Defendant-Intervenors.     ) | |

**OPENING BRIEF OF PLAINTIFFS PEABODY COAL COMPANY, LLC
AND EASTERN ASSOCIATED COAL CORP. IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
DEFENDANT COMMISSIONER OF SOCIAL SECURITY'S MOTION TO
DISMISS AND INTERVENOR-DEFENDANT UMWA COMBINED
BENEFIT FUND'S MOTION FOR SUMMARY JUDGMENT**

OF COUNSEL:

OGLETREE, DEAKINS, NASH,
  SMOAK& STEWART, PC.
John R. Woodrum
W. Gregory Mott
2400 N Street, NW, Fifth Floor
Washington, DC 20037
(202) 887-0855

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Thomas R. Hunt, Jr. (#466)
Jason A. Cincilla (#4232)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
  *Attorneys for Plaintiffs*

April 21, 2006

# TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS ..................................................................................iii

NATURE AND STAGE OF THE PROCEEDING........................................... 1

SUMMARY OF ARGUMENT ...................................................................... 1

STATEMENT OF FACTS .............................................................................. 4

    A.   A Brief History of the Coal Act................................................................ 4

    B.   The Supreme Court's Decision in *Eastern Enterprises* and the
          Commissioner's Response ..................................................................... 8

ARGUMENT ................................................................................................10

I. THE COMMISSIONER'S ASSIGNMENTS VIOLATE THE PLAIN
   LANGUAGE OF THE COAL ACT............................................................10

    A.   An Agency May Regulate Private Entities Only To The Extent
          Congress Has Delegated It The Power To Do So.................................10

         1.  The Commissioner's assignment to Peabody of super reachback
            retirees violates Congress's unambiguous liability allocation scheme............12

         2.  The structure of the Coal Act underscores that the super reachback
            retirees the Commissioner assigned to Peabody belong in the
            unassigned pool...................................................................................15

         3.  *Eastern* did not change the Coal Act responsible operator criteria. ...............18

         4.  Contrary case authority is not persuasive. ......................................21

    B.   Severability and Retroactivity Principles Do Not Support The
          Commissioner's Assignments...............................................................25

II.    THE LEGISLATIVE HISTORY DOES NOT SUPPORT THE
       COMMISSIONER'S ALTERNATE ASSIGNEE POLICY ...............................29

III.    THE COMMISSIONER'S ALTERNATE ASSIGNEE
        POLICY IS NOT ENTITLED TO DEFERENCE................................................35

CONCLUSION...............................................................................................................36

## TABLE OF CITATIONS

**Page**

**CASES**

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) ................................................. *passim*

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) ................................................. *passim*

*Berwind Corp. v. Commissioner of Soc. Security*, 307 F.3d 222
    (3d Cir. 2002) ......................................................................................... *passim*

*Blue Diamond Coal Co. v. Trustees of the UMWA Combined Benefit Fund*,
    249 F.3d 519, 522 (6th Cir. 2001) ...............................................7, 12, 33

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ................................................10

*C&K Coal Co. v. Taylor*, 165 F.3d 254 (3d Cir. 1999) ....................................................16

*Caminetti v. United States*, 242 U.S. 470 (1917) ...........................................................29

*Carnival Cruise Lines, Inc. v. United States*, 200 F.3d 1361, 1367-69
    (Fed. Cir. 2000) ........................................................................................26

*Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) .......................................................35

*Coltec Indus. v. Hobgood*, 280 F.3d 262 (3d Cir. 2002) ...................................................22

*Davis v. Wallace*, 257 U.S. 478 (1922) ...........................................................................28

*Dixie Fuel Co. v. Apfel*, 171 F.3d 1052 (6th Cir. 1999)....................................................30

*Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) ..................................................... *passim*

*Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469 (1992) .......................................15

*Harper v. Virginia Dep't of Taxation*, 509 U.S. 86 (1993) ..............................................27

*In re Leckie Smokeless Coal Co.,* 99 F.3d 573 (4th Cir. 1996) ........................................29

*Lindsey Coal Mining Co. v. Chater*, 90 F.3d 688 (3d Cir. 1996) .....................................23

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ...........................................10

*Lyng v. Payne*, 476 U.S. 926 (1986) ............................................................10

*Marchetti v. United States*, 390 U.S. 39 (1968) ....................................24, 25

*Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207 (4th Cir. 2000) ....................................28

*National Mining Ass'n v. Apfel*, 97 F. Supp. 2d 1070 (N.D. Ala. 1999) ....................10-11

*New York v. United States*, 505 U.S. 144 (1992) ................................................26

*Partington v. Attorney-General*, L.R. 4 H.L. 100 (1869) ......................................11

*Patterson v. McLean Credit Union*, 491 U.S. 164 (1989) ..................................27

*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004), *cert. denied*,
    544 U.S. 904 (2005) ...........................................................22, 23, 24, 30

*Rivers v. Roadway Express, Inc.*, 511 U.S. 298 (1994) ....................................27

*Travelers Ins. Co. v. Cardillo*, 225 F.2d 137 (2d Cir. 1955) ............................16

*Shenango Inc. v. Apfel*, 307 F.3d 171 (3d Cir. 2002) ....................................31

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ..........................................35

*United States v. Merriam*, 263 U.S. 179 (1923) ...............................................11

*United States v. Reese*, 92 U.S. 214 (1875) ...................................................25

*Unity Real Estate Co. v. Hudson*, 178 F.3d 649 (3d Cir. 1999) ..................1, 4, 7, 11

*West Virginia Univ. Hosps. v. Casey*, 499 U.S. 83 (1991) ...............................29

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952) ......................10

**STATUTES**

26 U.S.C. § 7852 ...........................................................................20

26 U.S.C. § 7852(a) ......................................................................19, 20

Coal Industry Retiree Health Benefit Act of 1992
    26 U.S.C. §§ 9701-22 .............................................................................1

        § 9701(c)(7) .........................................................................23, 25

§ 9704(f)(2)(B) ...................................................................................15
§ 9706 ..................................................................................... *passim*
§ 9706(a) ................................................................................. *passim*
§ 9706(a)(1)-(2) ..............................................................................6, 8
§ 9706(a)(1) .......................................................................................7
§ 9706(a)(2) .......................................................................................7
§ 9706(a)(3) ............................................................................ *passim*
§ 9706(a)(4) .....................................................................................20
§ 9706(b) .........................................................................................14
§ 9706(b)(1) .....................................................................................24
§ 9706(b)(1)(B) .........................................................14, 23, 24, 25
§ 9706(f) ..........................................................................................12

30 U.S.C. § 932(h) ............................................................................14, 15

42 U.S.C. § 1981 ......................................................................................27


## LEGISLATIVE HISTORY

House Comm. on Ways and Means, 104th Cong., *Development and
        Implementation of the Coal Industry Retiree Health Benefit Act
        of 1992* (Comm. Print 1995) ....................................................... *passim*

*Agency Management of the Implementation of the Coal Act: Hearing
        Before the Senate Subcomm. on Oversight of Gov't Mgmt., Restructuring
        and The District of Columbia of the Senate Comm. on Gov't Affairs,*
        105th Cong. (1998) ................................................................ 17-18, 35

*Provisions Relating to the Health Benefits of Retired Coal Miners:
        Hearing Before the House Comm. on Ways and Means,* 103d Cong. (1993) ......14

138 Cong. Rec. H11,412 (daily ed. Oct. 5, 1992) ....................................20

138 Cong. Rec. S17,636 (daily ed. Oct. 8, 1992) ................................7, 34

138 Cong. Rec. S17,637 (daily ed. Oct. 8, 1992) ....................................20

138 Cong. Rec. S17,637-38 (daily ed. Oct. 8, 1992) ...............................20


## MISCELLANEOUS

18 James Wm. Moore et al., *Moore's Federal Practice* § 134.02[1][c]
        (3d ed, 2006) ..........................................................................................22

Robert L. Stern, *Separability and Separability Clauses in the Supreme Court*,
51 Harv. L. Rev. 76 (1937) ...................................................................20

U.S. General Accounting Office, No. AIMD-00-280R, *Financial and
Legal Issues Facing the United Mine Workers of America Combined
Benefit Fund* (Aug. 15, 2000) ................................................................9

## NATURE AND STAGE OF THE PROCEEDING

Plaintiffs Peabody Coal Company and Eastern Associated Coal Corp. (collectively "Peabody") challenge the Commissioner of Social Security's ("Commissioner") decision assigning them liability for lifetime health benefit premiums for certain coal mine retirees (and their dependents) previously assigned to unrelated companies in accordance with specific liability assignment rules set forth in the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act" or "Act"), 26 U.S.C. §§ 9701-22. (D.I. 1) The Commissioner revoked her prior assignments to these companies in response to a 1998 Supreme Court decision holding that assignments to a former employer that did not sign a 1974 or later UMWA coal wage agreement were unconstitutional, *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998).[1] She subsequently reassigned to Peabody the super reachback retirees at issue in this case.

The Commissioner filed a Motion to Dismiss and supporting brief on March 14, 2006 (D.I. 9, 10). The Trustees intervened and, in response to the Court's Order setting a briefing schedule, filed a Motion for Summary Judgment and supporting brief March 31, 2006. (D.I. 13,14) Peabody hereby files this brief in support of Plaintiffs' summary judgment motion and in opposition to Defendants' motions.

## SUMMARY OF ARGUMENT

1.    The Coal Act is quintessential compromise-driven, special interest legislation. Arriving at a method for allocating liability to former employers for the more

---

[1] Plaintiffs will refer to these companies as the super reachback companies, and the challenged retired miners who worked longest for them as the super reachback retirees or super reachback beneficiaries. *See Unity Real Estate Co. v. Hudson*, 178 F.3d 649, 668 n.10 (3d Cir. 1999) (discussing the Coal Act's "super reachback" provision challenged in *Eastern*).

than 100,000 retired miners and dependents whose continuing health benefits were at risk

was controversial and critical to enactment.  As the Supreme Court observed:

> Crafting the legislative solution to the crisis . . . was no easy task.  The Coal Act was passed amidst a maelstrom of contract negotiations, litigation, strike threats, a Presidential veto of the first version of the bill and threats of a second veto, and high pressure lobbying, not to mention wide disagreements among Members of Congress.

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 445-46 (2002) (footnotes omitted).

The Court aptly summarized the Coal Act's tumultuous birth as follows:

> [N]egotiations surrounding enactment of this bill tell a typical story of legislative battle among interest groups, Congress, and the President.  Indeed, this legislation failed to ease tensions among many of the interested parties.  Its delicate crafting reflected a compromise amidst highly interested parties attempting to pull the provisions in different directions. As such, a change in any individual provision could have unraveled the whole.

*Id.* at 461 (citations omitted) (footnote omitted).  The Commissioner's alternate assignee policy unravels the critical liability assignment compromise embodied in section 9706(a)(3) of the Coal Act.

2.     As enacted in 1992, the Coal Act contains highly specific rules for allocating premium liability to a particular former employer.  The statute allocates the Commissioner no discretion in determining the former employer to whom a particular beneficiary will be assigned.  Had the Commissioner assigned these super reachback retirees to Plaintiffs before the *Eastern Enterprises* decision, a reviewing court would have unquestionably enjoined the assignments as *ultra vires* acts in violation of the specific responsible operator assignment criteria delineated in section 9706(a) of the Coal

Act, 26 U.S.C. § 9706(a). The intervening decision in *Eastern Enterprises* does not free the Commissioner from the exacting constraints of the Coal Act's assignment criteria, nor does it permit her to reassign to Plaintiffs liability that would otherwise be plainly unlawful.

3.     The Commissioner asserts that retroactivity and severability principles require her to reconfigure the Act's assignment rules, and permit her to make the assignments in this case to Plaintiffs. In the absence of any statutory language that would authorize imposition of liability on Plaintiffs for the super reachback companies' beneficiaries, these doctrines do not support the Commissioner's usurpation of Congress's plenary authority in its fiscal legislation to determine who will and will not be subject to taxation.

4.     There are many problems with the Commissioner's alternate assignee policy, not the least of which is that the Coal Act clearly provides that where a beneficiary cannot be assigned to a particular operator under the specific assignment rules laid down in section 9706 he is allocated to the unassigned pool. Because the answer lies in the statute, the Commissioner's search for congressional intent was unnecessary, and, in any event, she arrived at the wrong answer.

5.     Unlike other federal statutes – such as the Black Lung Benefits Act – the Coal Act does not provide for "next-in-line" or "drop back" assignments. The structure of the Coal Act confirms that Congress neither authorized nor directed the Commissioner to search for an alternate assignee. Accordingly, the Commissioner's resort to isolated Congressional Record remarks to conclude that Congress intended that tagging another

employer was always preferable to allocating a beneficiary to the unassigned pool is unwarranted and wrong.

6.    The Commissioner exceeded her authority when, in the wake of *Eastern*, she administratively allocated to Plaintiffs the $2.4 million (to date) financial burden of providing health care benefits for 92 retirees that Congress directed be assigned to super reachback companies.  The statute provides the mechanism for responding to *Eastern*, and the Commissioner's alternate assignee policy is properly enjoined as *ultra vires*.

## STATEMENT OF FACTS

### A.    A Brief History of the Coal Act

The history of the health care crisis in the unionized coal industry in the late 1980s and the events culminating in the passage of legislation designed to remedy the crisis have been discussed extensively by the Supreme Court.  *See Eastern Enters.*, 524 U.S. at 511-14; *Sigmon Coal*, 534 U.S. at 444-47; *Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003).  *See also Unity Real Estate*, 178 F.3d 649.

Between 1950 and 1992, health care for thousands of retired United Mine Workers of America ("UMWA") coal miners (and their dependants) was provided through multiemployer plans established and maintained through periodic collective bargaining agreements, known as National Bituminous Coal Wage Agreements ("NBCWA").  *Eastern Enters.*, 524 U.S. at 506-13.  NBCWA signatory coal operators were contractually obligated to contribute specific amounts to these multiemployer plans. For decades, they operated on a pay-as-you-go basis with plan trustees adjusting benefit levels to fit budgetary constraints.  *Id.* at 508-09.  The amount a signatory employer contributed to the plans bore no relationship to the number of retirees in the plan, if any,

who had worked for the contributing employer. The plans provided health benefits to eligible retirees without regard to whether their employers remained in business or continued to have a contractual obligation to contribute. *Id.* at 511; *see generally* House Comm. on Ways and Means, 104th Cong., *Development and Implementation of the Coal Industry Retiree Health Benefit Act of 1992*, 67-68 (Comm. Print 1995) (hereinafter "*Coal Act Implementation*").

By the late 1980s, a series of circumstances had combined to drive the plans to the brink of insolvency. *Sigmon Coal*, 534 U.S. at 444-45. In 1990, the Secretary of Labor established a commission to study the UMWA retiree health crisis and furnish recommendations to Congress. *Id.* The Advisory Commission on UMWA Retiree Health Benefits ("Coal Commission") conducted extensive hearings and issued a lengthy report, but failed to arrive at a unified conclusion or recommendation as to how to finance retired UMWA miners' health benefits. *Eastern Enters.*, 524 U.S. at 512; *Coal Act Implementation* at 77-81.

In 1991, the Senate Finance Committee held hearings, and a measure approved by both chambers was included as part of a larger piece of tax legislation. *Eastern Enters.*, 524 U.S. at 513; *Sigmon Coal*, 534 U.S. at 446 n.6. This proposed solution would have imposed statutory responsibility only on companies that had contributed to the multiemployer plans during the term of the 1978, 1984 and 1988 NBCWA. *Coal Act Implementation* at 12. Recognizing that there would still be thousands of retired miners who would remain "orphaned" even with this reachback approach, the legislation provided for an industry-wide tax to defray the remaining orphans' health benefit costs. The effort was for naught because the entire tax measure was vetoed in March 1992 as

part of the Bush Administration's "no new taxes" pledge. *Sigmon Coal*, 534 U.S. at 446

n.6.

Congress revisited the issue on the heels of the veto and in the face of the

scheduled expiration of the then-current 1988 NBCWA. *Id.*; *Eastern Enters.*, 524 U.S. at

513; *Coal Act Implementation* at 81-82. This effort resulted in the passage of the Coal

Act, which achieved Congress's purpose of ensuring the uninterrupted provision of health

benefits to a fixed pool of some 115,000 UMWA miners (and dependents) who retired

between 1950 and 1993. Only super reachback retirees who retired prior to January 1,

1976, and worked for the longest period for a super reachback company that remained in

business as of 1992 (or had a "related person" that remained in business as of July 1992)

are at issue in this case.

As enacted, the Coal Act included a provision at section 9706(a)(3) that imposed

financial liability on companies that had been signatory to coal wage agreements prior to

1978. *See* 26 U.S.C. § 9706(a)(3). This third, or lowest, of the three-tiered Coal Act

assignment rules provided that if a retiree could not be assigned under the first two

assignment rules to a former employer that signed a 1978 or subsequent NBCWA, *see* 26

U.S.C. § 9706(a)(1)-(2), liability must be assigned, if at all, "to the signatory operator

which employed the coal industry retiree in the coal industry for a longer period of time

than any other signatory operator prior to the effective date of the 1978 coal wage

agreement," 26 U.S.C. § 9706(a)(3). *See also Berwind Corp. v. Commissioner of Soc.*

*Security*, 307 F.3d 222, 225 (3d Cir. 2002) ("These [assignment] criteria establish a

system of priorities based upon the length of the beneficiary's service, the date of his

service, and whether his employer participated in national collective bargaining

agreements with the UMWA that were signed in 1978 or subsequent years. The system of assigning beneficiaries by the Commissioner involves three steps or tiers that we have described as the 'linchpin' of the Coal Act's statutory scheme.") (citation and footnote omitted).

Significantly, the Coal Commission and the vetoed coal tax provision had not proposed reaching back to extend health benefit liability to pre-1978 NBCWA signatory employers. *See Unity Real Estate*, 178 F.3d at 668 n.10 ("It is notable that the Coal Commission never proposed the 'super reachback' provision challenged in *Eastern*. The Commission's proposal provided for liability under what became § 9706(a)(1) and § 9706(a)(2), which only apply to post-1978 [NBCWA] signatories, while § 9706(a)(3) was added late in the legislative process.") (citations omitted); *Coal Act Implementation* at 57.

The Coal Act's drafters understood that reaching back to impose liability upon pre-1974 NBCWA signatory employers was an essential component of the only financing scheme to achieve consensus.[2] A 1995 Congressional Report referenced in *Sigmon Coal*, 534 U.S. at 445 n.4, *Peabody Coal*, 537 U.S. at 154, and in *Unity Real Estate*, 178 F.3d at 668 n.10, reinforces the pivotal role of section 9706(a)(3) – the super reachback provision – in securing passage of the Coal Act:

---

[2] *See, e.g.*, *Blue Diamond Coal Co. v. Trustees of the UMWA Combined Benefit Fund*, 249 F.3d 519, 522 (6th Cir. 2001) ("To prevent the consolidation of liability upon a relatively small number of coal producers, the Coal Act also contained what has become known as a 'super reachback' provision. . . . . [S]uper reachback companies became responsible for health benefits under the Combined Fund despite having opted out of UMWA collective bargaining agreements and previous health benefit funds for many years.") (citations omitted); 138 Cong. Rec. S17,636 (daily ed. Oct. 8, 1992) (statement of Sen. Warner) ("A period of arduous negotiations commenced. A comprehensive plan emerged, mandating contributions by not only present but former [Bituminous Coal Operators' Association] members as well. In general, dating back to 1950, the former employer of the longest duration will be assigned the health costs of the retiree.").

> [The super reachback concept] encompasses any company which had signed any coal wage agreement dating back to 1946, or is related to such a company as defined in the law. The "super-reachback" concept emerged in the full Senate version of the [Coal Act], approved as an amendment to H.R. 776, the National Energy Security Act of 1992, on the Senate floor on July 29, 1992. It was not discussed in any public hearings. *It represented a bipartisan compromise within the Senate and between the Senate and the Bush Administration.*

*Coal Act Implementation* at 57 (explaining the distinction between the limited reachback, *see* 26 U.S.C. § 9706(a)(1)-(2), and super reachback concepts, *see* 26 U.S.C. § 9706(a)(3)) (emphasis added).

### B.    The Supreme Court's Decision in *Eastern Enterprises* and the Commissioner's Response

The Commissioner began the Coal Act program by assigning more than 174 super reachback companies liability for the lifetime health benefits of their former long-term coal retirees in accordance with the compromise codified as section 9706(a)(3). *Coal Act Implementation* at 23. However, five years into the program, the Supreme Court enjoined application of section 9706(a)(3) to Eastern Enterprises, a pre-1974 NBCWA signatory that employed thousands of miners under successive NBCWAs from 1946 to 1966. *Eastern Enters.*, 524 U.S. 498. The Court held the Coal Act unconstitutional as applied to a former employer that had not signed the 1974 or any later NBCWA, based on the fact that the 1974 NBCWA was the first coal wage agreement to contain a promise of lifetime benefits for retired miners.

In the wake of *Eastern*, the Commissioner voided 1400 assignments she had previously made to Eastern Enterprises pursuant to section 9706(a)(3). Consistent with judicial retroactivity principles, she also voided assignments to other "similarly situated"

coal operators, *i.e.*, those who had not signed a 1974 or later NBCWA or were not part of an IRC controlled group with a company that had. *See, e.g., Berwind*, 307 F.3d at 231-32 ("On September 24, 1998, the Commissioner voided the Coal Act beneficiary assignments of 113 companies that he concluded were similarly situated to Eastern Enterprises."). To date more than 130 super reachback companies have been relieved of liability for over 8,000 super reachback beneficiaries. U.S. General Accounting Office, No. AIMD-00-280R, *Financial and Legal Issues Facing the United Mine Workers of America Combined Benefit Fund* 5 (Aug. 15, 2000) ("One hundred and thirty-two coal companies and approximately 8,000 beneficiaries were affected by this decision.").

The Commissioner initially reallocated all 8,000 super reachback retirees to the unassigned category meaning, for funding purposes, their health benefits would be paid primarily by transfers of interest earned on the Abandoned Mine Land Reclamation Fund ("AML Fund"). *See generally Berwind*, 307 F.3d at 226 ("If a miner . . . cannot be assigned to an extant company under this scheme, benefits are funded by either asset transfers from one of the Combined Fund's predecessor benefit plans, transfers from the [AML Fund], or, if those sources are insufficient or unavailable, an additional unassigned –or 'orphaned' – retiree premium is imposed [*pro rata*] on all signatory operators.") (citations omitted). Beginning in 1999, however, the Commissioner directed program administrators to revisit the super reachback retirees' pre-1976 wage histories and settle upon an alternative assignee by simply ignoring decades of service for Eastern Enterprises or other similarly situated super reachback companies. *See* Social Security Administration, Office of Program Benefits Fax, dated Jan. 13, 1999, to SSA Coal Act Program Service Centers. (Exhibit A hereto.)

The Commissioner eventually assigned some 1,500 super reachback retirees to a 1974 (or later) NBCWA signatory employer, despite Congress's clearly never intending that this particular former employer be called upon to pay any more than a *pro rata* share of the orphaned super reachback retiree's health benefits.  *Berwind*, 307 F.3d at 226. Among these were the 92 super reachback retirees whose assignments to Plaintiffs are contested in this lawsuit.  Plaintiffs have paid more than $2.4 million in Coal Act premiums on behalf of these 92 super reachback retirees. *See* Affidavit of Joyce Wolfgang ¶ 8, filed contemporaneously herewith.

## ARGUMENT

**I.    THE COMMISSIONER'S ASSIGNMENTS VIOLATE THE PLAIN LANGUAGE OF THE COAL ACT.**

### A.    An Agency May Regulate Private Entities Only To The Extent Congress Has Delegated It The Power To Do So.

Prior to passage of the Coal Act in 1992, the Commissioner had no extant authority to assign current or former coal operators responsibility for funding the health care benefits of retired miners.  And because it is a first principle of administrative law that government agents are "limited to the authority delegated by Congress," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), any claimed power to assign retired miners (and their health care costs) to current or former coal operators must flow from a statutory grant of power from Congress to the Commissioner.[3]

---

[3]  *See Sigmon Coal*, 534 U.S. at 462 ("Congress, however, did not delegate authority to the Commissioner . . . to assign liability in a manner inconsistent with the statute."); *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."); *Lyng v. Payne*, 476 U.S. 926, 937 (1986) ("[A]n agency's power is no greater than that delegated to it by Congress."); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585 (1952); *National Mining Ass'n v. Apfel*, 97 F. Supp. 2d 1070, 1078 (N.D. Ala. 1999)

In statutes levying taxes, such as the Coal Act,[4] the general rule requiring adherence to the letter of the language used applies with particular strictness. More than 80 years ago, the Supreme Court quoted with approval the words of Lord Cairns in *Partington v. Attorney-General*, L.R. 4 H.L. 100, 122 (1869):

> [A]s I understand the principle of all fiscal legislation, it is this: If the person sought to be taxed comes within the letter of the law he must be taxed, however great the hardship may appear to the judicial mind to be. On the other hand, if the Crown, seeking to recover the tax, cannot bring the subject within the letter of the law, the subject is free, however apparently within the spirit of the law the case might otherwise appear to be.

*United States v. Merriam*, 263 U.S. 179, 188 (1923).

Adherence to established agency delegation principles is particularly appropriate in construing the Coal Act. As the dissent recently pointed out in a far less troubling context:

> This [administrative law delegation] principle has special importance with respect to the extraordinary power the Commissioner asserts here: to compel coal companies to pay miners (and their families) health benefits that they never contracted to pay. . . . When an agency exercises a power that so tests constitutional limits, we have all the more obligation to assure that it is rooted in the text of the statute.

*Peabody Coal*, 537 U.S. at 174 (Scalia, J., dissenting) (citation omitted).

---

(Commissioner lacks authority under the Coal Act to administer justice and equity as she sees fit).

[4] The Coal Act is codified as an amendment (subtitle J) to the Internal Revenue Code. *See, e.g, Unity Real Estate*, 178 F.3d at 675 (Coal Act premium obligations are taxes).

1.    **The Commissioner's assignment to Peabody of super reachback retirees violates Congress's unambiguous liability allocation scheme.**

If the Commissioner had made the Coal Act assignments at issue to Peabody before the Supreme Court's 1998 decision in *Eastern*, and Peabody had contested them, the Commissioner would necessarily have had to have withdrawn them as erroneously assigned under section 9706.[5]  This is because section 9706(a) provides for one – *and only one* – assigned operator with respect to a particular retired coal miner.  It states in pertinent part:

> (a) **In general.** For purposes of this chapter, the Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business in the following order:
> (1) First, to *the* signatory operator which
>     (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and
>     (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.
> (2) Second, if the retiree is not assigned under paragraph (1), to *the* signatory operator which
>     (A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and
>     (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

---

[5] The Commissioner's suggestion that the Coal Act's administrative appeal provisions supports her administrative decision to assign Peabody liability for the super reachback retirees' lifetime health benefits is unavailing.  *See* Gov't Brief in Support of Motion to Dismiss ("Gov't Br.") at 15 (D.I. 10 at 15).  These provisions authorize reassignment only in the course of a "review" undertaken pursuant to an administrative challenge filed by an assigned operator which questions the underlying factual basis of an assignment. *See Blue Diamond Coal,* 249 F.3d at 527 (Section 9706(f) "deals with a review of the particular facts concerning a particular retiree, and *does not contemplate the general applicability or constitutionality of the super reachback provision*.") (emphasis added).

> (3) Third, if the retiree is not assigned under paragraph
> (1) or (2), to *the* signatory operator which employed the
> coal industry retiree in the coal industry for a longer
> period of time than any other signatory operator prior to
> the effective date of the 1978 coal wage agreement.

26 U.S.C. § 9706(a) (emphasis added).  *See Berwind*, 307 F.3d at 225-26 (summarizing

same).

In the instant case, "the signatory operator which employed the coal industry

retiree in the coal industry for a longer period of time than any other signatory operator

prior to the effective date of the 1978 coal wage agreement" and which "remains in

business" is indisputably a super reachback company whose assignments were voided by

the Commissioner.  That the super reachback company who employed the miner can not

now be legally required to pay the lifetime health benefits that Congress allocated

exclusively to that operator by no means empowers the Commissioner to elevate Peabody

into liability.  Rather, in keeping with the bipartisan compromise embodied in the section

9706(a)(3) super reachback provision, Congress's assignment criteria shields Peabody

and every other former coal operator in the miner's chain of employment from having to

pay anything more than a *pro rata* share for these super reachback retirees.  This is

because, in the Coal Act, Congress made no provision for cascading liability to a less

responsible employer, even though this concept had been included in other statutes (like

the Black Lung Act) and certainly could have been included here.  *Sigmon Coal*, 534

U.S. at 459 n.16 (noting that, in the Coal Act, Congress "expressly delineated those

parties which *it* sought to attach responsibility") (emphasis added).

Indeed, as further evidence of its intention to exercise plenary authority over the

liability assignment process, Congress even supplied the Commissioner with explicit

rules with respect to the types of signatory employment to be excluded when designating

the most responsible prior employer, among many, that would bear the financial burden

of providing a particular retiree's lifetime health benefits.   Section 9706(b)(1)(B)

provides that, in identifying *the* responsible operator, the Commissioner shall take into

account all employment with a signatory operator, except:

> (B)  **Certain employment disregarded**.  Employment with-
>         (i) a person which is (and all related persons with respect to
>             which are) no longer in business, or
>        (ii) a person during a period during which
>             such person was not a signatory to a
>             coal wage agreement,
>     shall not be taken into account.

26 U.S.C. § 9706(b)(1)(B).

Read together, sections 9706(a) and (b) provide an unambiguous blueprint that

neither contemplates nor authorizes change orders or supplementation by executive

branch administrators.  Congress did not delegate to the Commissioner the authority to

recalibrate this "express and all-inclusive scheme."  *Sigmon Coal*, 534 U.S. at 459 n.16.

The Coal Act stands in marked contrast to other statutes involving the provision of

benefits to retired miners, such as the Black Lung Benefits Act, *see* 30 U.S.C. § 932(h),

where Congress did not directly legislate the critical responsible operator definition, but

instead delegated that responsibility to the Secretary of Labor.  The Coal Act grants the

agency no authority to establish (or change) rules for allocating newly-created, statutory

liabilities based on decades-old employment relationships.[6]  *See Peabody Coal*, 537 U.S.

---

[6]  *Compare Provisions Relating to the Health Benefits of Retired Coal Miners: Hearing
Before the House Comm. on Ways and Means*, 103d Cong. 21 (1993) (testimony of
Lawrence H. Thompson, Acting Commissioner of Social Security) ("The Coal Act is
very precise in describing how these assignments are to be made and *SSA has no
discretion in applying the criteria*.") (emphasis added), *with* 30 U.S.C. § 932(h)

at 183 (examining the structure of the Coal Act and noting "[f]or each assigned beneficiary, only one signatory operator is held responsible for health benefits, *even if* that miner had worked for other signatory operators that should in perfect fairness share the responsibility") (Scalia, J., dissenting).  If the liability assignment scheme of the Coal Act is to be changed, or if the Legislature wants the Commissioner to review for reassignment the wage records of super reachback retirees whose health benefits were voided and were being paid from interest earned on the AML Fund, the change must come from Congress, not the Commissioner.  *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 483-84 (1992) ("It is the duty of the courts to enforce the judgment of the Legislature, however much we might question its wisdom or fairness.").

> **2.    The structure of the Coal Act underscores that the super reachback retirees the Commissioner assigned to Peabody belong in the unassigned pool.**

When an assigned operator goes out of business, assignment to some other former operator in the retired miner's chain of coal mine employment is not even an option available to the Commissioner.  Rather, the assigned operator's coal retirees are orphaned and seamlessly allocated to the pool of unassigned beneficiaries.  Beginning in 1993, and in each ensuing year, Congress mandated annual adjustments to the unassigned beneficiaries funding formula to take into account every instance in which an assignee (and all its "related persons") "ha[s] ceased business."  26 U.S.C. § 9704(f)(2)(B).  As the Supreme Court noted in *Peabody Coal* with respect to this out-of-business provision:

> Congress wished to identify the first, most responsible operator for a given retiree, and not to follow that with a

_____

("Secretary [of Labor] may . . . establish standards for apportioning liability for [black lung] benefits . . . among more than one operator where such apportionment is appropriate.").

> second assignment to a less responsible operator if the initial
> assigned operator left the business.

*Peabody Coal*, 537 U.S. at 169 n.12 (2003). Defendants fail to identify any statutory support for their proposition that Congress intended the exact opposite result where assignment to the entity that Congress identified as the most responsible operator is frustrated by constitutional considerations.

The textual commitment in the Coal Act to annual adjustments in the unassigned premium to encompass newly-orphaned retirees upon an assignee's demise underscores that there is no overriding purpose in the Coal Act to assign every beneficiary to a former employer before allocating the beneficiary to the unassigned pool. Indeed, it proves more. It affirmatively demonstrates a congressional preference that, where the most responsible operator under the section 9706 criteria can not be compelled to pay for its retirees, the cost of providing that beneficiary's health care is to be paid from interest earned on the AML Fund, and (if necessary) supplemented by an unassigned beneficiaries premium to be paid by all operators on a *pro rata* basis.[7]

---

[7] There are many reasons why Congress may have organized the Coal Act in this manner, including concerns for administrative convenience. *See, e.g., Travelers Ins. Co. v. Cardillo*, 225 F.2d 137, 144-145 (2d Cir. 1955) (refusing to apportion liability among more than one former employer, holding that in cases arising under the Longshoremen's and Harbor Workers' Compensation Act, the employer on the last date of exposure in occupational disease cases bears sole liability for workers' compensation benefits and recognizing it would be "sheer folly to seek or expect to discover a formula devoid of any possibility of inequity or seeming injustice"). Perhaps the drafters were concerned that the "next-in-line" theory of assignment the Government now espouses "would have introduced a substantial degree of complexity" and that "arbitrary rules known in advance, even if inequitable in some specific instances, are on the whole necessary for the efficient conduct of business" and would better serve the mining industry. *C&K Coal Co. v. Taylor*, 165 F.3d 254, 258 (3d Cir. 1999) (noting the "intrinsic appeal" of apportioning liability but refusing to do so under black lung successor liability regulations). It is also possible that support from the regulated community needed to gain a politically acceptable solution could not be obtained absent a statutory construct that

Significantly, Congress itself did not see fit to amend or change the Coal Act assignment rules in the wake of *Eastern*, even though a Senate hearing was convened ten weeks after the Supreme Court's ruling, in part, to consider how it would impact the Coal Act's financing scheme, and whether it provided a need to reconsider the only method of financing health benefits for UMWA retirees that Congress and the Bush Administration had been willing to approve. The following exchange among Chairman Brownback and Senators Rockefeller and Conrad is instructive:

> Senator BROWNBACK. This is a government oversight hearing and so we are trying to figure out what it is that we can do . . . . I would ask either you [Sen. Rockefeller] or Senator Conrad briefly if you could say to me, do you think that the Congress needs to clarify the [Coal] Act since the Eastern case, where they have ruled a certain way in the Super Reachback category, or do you think it is just something that does not need to be addressed, we just need to figure the financing out on this?
>
> . . .
>
> Senator ROCKEFELLER. I am against clarification. I am for funding, because funding is carried out by the Executive Branch in coordination with us and is what I call a neutral act of trying to do the right thing. Clarification has to do with precisely the basic and very real, and I hope the Chairman understands that, fear on my part that once you start to clarify a law that was passed, indeed, as a compromise, as Senator Conrad indicated, in the compromise that came from the Bush administration, that once one gets into the clarification of the language of law, I start to sweat.
>
> . . .
>
> Senator CONRAD. I honestly believe that is the only way to solve this and I believe that the AML fund offers the best source of funding for the long-term to assure that the retiree benefits are kept and that some of the companies are

included specific liability assignment rules which, once applied, assured operators that their financial burden would not thereafter be subject to change.

> relieved of their responsibilities because of the Court case
> and others who are similarly situated.

*Agency Management of the Implementation of the Coal Act: Hearing Before the Senate Subcomm. on Oversight of Gov't Mgmt., Restructuring and The District of Columbia of the Senate Comm. on Gov't Affairs*, 105th Cong. 14-15 (1998). In the wake of *Eastern Enterprises*, only Congress has the authority to impose on Plaintiffs liability for retirees that the 102nd Congress, through section 9706(a)(3), allocated to pre-1974 signatories. Congress did not do so.[8]

### 3.  *Eastern* did not change the Coal Act responsible operator criteria.

Since the Commissioner cannot plausibly argue that the statutory text mandates that Peabody pay lifetime health benefit premiums for retirees that Congress specifically directed be paid by a super reachback company, she takes a different tack. She claims that the Supreme Court's decision in *Eastern Enterprises* freed her from the constraints of Congress's exacting responsible operator criteria to engage in gap-filling. Indeed, she asserts that "for purposes of assignment, [she] was required to ignore any operator to which an assignment would be unconstitutional (such as an Eastern-like operator), resulting in another operator (here, one of the plaintiffs) being the 'highest priority' and therefore the proper assignee." Gov't Br. (D.I. 10 at 9). *See also* Opening Brief in

---

[8]  The Commissioner's attempt to salvage her administrative assignment of liability to Peabody on the basis that "the plaintiffs' reading of the statute throws out the baby with the bath water by invalidating numerous constitutional applications of the statute along with those held unconstitutional in *Eastern Enterprises*," Gov't Br. at 11 (D.I. 10 at 11), totally misses the point. The fact that the Constitution would not be violated if *Congress* were to impose on Plaintiffs a requirement to pay for super reachback companies' retirees is irrelevant. The issue here is whether, in the Coal Act, Congress delegated authority to the *Commissioner* to administratively impose that liability on Plaintiffs.

Support of Defendant-Intervenor Trustees' Motion for Summary Judgment ("Combined Fund Br.") (D.I. 14 at 9).

The Commissioner simply misreads the import of the Supreme Court's holding in *Eastern* when she concludes that it provides the basis for her administrative decision to assign super reachback retirees to Peabody. The only question presented in *Eastern* was whether, as a constitutional matter, liability imposed under section 9706(a)(3) could be enforced against prior employers that did not sign a 1974 or later agreement. Although *Eastern* held that liability could not be imposed on super reachback companies, that decision does not address how the super reachback retirees' health care costs are to be paid.

The Commissioner's claim that the Supreme Court compelled her usurpation of Congress's exclusive authority to determine who will be subject to taxation is untenable for numerous reasons. The most obvious reason is that the Coal Act already provides for the financing of health care costs for retired miners who cannot be assigned to their most responsible operator under section 9706. By operation of law, they are unassigned, and their health care costs are fully paid in accordance with the procedures and redundant funding sources provided elsewhere in the Coal Act.

The Commissioner seeks to avoid the fact that, post-*Eastern*, the provisions of the Act not affected by the Supreme Court's decision resolve the financing issue by claiming this is a "case unprovided for." Gov't Br. (D.I. 10 at 14). This argument is unpersuasive. Congress finessed the problem of potential unenforceability of its tax legislation by incorporating time-tested IRC severability language. *See* 26 U.S.C. § 7852(a) ("If any provision of this title, or application thereof to any person . . . is held invalid, the

remainder of the title, and the application of such provision to other persons shall not be affected thereby."); *see also* Robert L. Stern, *Separability and Separability Clauses in the Supreme Court*, 51 Harv. L. Rev. 76, at 126, 128 (1937) ("Although all problems of severability cannot be recognized in advance, the most important of them can be."). For statutory construction purposes, it is as if the Coal Act drafters wrote IRC § 7852 into the 9706 assignment criteria as section 9706(a)(4).

Significantly, while Defendants are quick to characterize this as a case unprovided for, it is a matter of record that Congress was anything but oblivious to the prospect of its super reachback provision crossing over the constitutional line. *See, e.g.*, 138 Cong. Rec. H11,412 (daily ed. Oct. 5, 1992) (statement of Rep. Pickle) (singling out the coal retiree funding provision "taxing companies that have no current connection with the bituminous coal industry, some out of the coal business for 15 or 20 years" as a "travesty of justice" equating it to a "street gang mugging an innocent passerby"); *id.* at S17,637 (daily ed. Oct. 8, 1992) (statement of Sen. Warner) (["O]ne area which must be examined, if only to avoid future litigation is the question of constitutionality."); *id.* at S17,637-38 (memorandum prepared by former Reagan Administration Assistant Attorney General opining on the legislation's constitutional defects).

In sum, this is not a case unprovided for. Application of IRC section 7852(a) means that the provisions of the Coal Act that remain in effect (*e.g.* drawing on AML Fund interest to pay for health benefits where there is no responsible employer to pay premiums) continue to function. Super reachback companies can and have been severed from the Coal Act's financing scheme without threatening viability. We know that the Coal Act resolves the financing question on its face because, after the 1998 *Eastern*

decision, the Commissioner properly vacated 8,000 assignments of super reachback beneficiaries and designated them as unassigned. All 8,000 (except those the Commissioner subsequently reassigned to Peabody and other companies) have to this date seamlessly received their congressionally mandated health benefits from financing sources earmarked by Congress for unassigned beneficiaries.

Under the Coal Act, a beneficiary is unassigned unless he can be assigned to his most responsible operator in accordance with the specific assignment rules in section 9706. *Berwind*, 307 F.3d at 226. The Commissioner therefore violated no provision in the Coal Act when she put all of the super reachback beneficiaries in the unassigned pool (even though Congress obviously intended that the super reachback companies would pay for their health care, unless they became defunct, at which point the beneficiaries would enter the unassigned pool).

As the foregoing demonstrates, the Act provides on its face for the financing of health benefits for *all* beneficiaries whose assignment to a super reachback company was vacated in response to *Eastern*. It was the Commissioner's subsequent and imprudent decision to engage in a retrospective examination of congressional intent (an elusive objective in the best of circumstances), not her initial decision to designate all super reachback beneficiaries as unassigned, that resulted in her *ultra vires* decision allocating to Plaintiffs a financial burden not permitted by the statute.

### 4.    Contrary case authority is not persuasive.

Defendants rely heavily on the fact that several other courts of appeal have affirmed the Commissioner's authority to reassign super reachback retirees to alternate former employers. It is well settled that the denial of a petition for a writ of certiorari is

not an affirmance on the merits and that the decision of a court of appeals for one circuit

does not bind the courts of appeal for another circuit, much less that circuit's trial courts.

18 James Wm. Moore et al., *Moore's Federal Practice* § 134.02[1][c], at 134-23 (3d ed.,

2006).  Rather, their usefulness to an independent inquiry turns on the persuasiveness of

their reasoning.[9]

Defendants rely to a substantial degree on the decision of the split panel ruling in

*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004), *cert. denied,* 544 U.S. 904

(2005).  That decision has been particularly influential because it was the first court of

appeals decision to consider the issue of assigning super reachback beneficiaries to

alternate former employers.  Significantly, in his dissent in *Pittston* Chief Judge Wilkins

concluded that "these [super reachback] reassignments contravened the plain language of

the Coal Act." *Id.* at 407 (Wilkins, J., dissenting).  Judge Wilkins noted that:

> *Eastern* only prevented *assignment* of the retiree to the single
> company that § 9706(a) identified.  It did not somehow create an
> ambiguity regarding the identification of that company.  In other
> words, the "signatory operator" remaining "in business" "which
> employed the . . . retiree in the coal industry for a longer period of
> time than any other signatory operator prior to the effective date of
> the 1978 coal wage agreement" is no different after *Eastern* than it
> was before.  The majority reaches the opposite conclusion by
> reasoning that, under *Eastern*, the *Eastern*-type companies might
> reasonably be viewed as being no longer "in business," thereby
> leaving the door open to assignment to other, non-*Eastern*-type
> companies.  However, that interpretation of "in business" is plainly
> foreclosed by the definition Congress gave that term.

*Pittston*, 368 F.3d at 407 n.1 (citation omitted) (Wilkins, J., dissenting).

---

[9] It is worth noting in this regard that prior to the *Eastern* decision which precipitated the
issue before this Court, every court that had addressed the constitutionality of the Coal
Act as it applied to super reachback companies had found that imposing liability on them
was constitutional, and that the Supreme Court had denied several certiorari petitions on
the issue. *See Coltec Indus. v. Hobgood*, 280 F.3d 262, 266 (3d Cir. 2002).

In effect, as Judge Wilkins observed, under section 9706 the only way assignment of super reachback beneficiaries to alternate former employers could occur would be to read into section 9706(b)(1)(B) (captioned "certain employment disregarded") new language which directs the Commissioner to disregard employment with a person as to whom it is unconstitutional to make assignments. The panel majority, in defense of its ratification of the Commissioner's decision to do exactly this, and in response to Judge Wilkins' criticism, observed that the Commissioner:

> reasoned that inasmuch as Congress intended to include in the pool [of potential assignees] only those companies then "in business," she should take the *small step* of construing the class of out-of-business operators to include Eastern-like companies who were constitutionally disqualified. This gap-filling is, as we conclude, entitled to *Chevron* deference.

*Pittston*, 368 F.3d at 404 n.3. (citation omitted) (emphasis added) (panel majority).

Since the panel majority's ruling is predicated on a flawed gap-filling thesis, it supplies no principled ground to re-allocate to Plaintiffs liability that Congress deliberately reserved for long-term former employers that did not sign a 1974 coal wage agreement. There are three additional problems with the panel majority's defense of the Commissioner's action in *Pittston*.

First, the "small step" which the panel majority approved necessarily rewrites and expands the Coal Act's exacting "in-business" definition. 26 U.S.C. § 9701(c)(7). *See Lindsey Coal Mining Co. v. Chater*, 90 F.3d 688, 693 n.8 (3d Cir. 1996) (construing the extraordinary breadth of the definition "with the benefit of legislative history specifying that "even if the signatory is no longer in the coal mining business or indeed any business at all, but a related person continues to derive revenues . . . it will be deemed the assigned operator.") Indeed, in view of the substantial financial impact on Plaintiffs of fictionally

treating the super reachback companies as out of business, characterizing the Commissioner's action as a "small step" is tantamount to saying a person with his finger on the trigger takes only a small step when he pulls it.

Second, *Eastern* did not declare the facial application of section 9706(b)(1)(B) unconstitutional in any manner, nor does severability jurisprudence result in this section being severed from the statute. The Commissioner on her own initiative decided that she would expand section 9706(b)(1) to treat a super reachback company as an out of business company.

The third problem is that the *Pittston* court's approval of the Commissioner's decision to treat super reachback companies as out of business is that this approach was rejected by the Supreme Court in *Marchetti v. United States*, 390 U.S. 39 (1968). In *Marchetti*, the Court addressed the constitutionality of a federal statute which required a person to register before engaging in the business of accepting wagers, and to pay an occupational tax, notwithstanding the fact that by doing so the individual would expose himself to state and federal criminal penalties for engaging in wagering. The Court concluded that the statute violated the defendant's constitutional right against self-incrimination. In order to save the statute, the Government urged the Court to permit continued enforcement of the registration and occupational tax provisions, but impose restrictions on the ability of the authorities as to the use of that information. *Id.* at 58. The Court declined, observing that this would "preclude effectuation of a significant element of Congress' purposes in adopting the wagering taxes." *Id.* at 59. Justice Harlan noted that to accommodate the Government's request it would not suffice to simply sever section 6107, because:

> We would be required not merely to strike out words, but to insert words that are not now in the statute. Here, as in the analogous circumstances of *United States v. Reese*, 92 U.S. 214 [1875], "This would, to some extent, substitute the judicial for the legislative department of the government. . . . To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of duty."

*Marchetti*, 390 U.S. at 60 n.18.

Defendants urge a similar result here. They propose that the unconstitutional applications of section 9706(a)(3) be severed, and that the Court read into section 9706(b)(1)(B) language which treats the super reachback companies as out of business. This is both improper and unnecessary, because (unlike the situation in *Marchetti*) the essential purpose of the Coal Act – the provision of benefits to the super reachback beneficiaries – can be accomplished without rewriting section 9706 or section 9701(c)(7).

### B.    Severability and Retroactivity Principles Do Not Support The Commissioner's Assignments.

The Commissioner's (and the Combined Fund's) reliance on severability principles to rationalize the agency's decision is similarly misplaced. Severability jurisprudence is not a license to legislate, and does not sanction an administrative agency's imposition of tax liability where Congress saw fit to impose none. Defendants' arguments about severability simply go question-begging: Where does the Act allow alternative enforcement against Plaintiffs for statutory liabilities Congress allocated to pre-1974 employers?

Defendants have pointed to no severability case which even suggests that legislative intent empowers administrators to designate another source of revenue to

replace that lost as the result of a defect in one portion of the statute.    Severability

jurisprudence establishes nothing more than:

> [W]here Congress has enacted a statutory scheme for
> an obvious purpose, and where Congress has included
> a series of provisions operating . . . to achieve that
> purpose, the invalidation of one of the [provisions]
> should not ordinarily cause Congress' overall intent to
> be frustrated.

*New York v. United States*, 505 U.S. 144, 186 (1992).

In *Carnival Cruise Lines, Inc. v. United States*, 200 F.3d 1361, 1367-69 (Fed. Cir.

2000), the court held that the Harbor Maintenance Revenue Act could still function in a

manner consistent with the intent of Congress after the Supreme Court revealed in 1998

its provision taxing exports had violated the Export Clause since 1987.    The court

concluded that because import tax provisions were left intact, and the overriding purpose

of the harbor tax was to generate revenue to fund port and harbor projects, the loss of the

export tax revenue did not defeat that objective. Notwithstanding the constitutional defect

in this taxing statute, it is evident that if the loss of revenue meant that some port and

harbor projects which Congress intended be undertaken could no longer be financed, only

Congress could impose on Carnival Cruise Lines, or others subject to the constitutionally

permissible import tax, a greater or additional fee to replace revenue lost because the

import tax was unenforceable.

In the instant case, Congress enacted the Coal Act for an obvious purpose – to

secure health benefits for a group of UMWA retirees and their dependents.  The Act also

includes a series of provisions which operate to achieve that purpose, and the invalidation

of section 9706(a)(3) insofar as it applies to a former employer who did not sign a 1974

or later coal wage agreement does not cause Congress's overall intent to be frustrated.

The reason the purpose of the Coal Act can be effectuated after *Eastern* is not, as Defendants assert, because the Commissioner has inherent authority to determine how Congress would have financed health care for super reachback beneficiaries after the decision.  Rather, it is because the Act includes financing provisions for beneficiaries who cannot be assigned to a particular operator in accordance with the specific liability assignment rules that Congress prescribed in section 9706.

Retroactivity principles articulated in cases such as *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86 (1993), and *Rivers v. Roadway Express, Inc.*, 511 U.S. 298 (1994), likewise provide no support for the Commissioner's liability assignment in this case. Among the core purposes of the retroactivity doctrine is that similarly situated persons are to be treated similarly.  In *Harper*, giving full retroactive effect to the Supreme Court's authoritative statement as to the unconstitutionality of certain preferential state tax schemes meant that similarly situated taxpayers could pursue refunds from state tax commissioners for amounts the Court revealed they had previously overpaid.  Although *Harper* further stated that full retroactive effect would be given to *all events* that predated the rule, *Harper*, 509 U.S. at 97, the decision itself suggests that this is confined to events that animate the claims of litigants before the courts.  In *Rivers*, the Court's 1989 ruling in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), revealed the narrow scope of 42 U.S.C. § 1981, and propelled a trial court's dismissal of the plaintiffs' then-pending claim for damages that was premised on the court of appeals' far broader (but unwarranted) reading of that statute.  Neither decision, however, can reasonably be read as providing a basis for this Court's approval for the executive or judicial branches to impose liability on taxpayers that is not otherwise authorized by Congress.

The Commissioner fully effectuated retroactivity jurisprudence by voiding beneficiary assignments to Eastern Companies and returning their money. *See Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207, 211 (4th Cir. 2000) (giving "full effect" to *Eastern* by providing full compensation for premiums a super-reachback paid back to 1993). Plaintiffs agree that the effect of retroactivity jurisprudence means the super reachback companies were never eligible to receive assignments, and that those assignments were invalid from the beginning. However, this provides no insight or guidance as to what happens to those beneficiaries post-*Eastern*. That is a separate question which can be resolved only by examining the statutory provisions unaffected by the *Eastern* decision.

In this regard, the Supreme Court has made clear that if part of a statute is invalidated as to certain applications, that does not mean the invalidated portion is not to be read and considered when applying the remainder:

> To refuse to give force and vitality to a provision of law is one thing, and to refuse to read it is a very different thing. It is by a mere figure of speech that we say an unconstitutional provision of a statute is "stricken out." For all the purposes of construction it is to be regarded as part of the act.

*Davis v. Wallace*, 257 U.S. 478, 484 (1922). For purposes of construing the assignment rules post-*Eastern*, the Commissioner cannot simply ignore section 9706(a)(3), which states that the only responsible operator for super reachback beneficiaries is the former employer who employed the miner longest. Nor does retroactivity analysis permit the Commissioner to supplement the rules regarding what employment is to be disregarded when identifying *the* responsible employer. Absent a next-in-line assignment provision in the Coal Act, retroactivity analysis does not aid the Commission's cause.

## II.    THE LEGISLATIVE HISTORY DOES NOT SUPPORT THE COMMISSIONER'S ALTERNATE ASSIGNEE POLICY.

"The best evidence of [congressional] purpose is the statutory text adopted by both Houses of Congress and submitted to the President." *West Virginia Univ. Hosps. v. Casey*, 499 U.S. 83, 98, 111 (1991). *See also Caminetti v. United States*, 242 U.S. 470, 490 (1917) ("In other words, the language being plain, and not leading to absurd or wholly impracticable consequences, it is the sole evidence of the ultimate legislative intent."). Congress's overriding purpose in enacting the Coal Act was to extricate the UMWA Benefit Plans from serious financial crisis and thereby secure delivery of benefits for more than one hundred thousand UMWA retirees and dependents. *See Sigmon Coal*, 534 U.S. at 444-46. This was accomplished by the Act's detailed assignment and financing provisions. In this regard, section 9706 makes clear that the operator responsible is a particular former employer, not every former employer.

Congress understood there would be thousands of miners who, as a practical matter, would not be allocated under the Coal Act's responsible operator criteria. By operation of law, those miners are unassigned, and all go to the "unassigned pool" for purposes of financing their health benefits. While many are true orphans who have been in the unassigned pool from the outset of the program in 1993 (because they could not be matched to their responsible operator due to its demise before the Coal Act became law), thousands are unassigned for other reasons. These reasons range from an assigned operator's post-enactment demise, *see, e.g., In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 577 (4th Cir. 1996) (140 beneficiaries),[10] to the judicial invalidation of the

_____

[10] In 1997 the Combined Fund noted that there had already been more than thirty-four bankruptcy cases since the enactment of the Coal Act involving more than 6,200

Commissioner's assignment decisions such as occurred in *Dixie Fuel Co. v. Apfel,* 171 F.3d 1052 (6th Cir. 1999) (50 beneficiaries) and *Eastern* (8,000 beneficiaries). As this demonstrates, it is disingenuous to claim that the unassigned pool is reserved for "true orphans."

The Commissioner characterizes *Eastern* as creating a case unprovided for, requiring her to plumb legislative intent for guidance as to what Congress would have done had it known the super reachback companies could not be compelled to bear the financing obligations allocated them under section 9706(a)(3). As Judge Wilkins noted in *Pittston,* in dissent, "[t]he statute provides unambiguous instructions for the Commissioner to follow with respect to retirees who are not assigned under § 9706(a): They must remain unassigned. Thus, there is no gap for the Commissioner to fill." *Pittston,* 368 F.3d at 407 (footnote omitted) (Wilkins, J., dissenting).

After engaging in an unnecessary and perilous foray into the intent of Congress, the Commissioner concluded that her decision to allocate super reachback beneficiaries to Plaintiffs was required by the drafters' overriding interest in minimizing the number of unassigned beneficiaries.[11] *But see, e.g., Peabody Coal,* 537 U.S. at 184 (indicating it

---

Combined Fund beneficiaries. Petition for Writ of Certiorari at 3, *UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.,* No. 96-1117 (U.S.), *cert. denied,* 520 U.S. 1118 (1997). Subsequent high profile bankruptcies of assigned operators, including LTV Steel, Bethlehem Steel, Quaker Coal Company, and Horizon Natural Resources, have added many more beneficiaries to the unassigned pool.

[11]   The Commissioner's reliance on generalized comments in the legislative record underscores her failure to recognize that a comment by a member of Congress, to the effect that the overriding purpose of the Act's assignment provisions is to find and designate a specific obligor for as many beneficiaries in the Plans as possible, Gov't Br. at 13 n.6 (citing *Peabody Coal,* 537 U.S. at 171-172) (D.I. 10 at 13 n.6), cannot supercede the statute itself. It is the language which appears in the legislation as enacted,

would be naïve to rely "on guesses as to what Congress would have wanted in legislation as complicated as this") (Scalia, J., dissenting).

The Commissioner wrongly assumed that "[t]he Supreme Court's decision in *Peabody* and the Third Circuit's decision in *Shenango* [*Inc. v. Apfel*, 307 F.3d 171 (3d Cir. 2002)] settle the question that the legislative intent was to have assignable beneficiaries, like those at issue in this case, assigned to responsible coal operators who employed them, like plaintiffs, rather than remain permanently unassigned." Gov't Br. at 14 (D.I. 10 at 14). *Peabody Coal* and *Shenango* are inapposite here. The Commissioner in those cases applied the assignment rules in section 9706 correctly, but untimely, because the assignments were made after the October 1, 1993 assignment cutoff date in section 9706(a). It was uncontroverted, however, that the beneficiaries in those cases were Peabody's, Bellaire's and Shenango's respective responsibility under the priority assignment rules in section 9706(a). The Commissioner's failure to timely carry out the statutory directive was simply never contemplated by the Legislature. Not enforcing the assignments on timeliness grounds, according to the Third Circuit and the Supreme Court, would have resulted in a windfall. Indeed, the Supreme Court noted that operators whose assignments were not made until after the statutory due date received what amounted to an interest free loan on payments Congress wanted them to have begun

---

not the language which appears in the comments of a legislator, that establishes who the responsible operator is for each beneficiary.

Moreover, the Commissioner's exclusive reliance on general expressions to the effect that Congress wanted to allocate beneficiaries to the responsible private parties fails to recognize that Congress effectuated identification of the most responsible employer in the highly specific rules in section 9706. Without regard to whether the challenged beneficiaries in this case may have once worked for one of them, Plaintiffs are not their "responsible coal operators."

paying into the Combined Fund in 1993.  In this respect, the *Peabody Coal* holding is unremarkable.  *Peabody Coal*, 537 U.S. at 160 (citing a line of tardy administrative performance cases dating back to 1986 while noting "[h]ence the oddity at this date of a claim that late official action should shift financial burdens from otherwise responsible private purses to the public fisc . . . .").

The situation here is the complete opposite.  Plaintiffs are not seeking a windfall, they are seeking to bar the Commissioner from imposing a financial burden Congress did not lay at their door.  Indeed, the Commissioner acknowledges that in this case "[i]t is uncontested that the Coal Act, by itself, unambiguously required that the beneficiaries at issue here be assigned to Eastern Enterprises and other Eastern-like companies."  Gov't Br. at 8-9 (D.I. 10 at 8-9).

The applicable Supreme Court precedent here is *Sigmon Coal*, not *Peabody Coal*.  Here, as in *Sigmon Coal*, the Commissioner resorted to her view of congressional intent to circumvent statutory assignment language framed as the product of a tenuous legislative compromise to rationalize an administrative decision imposing substantial, long term financial obligations on parties to whom Congress plainly did not allocate that liability.  Accordingly, the appropriate legal lens through which to assess the legality of the Commissioner's alternate assignee policy is *Sigmon Coal*, in which the Court assessed  the  legality of the Commissioner's Coal Act successor policy and rejected her invitation to "read into the statute mandatory liability" in the face of explicit directives "as to who may be assigned liability for beneficiaries."  *Sigmon Coal*, 534 U.S. at 454.

What the case law, legislative history, and secondary sources underscore is that the Coal Act was the result of a difficult legislative compromise, a critical component of

which was expanding the Combined Fund contribution base to tax previous signatories for retired miners they had employed  *See, e.g., Blue Diamond*, 249 F.3d at 522 ("To prevent the consolidation of liability upon a relatively small number of coal producers, the Coal Act also contained what has become known as a 'super reachback' provision.") (citations omitted).  When the Senate finally passed the Coal Act as a floor amendment, *see Sigmon Coal*, 534 U.S. at 446 n.6, it included a provision of unparalled scope designed to reach back to impose Combined Fund premium obligations on any former signatory to any coal wage agreement since 1950, including super reachbacks such as Eastern.[12]

This legislative judgment to lock in all former signatories effectuated Congress's intent that the burden for financing Combined Fund benefits would be spread beyond the several hundred companies subject to the 1988 coal wage agreement then in effect.  In structuring the section 9706 criteria for identifying the "*most responsible*" former employer who would be required to provide a beneficiary's lifetime health benefits, Congress recognized that the signatories to the 1988 coal wage agreement (like the Plaintiffs) had been shouldering a heavy financial burden due in part to the fact they were

---

[12]   For a comprehensive overview of the financing of retiree benefits under the Coal Act, *see Coal Act Implementation* at 57 ("'Limited reachback' is the concept referred to in the Coal Commission Report prepared in 1990, the Coal Industry Retiree Health Benefit Act of 1991 (S. 1989, as introduced by Senator Rockefeller), the General Accounting Office in its tabulations for the Congress in 1992, and most discussions of the subject during 1991 and early 1992, including Senate hearings.  The Energy Policy Act of 1992 expanded the concept to a super-reachback.  This encompasses any company which had signed any coal wage agreement dating back to 1946, or is related to such a company as defined in the law.  The super-reachback concept emerged in the full Senate version of the [Coal Act], approved as amendment to H.R. 776, the National Energy Security Act of 1992, on the Senate floor on July 29, 1992.  It was not discussed in any public hearings. It represented a bipartisan compromise within the Senate and between the Senate and the Bush Administration.") (citations omitted).

paying for retirees who had been "dumped" into the UMWA 1950 and 1974 Benefit Plans by companies that were no longer signatories, but were still in business.[13] *Sigmon Coal*, 534 U.S. at 444 ("'As more and more coal operators abandoned the Benefit Plans, the remaining signatories were forced to absorb the increasing cost of covering retirees left behind by exiting employers.'") (quoting *Eastern*, 524 U.S. at 511). Pulling the pre-1974 coal wage agreement signatories back into the funding mix was integral to the only financing scheme that Congress and the Bush Administration could agree upon.

Accordingly, allocating the Eastern beneficiaries to the unassigned pool is not only required by the language of section 9706, it is also the only result consistent with the congressional goal of moderating the financial impact of the legislation on the 1978 and subsequent NBCWA signatory companies. The Commissioner's unilateral decision to shift to Plaintiffs the very financial burden that Congress determined should be assigned to pre-1978 signatories like Eastern Enterprises undercuts the compromise financing scheme Congress delineated in section 9706. In fact, it actually undermines the purpose and structure of the Coal Act because it perpetuates the very problem the assignment scheme in section 9706 was designed to solve.[14]

---

[13] *See, e.g.,* 138 Cong. Rec. S17,636 (daily ed. Oct. 8, 1992) (statement of Sen. Warner) ("In an unprecedented effort, the Congress and the White House have joined together to craft and include mandatory financing provisions to restore the solvency of the ailing union retiree health plan. The present supporters of the health plan, the Bituminous Coal Operators' Association [BCOA], are greatly burdened with its costs, and, in fact, have been contributing on a deficit basis for sometime.").

[14] *See, e.g.,* 138 Cong. Rec. S17,636 (daily ed. Oct. 8, 1992) (statement of Sen. Warner) ("A period of arduous negotiations commenced. A comprehensive plan emerged, mandating contributions by not only present but former BCOA members as well. In general, dating back to 1950, the former employer of the longest duration will be assigned the health costs of the retiree.").

### III.    THE COMMISSIONER'S ALTERNATE ASSIGNEE POLICY IS NOT ENTITLED TO DEFERENCE.

The SSA is not entitled to deference in its implementation of the Coal Act under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). As one of the agency's senior Coal Act officials testified before Congress in 1998, "[t]he Social Security Administration has played a role almost as a contractor, in that SSA simply assigns miners to companies."[15] Congress did not delegate rule-making or interpretive authority to the agency. Under the Supreme Court's holding in *United States v. Mead Corp.*, 533 U.S. 218 (2001), absent such delegation *Chevron* is not controlling: "We hold that administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226-27.

In marked contrast to the broad powers conferred on the Labor Department to identify through rulemaking "responsible operators" for purposes of shifting financing burdens under the Black Lung Benefits Act, Coal Act assignments do not flow from any general grant of authority under the Act to develop assignment criteria. Nor does it flow from any rulemaking by the Commissioner. Indeed, by her own admission, the Commissioner obtained no comment and consulted no interested party in conjunction with implementing her post-*Eastern* alternate assignee policy. Rather, she has engaged in statutory construction and the application of constitutional doctrines such as severability

---

[15] *Agency Management of the Implementation of the Coal Act: Hearing Before the Senate Subcomm. on Oversight of Gov't Mgmt., Restructuring, and the District of Columbia of the Senate Comm. on Gov't Affairs*, 105th Cong. 19 (1998) (testimony of Marilyn O'Connell, Associate Commissioner, Office of Program Benefits Policy, Social Security Administration).

and retroactivity developed by the courts.   These activities are uniquely within the competence and authority of the judicial branch and no deference to agency decision-making is merited.

## CONCLUSION

For the foregoing reasons Plaintiffs' Motion for Summary Judgment should be granted, and Defendants' Motions should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Thomas R. Hunt, Jr. (#466)
Jason A. Cincilla (#4232)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
*Attorneys for Plaintiffs*

OF COUNSEL:

OGLETREE, DEAKINS, NASH, SMOAK
    & STEWART, PC.
John R. Woodrum
W. Gregory Mott
2400 N Street, NW, Fifth Floor
Washington, DC  20037
(202) 887-0855

April 21, 2006

## CERTIFICATE OF SERVICE

I, Jason A. Cincilla, Esquire, hereby certify that copies of the **Opening Brief Of Plaintiffs Peabody Coal Company, LLC And Eastern Associated Coal Corp. In Support Of Their Motion For Summary Judgment And In Opposition To Defendant Commissioner Of Social Security's Motion To Dismiss And Intervenor-Defendant UMWA Combined Benefit Fund's Motion For Summary Judgment** were served on April 21, 2006 as follows:

### BY ELECTRONIC FILING:

Patricia C. Hannigan, Esq.
U.S. Attorney's Office
1007 Orange Street, Suite 700
P. O. Box 2046
Wilmington, DE  19899-2046

Carolyn Shelly Hake, Esq.
Ashby & Geddes, P.A.
222 Delaware Ave., 17th Floor
P. O. Box 1150
Wilmington, DE  19899

### BY FIRST CLASS MAIL:

Richard G. Lepley
Eric R. Womack
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530

David W. Allen
Larry D. Newsome
Christopher F. Clarke
UMWA Health & Retirement Funds
Office of the General Counsel
2121 K Street, N.W.
Washington, DC  20037

Jason A. Cincilla (#4232)