IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PEABODY COAL COMPANY, LLC, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>JO ANNE B. BARNHART, Commissioner )<br>of the Social Security Administration, )<br><br>Defendant, )<br><br>and )<br><br>MICHAEL H. HOLLAND, *et al.*, Trustees of )<br>the UMWA Combined Benefit Fund, )<br><br>Defendant-Intervenors. ) | C.A. No. 05-671-SLR |

## PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITIONS TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

OF COUNSEL:

OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, PC
John R. Woodrum
W. Gregory Mott
2400 N Street, NW, Fifth Floor
Washington, DC  20037
(202) 887-0855

MORRIS, NICHOLS, ARSHT & TUNNELL
Thomas R. Hunt, Jr. (#466)
Jason A. Cincilla (#4232)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
*Attorneys for Plaintiffs*

May 22, 2006

# TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS ........................................................... ii

INTRODUCTION ................................................................ 1

ARGUMENT..................................................................... 1

I.    *Peabody* And Broad Pronouncements Regarding The 102nd Congress's
      Legislative Intent Do Not Provide A Principled Basis For The
      Commissioner's Alternate Assignee Policy.. ............................................... 1

II.   Defendants Cannot Demonstrate That The Coal Act Or Judicial
      Doctrines Empower The Commissioner To Assign Liability In A
      Manner That Was Not Authorized In The Coal Act. ........................................... 9

III.  The Commissioner's Alternate Assignee Policy Is Not Entitled
      To Deference And Has No Persuasive Value....................................................... 19

CONCLUSION ................................................................ 20

# TABLE OF CITATIONS

Page

## CASES

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987) ..........................................................16

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) ...................................................*passim*

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) ....................................................*passim*

*Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984)........................................................19

*Davis v. Wallace*, 257 U.S. 478 (1922) ............................................................................17

*Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) ....................................................*passim*

*Marchetti v. United States*, 390 U.S. 39, 59 (1968) ..........................................................14

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ...............17, 18

*Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004)...............................................17

*Tilton v. Richardson*, 403 U.S. 672 (1971).......................................................................17

*Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*,
    872 F.2d 208 (7th Cir. 1989) ......................................................................................6-7

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ..........................................................19

*Unity Real Estate Co. v. Hudson*, 178 F.3d 649 (3d Cir. 1999) .........................................6

## STATUTES

26 U.S.C. § 7852 ...............................................................................................................3

Coal Industry Retiree Health Benefit Act of 1992

    26 U.S.C. §§ 9701-22 ...............................................................................................1
        § 9701 .............................................................................................................7
        § 9701(c)(7) ...................................................................................................13
        § 9704 .............................................................................................................5
        § 9704(d)...............................................................................................14, 15, 16
        § 9706 .......................................................................................12, 13, 14, 15

§ 9706(a) ................................................................ 2, 7, 14, 16
§ 9706(a)(1)-(3) ...................................................................... 19
§ 9706(a)(3) ..................................................... 12, 13, 14, 15
§ 9706(b)(1)(B) ........................................................... 13, 14

30 U.S.C. § 932(h) ............................................................... 11

30 U.S.C. § 1232 .................................................................. 13

## LEGISLATIVE HISTORY

138 Cong. Rec. 34,003 (1992) ................................................. 8-9

**INTRODUCTION**

Defendants' failure to prove two key assertions offered in support of the Commissioner's alternate assignee policy requires that her assignment of liability to Plaintiffs be vacated as arbitrary, capricious and not in accordance with law. The first assertion Defendants cannot defend is that the 102nd Congress would have imposed this liability on Plaintiffs in 1992 had it known the Supreme Court would refuse to enforce part of the liability allocation scheme that Congress actually established in section 9706 of the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act" or "Act"), 26 U.S.C. §§ 9701-9722. Although Defendants assert repeatedly that it is clear the 102nd Congress would have supported the Commissioner's alternate assignee policy, repetition of the claim does not make it so. The second assertion Defendants cannot defend is that the Coal Act delegates authority to the Commissioner to reassign to Plaintiffs liability the Act imposes on other employers, but which cannot be enforced against them. The Commissioner's reliance on other considerations, such as the reasonableness of her decision, and her view of statutory purpose and congressional intent, cannot supply an independent basis for an administrative agency to exercise Congress's taxing power in a manner not otherwise provided for in the Act itself.

**ARGUMENT**

I.     *Peabody* **And Broad Pronouncements Regarding The 102nd Congress's Legislative Intent Do Not Provide A Principled Basis For The Commissioner's Alternate Assignee Policy.**

The Commissioner asserts that "because Congress did not predict [*Eastern Enterprises*] the only question for the Court is whether the Commissioner's action in light of *Eastern Enterprises* was consistent with the intent of Congress and the purpose of the

Coal Act." Comm'r Opp'n Br. at 4 (D.I. 19 at 4). This characterization of the issue effectively acknowledges that there is no statutory basis for the Commissioner's liability assignment to Plaintiffs, because if there were the question of congressional intent and the purpose of the Act would be irrelevant. In any event, to the extent that the Commissioner's alternate assignee policy (which she describes as "reinitiating the search through the hierarchy for an initial, accurate assignment") is premised on the intent of Congress, or the purpose of the Coal Act, it must be vacated.

Defendants rely principally on *Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) as support for their position that the 102nd Congress clearly intended for the approximately 90 super reachback beneficiaries at issue to be assigned to Plaintiffs rather than allocated to the unassigned pool, where she permanently allocated 6500 other super reachback beneficiaries that she could not reassign even under her alternate assignee policy. The assignment dispute before the Supreme Court in *Peabody* and the dispute here are totally different. In *Peabody*, it was undisputed that the 102nd Congress had mandated that the Commissioner assign the 330 beneficiaries at issue to the companies. The issue, however, was whether she was *divested* of that authority by virtue of her failure to assign the liability timely. *Id.* at 156 ("These companies challenged the assignments . . . claiming that the statutory date [by which the assignments were to have been made] sets a time limit on the Commissioner's power to assign . . . ."); 26 U.S.C. § 9706(a) ("Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree"). If the assignments were time barred, they and an estimated 10,000 other untimely assignments the Commissioner had made to other assigned operators, *see Peabody*, 537 U.S. at 157 n.4, belonged in the unassigned pool. The Court held otherwise

recognizing it was confronted with a genuine "case unprovided for" and "it was unrealistic to think that Congress understood unassigned status as an enduring 'consequence' of uncompleted work . . . ." *Id.* at 164. Here it is undisputed that Congress did not empower the Commissioner to assign liability for these particular super reachback retirees to Plaintiffs, and the issue is whether, in the absence of an intervening statutory amendment, and in the face of a built-in and time-tested severability clause to accomodate constitutional invalidation, *see* 26 U.S.C. § 7852, she was *invested* with the authority to do so by virtue of the decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998).

Every comment drawn from the Congressional Record and every reference to statutory purpose and preamble in *Peabody* was offered in support of the Court's confirming that the Commissioner was not deprived of her extant statutory authority to assign liability (albeit late) precisely as the 102nd Congress had directed. *Peabody*, 537 U.S. at 158 ("Nor, since *Brock*, have we ever construed a provision that the Government 'shall' act within a specified time, without more, as a jurisdictional limit precluding action later."). In furtherance of its holding that the Coal Act text did not provide a specific "consequence" for untimely assignments, the Court pointed to legislative history as reinforcing evidence that the statutory deadline should not be given jurisdictional effect.

Significantly, *Peabody* did not rely on legislative history or characterizations of statutory purpose to affirm assignments that were not in accordance with the 102nd Congress's explicit assignment designations. In this regard, language the Commissioner relies on in the *Peabody* decision as support for her alternate assignee policy demonstrates that her reliance on *Peabody* is oversold. For example, the Commissioner quotes approvingly the statement in *Peabody*, *see* Comm'r Opp'n Br. at 10 (D.I. 19 at 10), which

affirms that the failure to make timely assignments would not be permitted to "shift financial burdens from *otherwise responsible private purses* to the public fisc, let alone siphon money from funds set aside expressly for a different public purpose, like the AML Fund." *Peabody* 537 U.S. at 160 (emphasis added). But this language merely makes the point that the Commissioner's failure to meet a deadline will not serve as a bar to assigning liability to private parties the 102nd Congress designated as the responsible operators. It cannot be read as support for the Commissioner's position in this case that Congress would have approved her decision to take super reachback retirees out of the unassigned pool, where she first allocated them in 1999, and reassign to Plaintiffs sole responsibility for financing their health benefits back to 1993.

The Commissioner also offers *Peabody* as support for her position that the "assignment of *Eastern* beneficiaries to the plaintiffs prevents the same shifting of burdens from responsible operators to public funds." Comm'r Opp'n Brief at 11 (D.I. 19). This demonstrates the fundamental flaw in the Commissioner's alternate assignee policy – she *assumed* that Plaintiffs should be the "responsible operators" in the wake of *Eastern* based solely on her view that this is the result the Legislature would have preferred, notwithstanding that Congress did not, in the Coal Act, designate Plaintiffs as their responsible operator.

Significantly, Defendants do not take issue with the point in Plaintiffs' opening brief that expanding the pool of former employers to include super reachback companies was critical to the compromise that allowed the Coal Act to be enacted. It is therefore difficult to understand how the Commissioner can, in good faith, claim that in this case:

> Plaintiffs would like to shift the burden placed on them by
> the Coal Act and the Supreme Court's interpretation of the

> Act's provisions to the public fisc or to other operators
> having no employment relationship to those miners affected
> by *Eastern Enterprises*. The result of such a decision would
> be a monetary windfall for the plaintiffs in derogation of the
> express Congressional purpose motivating the passage of the
> Coal Act.

Comm'r Opp'n Br. at 2 (D.I. 19 at 2).

The Coal Act did not place this burden on Plaintiffs – the Commissioner did. Moreover, vacating her liability assignment to Plaintiffs does not result in a monetary windfall, it merely ensures that Plaintiffs have to pay no more for these super reachback beneficiaries than a pro rata share under section 9704, as the 102nd Congress provided in its assignment and financing scheme. Finally, the Commissioner's claim that allocating these super reachback beneficiaries to the unassigned pool would be in derogation of the express congressional purpose motivating passage of the Coal Act is revisionist history, and patently wrong.

As Plaintiffs demonstrated in their opening brief, D.I. 17 at 7, 33-34, inclusion of the super reachback companies to spread the financial burden of providing health benefits for Combined Fund beneficiaries occurred towards the end of the legislative process and was critical to obtaining enactment. It is a non-sequitor for the Commissioner to argue that allocating financial responsibility for super reachback retirees to Plaintiffs rather than the unassigned pool effectuates the clear purpose of the Act, because her approach concentrates liability on a smaller group of former employers. While this approach was recommended by the Coal Commission, expanding liability to encompass super reachback companies is the only financing scheme that could be enacted into law. *See* Pl.'s Opening Br. at 33 n.12 (D.I. 17 at 33 n.12), ("'The super-reachback concept emerged in the full Senate version of the [Coal Act] approved as amendment to H.R. 776,

the National Energy Security Act of 1992, on the Senate floor on July 29, 1992. It was not discussed in any public hearings. It represented a bipartisan compromise within the Senate and between the Senate and the Bush Administration.'") (citation omitted). *See also Unity Real Estate Co. v. Hudson*, 178 F.3d 649, 668 n.19 (3d Cir. 1999).

The Commissioner's alternate assignee policy effectively reconstitutes the statutory liability allocation scheme that Congress was not able to enact. The Commissioner summarily dismisses this legislative history as "irrelevant to the question at hand." Comm'r Opp'n Br. at 13 (D.I. 19 at 13). Her refusal to even consider it in her quest to understand what the 102nd Congress would have done, had it predicted the 1998 *Eastern* decision, discredits her myopic focus on comments in the legislative record that support her pre-formed opinion that Congress would always have assigned beneficiaries to operators rather than leave them unassigned. Assuming arguendo that, post-*Eastern*, the Commissioner did not exceed her statutory authority in making these assignments, her failure to solicit input from interested parties, including 1988 signatory operators like Plaintiffs, which labored to secure passage of the Coal Act, and her failure to consider text and legislative history that is inconsistent with her assumptions, renders the alternate assignee policy arbitrary and capricious. *Barnhart v. Sigmon Coal*, 534 U.S. at 438, 461 (2002) ("Dissatisfied with the text of the statute, the Commissioner attempts to search for and apply an overarching legislative purpose to each section of the statute. Dissatisfaction, however, is often the cost of legislative compromise."); *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 872 F.2d 208, 213 (7th Cir. 1989) ("Discarding the plain language of a statute in favor of committee reports or other legislative history ignores the realities of the legislative process. The crafting of specific

language often reflects legislative compromise reached after hard fought battles over the means to reach even common goals. Courts should only reluctantly turn to legislative history for fear of upsetting the delicate balance reflected in a finally worded piece of Legislation.")

The Commissioner argues that *Sigmon* is not the applicable precedent here because it involved section 9701 of the Coal Act, and did not address a situation where a court invalidated a section of the Act as applied to certain assigned operators. Neither of these observations undercuts the importance of *Sigmon* to the instant case, and the first assertion ignores the fact that the Commissioner has made thousands of assignments under section 9706(a) to "related persons," as that phrase is defined in section 9701. As noted in *Sigmon*, the Commissioner relied on the same expressions of purpose and legislative intent in support of her policy of assigning liability to the successor in interest of a defunct employer:

> The Commissioner admits that the "statute does not state *in haec verba* that an assignment may be made to a direct successor . . ." [but] the Commissioner concludes that in light of the text, structure, and purposes of the Coal Act, such direct successors in interest *are* included within the liability scheme and *should* be responsible for a signatory operator's Combined Fund premiums if the signatory operator itself is defunct and there is no other "related person" still in business.

*Sigmon*, 534 U.S. at 454 (citation omitted). In support of her policy decision, the Commissioner noted that the statute specifically authorized her to assign liability to the successor in interest of a related person to the defunct signatory employer, but not to the successor in interest of the employer. The Commissioner argued that the oddity of such a

statutory directive had to be examined against the backdrop of congressional intent and statutory purpose that favored minimizing the number of unassigned beneficiaries.

The Court nonetheless refused to read into the Act authority for the Commissioner to assign liability to entities as to whom Congress (for whatever reason) did not, noting the conflict among the interested parties, and the delicate compromise that permitted enactment. *Id.* at 461 ("[A] change in any individual provision could have unraveled the whole. It is quite possible that a bill that assigned liability to successors of signatory operators would not have survived the legislative process."). *Sigmon* is therefore highly relevant to the enforceability of the Commissioner's alternate assignee policy, because this policy provides the exclusive basis for her imposition of liability in a manner different than provided for in the statute.

The Commissioner relies heavily on sound bites from the Congressional Record for her alternate assignee policy. For example, she asserts that "the Commissioner was aided by clear expressions of Congress's intent to keep the number of unassigned beneficiaries to a minimum." Comm'r Opp'n Br. at 1 (D.I. 19 at 1). Indeed, this particular statement appears to be one of the lynchpins for her policy. Viewed in context, the statement cannot fairly be considered to reflect the overriding purpose of the Coal Act. The relevant text provides in its entirety:

> The statute makes provision by which assigned operators may transfer the assignment of an eligible beneficiary to a successor employer pursuant to private contractual arrangements for a purchase. An assigned operator may inform the Trustees of the Combined Fund of the transfer of its responsibility to make premium payments under the Act to a third party and the Combined Fund Trustees will make appropriate accommodations. However, even in such case the assigned operator remains the guarantor of the benefits under the Conference Report. The Conference Report's

Case 1:05-cv-00671-SLR    Document 20    Filed 05/22/2006    Page 13 of 25

9

> purpose is to assure that any beneficiary, once assigned, remains the responsibility of a particular operator, and that the number of unassigned beneficiaries is kept to an absolute minimum.

138 Cong. Rec. 34,003 (1992) (comments of Senator Wallop).[1]  Thus, the Senator's remark was made in the specific context of clarifying that once assigned, always assigned, to avoid the possibility that an assigned operator might terminate its liability by selling to a successor employer.

## II.    Defendants Cannot Demonstrate That The Coal Act Or Judicial Doctrines Empower The Commissioner To Assign Liability In A Manner That Was Not Authorized In The Coal Act.

At their core, Defendants' arguments avoid grappling with the fundamental distinction between the constitutional power of the legislative branch to impose liability on a taxpayer, and the power of an administrative agency to impose such liability.  It is not disputed in this case that, as enacted, Congress did not assign the contested financial obligations to Plaintiffs.  Accordingly, even in the wake of *Eastern*, the Commissioner may not administratively impose this liability on Plaintiffs unless she can identify the statutory basis for her authority to do so.  *See* Pl.'s Opening Br. at 10 n.3 (D.I. 17 at 10 n.3).

There are two principal ways that, post-*Eastern*, the Commissioner could defend her alternate assignee policy.  First, Congress could have amended the statute to reassign to other former employers financial obligations which the statute assigns to super reachback companies.   Second, the Commissioner could identify specific statutory provisions that authorize her to administratively reassign the liability to others,

---

[1]    In *Sigmon* the Court refused to give weight to comments such as these offered in support of a policy position in conflict with the language of the Act. *Sigmon*, 534 U.S. at 457 n.15.

notwithstanding that the judicial branch found that the initial assignee is protected from liability by the Constitution.

The Commissioner cannot demonstrate that the first option is available. Shortly after the decision in *Eastern,* a Senate Oversight Subcommittee did indeed consider whether there was a need to amend the statute. Significantly, as Plaintiffs demonstrated in their opening brief, D.I. 17 at 17-18, the most pertinent comment at that hearing supports Plaintiffs' position that, post-*Eastern*, super reachback beneficiaries should have been allocated to the unassigned pool. Thus, in the course of discussing whether the Coal Act should be reopened to respond to *Eastern*, Senator Conrad stated that "I honestly believe that . . . the AML Fund offers the best source of funding for the long-term to assure that the retiree benefits are kept and that some of the companies are relieved of their responsibilities because of the court case and others who are similarly situated." Pl.'s Opening Br. at 17-18 (D.I. 17 at 17-18).

The only reply Defendants could muster in response to this statement of legislative intent is that these statements were made in 1998 and provide no support for Plaintiffs contentions as to what Congress may have intended in 1992. Trustees' Opp'n Br. at 15 n.10 (D.I. 18 at 15 n.10). Although the Commissioner offered no response to this post-*Eastern* legislative hearing, she does note that, to the extent Congress did not amend the Act, that inaction signifies "an intent to endorse the status quo, namely the Commissioner's reassignments, including those to plaintiffs." Comm'r Opp'n B. at 15 n.8 (D.I. 19 at 15 n.8) (citation omitted). The Commissioner fails to mention, however, that she did not implement her alternate assignee policy until 1999, well after the 1998 Hearing in which the Oversight Subcommittee determined the Act should not be

revisited. *See also Peabody*, 537 U.S. at 165 n.10 ("Postenactment statements, though entitled to less weight, are to the same effect.").

In any event, the point of the Oversight Subcommittee's 1998 hearing is that it (along with many other things) undercuts the Defendants' mantra that congressional intent clearly supports the Commissioner's position that Congress intended that liability for super reachback beneficiaries be reassigned to companies not affected by the Supreme Court's decision. The only inference that can be attributed to the legislative action that did occur post-*Eastern* is that Congress expected that the retirees would be unassigned and their benefits provided by the Abandoned Mine Land Reclamation Fund ("AML Fund"), not that the Commissioner would seek out other employers to hold responsible. Since Congress did not amend the Act to enhance the Commissioner's assignment authority, we now consider whether the Act itself provides the agency with this power.

There are, in theory, several ways the Commissioner could demonstrate that Congress authorized her to reassign liability for super reachback beneficiaries to Plaintiffs. For example, the Commissioner could point to statutory language that authorizes the agency to develop criteria (generally through notice and comment rulemaking) for determining the most responsible former employer. The Commissioner also could point to statutory language that authorizes her to designate a successor responsible employer where the employer specified as most responsible in the statute is unavailable, for whatever reason, to pay premiums on behalf of a Combined Fund beneficiary. The Black Lung Benefits Act, 30 U.S.C. § 932(h), provides an example of such an approach. None of these avenues are available here. Congress did not delegate the agency a role in determining which former employer would be assigned Coal Act

liability, and the specific assignment criteria in section 9706 permits the Commissioner to assign liability only to a *particular* former employer. *Sigmon*, 534 U.S. at 462 ("The Commissioner's final argument is that, even if the Coal Act did not affirmatively provide that responsibility for combined fund premiums may be imposed on a signatory's direct successor, it was reasonable for the Commissioner to conclude that direct successors of a signatory operator should be responsible for the operator's employees. Congress, however, did not delegate authority to the Commissioner to develop new guidelines or to assign new liability in a manner inconsistent with the statute.").

In the absence of actual statutory authority for her alternate assignee policy, the Commissioner looks elsewhere for support. First, she defends her policy on the grounds that it was the Supreme Court that recalibrated the statutory scheme when it determined that, for constitutional reasons, Congress's assignment of liability to super reachback companies was not enforceable. Comm'r Opp'n Br., D.I. 19 at 3. The Commissioner cannot lay responsibility for her alternate assignee policy at the door of the Court, however. *Eastern Enterprises* held only that section 9706(a)(3) was unconstitutional as applied to assignments to former employers who did not sign a 1974 or later coal wage agreement. As Plaintiffs have previously demonstrated, Plaintiffs' Opening Brief, D.I. 17 at 19-21, the Act provides on its face that retirees who cannot be assigned to the specific former employer designated in section 9706 are allocated to the unassigned pool, and their benefits are paid from interest earned on the corpus of the AML Fund. To the extent the AML Fund interest transfers are insufficient, assigned operators are assessed a pro rata contribution.[2] *Eastern* does not address the question of financing benefits for the

---

[2]    Defendants imply that there is some overriding congressional policy to avoid this financing mechanism unless every other option fails. In fact, the AML Fund consists of payments made by

super reachback retirees, and the Commissioner is therefore solely responsible for the agency's decision to by-pass the statutory financing mechanism in favor of a policy that reassigns liability to other former employers.

The Commissioner also asserts that application of the judicial doctrines of severability and retroactivity means her assignment of liability to Plaintiffs "followed the Coal Act statutory assignment scheme to the letter . . .". Comm'r Opp'n Br. at 1 (D.I. 19 at 1). It is simply not correct that the Commissioner followed the statutory assignment scheme to the letter after *Eastern*, because the letter of section 9706 specifies that a beneficiary may only be assigned to the signatory operator that remains in business and employed the beneficiary longest under a UMWA wage agreement. Plaintiffs are not that operator. The Commissioner therefore must either ignore the letter of the section 9706 statutory assignment criteria, or redefine the "in-business" definition in section 9701(c)(7) in order to justify her alternate assignee policy.

Section 9706(b)(1)(B) reaffirms that the Commissioner did not follow the letter of the Act because, without congressional action, the Commissioner is not free to treat the super reachback companies as constructively out of business in order to justify an assignment of their retirees to Plaintiffs under section 9706(a)(3). Characterizing this as an *expressio exclusio* argument, the Trustees claim it is implausible to believe Congress

---

coal companies, *see* 30 U.S.C. § 1232, not general tax revenues. Moreover, the AML Fund only transfers to the Combined Fund interest earned by the Fund. Since Congress made AML Fund interest available to finance unassigned beneficiaries' health care, it can hardly be argued that using it for the specific purpose for which it was allocated somehow undercuts the purpose of the Act. Furthermore, the statutory requirement that assigned operators will, if necessary, pay a pro rata unassigned beneficiaries premium simply parallels the pre-Act practice of signatory operators making contributions to the UMWA retiree plans, without regard to whether they had ever actually employed any of the beneficiaries. In addition, even with the transfer of 8,000 super reachback retirees to the unassigned pool, assigned operators have paid an unassigned beneficiaries premium in only 2 of the 14 years the Combined Fund has existed.

deliberately chose not to include in section 9706(b)(1)(B) employment with a company as to whom it is unconstitutional to make assignments. Trustees' Opp'n Br. at 6 (D.I. 18 at 6). This argument misses the point, however. The question is not what Congress might have done in 1992, it is, as the Court noted in *Marchetti v. United States*, 390 U.S. 39, 59 (1968), whether the Commissioner has the authority to write such an exception into the Act in 1999, when the purpose and effect of doing so is to bootstrap her into a position to allocate to Plaintiffs liability she is not otherwise authorized to impose. Defendants' dismissal of *Marchetti* on the basis that congressional intent was unclear there, but is clear here, is incorrect.

Defendants assert that the allocation of liability for super reachback beneficiaries cannot be resolved under the plain language of the Coal Act, notwithstanding that section 9704(d) established the funding mechanism for "beneficiaries who are not assigned under section 9706 to any person for such year." Harkening back to the section 9706 assignment criteria, the Trustees say that, post-*Eastern*, plain language does not provide for shifting super reachback retirees to the unassigned pool, "because the words of § 9706(a), literally applied, require *Eastern* beneficiaries be assigned to Eastern-type operators." Trustees' Opp'n Br. at 5 (D.I. 18 at 5).

This confuses congressional intent with statutory language. It is true that Congress intended that super reachback companies would be responsible for retirees allocated to them pursuant to section 9706(a)(3), and that intent was frustrated by *Eastern*. However, the parties agree that application of the retroactivity doctrine means assignments to these former employers are void *ab initio*, i.e. the affected retirees are unassigned. Thus, application of the retroactivity doctrine means these retirees are now

in the same situation every other Combined Fund beneficiary was in when the statute was enacted in 1992; they are unassigned unless they can be allocated to a particular former employer in accordance with the criteria Congress (not the Commissioner) established in section 9706.

The Commissioner's error is that she assumed voiding assignments to the super reachback companies put her in the position of having to decide what the 102nd Congress would have done in 1992, had it been prescient. What the situation required, however, was an examination of the statutory provisions not affected by the Court's refusal to enforce the statutory allocation of liability for certain retirees to pre-1974 signatory companies. The unaffected statutory provisions provide the answer. Although nothing in the Act authorizes the transfer of super reachbacks retirees to other former employers, the statute does specify in section 9704(d) that assigned operators will pay a pro rata premium for Combined Fund beneficiaries "who are not assigned under section 9706 to any person for such plan year." 26 U.S.C. § 9704(d). Thus, the fact that *Eastern* means the clear intent of Congress as expressed in section 9706(a)(3) cannot be effectuated does not mean that the plain language of the Act (that can be enforced) does not answer the question of how super reachback retirees' benefits will be paid.

In the Commissioner's view, "so long as a beneficiary is 'matchable' or 'connected' with an employer that remains in business, the Coal Act calls for the beneficiary to be assigned."[3]  Comm'r Opp'n Br. at 14 (D.I. 19 at 14).  Extended to its

---

[3]  *Peabody* does not support the Commissioner's view that if a beneficiary can be matched to any former employer in business the Act requires assignment to that employer.  As the Court noted:

> The Act speaks of the beneficiaries not in terms of the Commissioner's failure to assign them in time, but simply as "beneficiaries who are not assigned"  §

logical conclusion, this reasoning also supports reassigning the retirees of operators who go out of business to a different prior employer. The Commissioner has, of course, never taken this position for the obvious reason that the Act does not authorize her to do so. There is no statutory difference between beneficiaries whose responsible employer can't pay premiums because they are defunct, and beneficiaries whose responsible employer can't be compelled to pay premiums because the Judicial Branch won't enforce the premium obligation. The Act provides the Commissioner no greater authority to assign super reachback beneficiaries to another former employer than beneficiaries of defunct companies to another former employer.

The Commissioner cites *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987), for the proposition that "severability analysis strikes out the unconstitutional applications of a statute and thereby, necessarily and to that limited extent, alters it." Comm'r Opp'n Br. at 5 (D.I. 19 at 5). The Commissioner reads this to mean that she must void the unconstitutional assignments, and also revisit the hierarchy of potential assignees for an initial, accurate assignment. *Id.* at 6. Accepting the Commissioner's characterization of the process does not aid her cause, because severability analysis does not unmoor an administrator from the obligation to follow statutory provisions that are not invalidated by a court's ruling. *Eastern* did reduce the pool of former employers as to whom liability may be assigned. However, in the course of allocating liability to the reduced pool of

---

9704(d). The most obvious reason for beneficiaries being unassigned, in fact, is the disappearance of a beneficiary's former employer, leaving no signatory operator for assignment under § 9706(a). *This is not to say that failure of timely assignment does not also leave a beneficiary "unassigned" under the Act.*

537 U.S. at 164 (emphasis added). This comment demonstrates that the inability to enforce a correct assignment under section 9706(a) results in the beneficiary being unassigned.

employers the agency cannot just ignore relevant statutory language.  Indeed, Defendants

offer no response to the law on this point, which Plaintiffs cited in their opening brief:

> To refuse to give force and vitality to a provision of law is one thing, and
> to refuse to read it is a very different thing.  It is by a mere figure of
> speech that we say an unconstitutional provision of a statute is 'stricken
> out'.  For all the purposes of construction it is to be regarded as part of
> the act.

*Davis v. Wallace*, 257 U.S. 478, 484 (1922).  The Commissioner's post-*Eastern* authority

to assign liability to Plaintiffs is not enhanced, it still must be grounded in the provisions

of the statute.

The Commissioner cites *Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004)

in response to Plaintiffs' observation, D.I. 17 at 25-26, that no case has ever held that

severability analysis means an agency can rely on congressional intent as a substitute for

Congress's delegation of authority to impose liability, Comm'r Opp'n Br. at 6 (D.I. 19 at

6).  Other than the courts that have enforced the Commissioner's alternate assignee

policy, Defendants have pointed to no severability (or retroactivity) case in which a court

enforced an administrative decision to retroactively reallocate to unaffected parties the

burden to make up millions of dollars of revenue lost because certain parties could not

constitutionally be required to pay their statutory share.[4]

The Commissioner cites *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526

U.S. 172, 191 (1999) for the proposition that severability analysis is essentially an inquiry

---

[4]  The Commissioner also cites *Tilton v. Richardson*, 403 U.S. 672 (1971), but it is inapposite.
*Tilton* involved the constitutionality of a federal grant to church-related colleges for the
construction of academic facilities.  The Court severed the portions of the statute which limited to
20 years the recipients' obligation not to use federally-financed facilities for sectarian instruction
or religious worship, because that provision violated the constitutional prohibition against
contribution of substantial value to religious bodies.  Thus, the effect of the Court's ruling was to
preserve the ability of religious institutions to receive federal money, not impose financial
obligations on those institutions.

into legislative intent.  Comm'r Opp'n Br. at 7 (D.I. 19 at 7).  This provides no support for her action here, however, because the inquiry into legislative intent simply refers to whether the Legislature would have enacted those provisions within its power independently of the provision which is not.  If a court can conclude that the Legislature would have done so, the invalid portion may be dropped and what is left will be enforced. *Minnesota*, 526 U.S. 191.  This analysis does not support the Commissioner's broader proposition, which is that an agency may rely on legislative intent as the basis for retroactively reallocating liability in a manner not otherwise authorized by the statute.

        In response to Plaintiffs' point that the Act contains no next in line or fall back provision for reassigning liability, the Commissioner argues that retroactivity analysis means the beneficiaries were never assignable to the super reachback companies in the first instance.  Therefore, under her alternate assignee policy, she "retroactively reassign[ed] the beneficiaries to the *correct* assignees, namely plaintiffs." Comm'r Opp'n Br. at 14 (D.I. 19 at 14).  She also characterizes these assignments to Plaintiffs as "an initial, accurate assignment." *Id.* at 6.  This argument is, of course, purely circular.  It is uncontested that these assignments would not be permitted under the statute in the absence of *Eastern*.  The legal question is whether they may nevertheless be assigned to Plaintiffs as the consequence of that decision.  Their assignment to Plaintiffs could be "correct" if the statute delegated the Commissioner authority to determine the responsible operator through rulemaking, or by operation of a statutory provision that provides for a next in line employer to be tapped.  Since it does not, her bald assertion that these are the initial, accurate assignments merely assumes her conclusion.  They are neither accurate nor correct unless the Commissioner can first demonstrate the source of her authority to

impose on Plaintiffs liability that was not imposed on them in the statute as enacted. *See Peabody*, 537 U.S. at 169 n.12 ("Here, as throughout this opinion, 'accuracy' refers not to an elusive system of 'perfect fairness' but to assignments by the Commissioner following the scheme set out in §§ 9706(a)(1)-(3).") (citation omitted).

## III.    The Commissioner's Alternate Assignee Policy Is Not Entitled To Deference And Has No Persuasive Value.

The Commissioner claims that because Congress entrusted the Commissioner with the interpretation of the Act, *Mead* is no impediment to *Chevron* deference. Comm'r Opp'n Br., D.I. 19 at 16. It is undisputed that Congress assigned the Commissioner no rulemaking authority, and that she has never promulgated any rules. Thus, if *Mead* stands for the proposition that deference is due whenever Congress assigns a statutory duty to an agency, then *Mead* means nothing at all.

*Mead* does, however, recognize the precise situation presented here:

> But whether or not they enjoy an express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered.

*United States v. Mead Corp.*, 533 U.S. 218, 227 (2001).

The Commissioner made an administrative decision that Plaintiffs contest. The Commissioner's counsel (and the Trustees' counsel) have in their briefs explained the basis for the decision. As described in *Mead*, the Court will consider the persuasiveness of the Commissioner's arguments as presented by her advocates. Under the facts here, the Commissioner's decision is entitled to that degree of consideration by the Court, but not more.

## CONCLUSION

For the foregoing reasons Plaintiffs' Motion for Summary Judgment should be granted, and Defendants' Motions should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Thomas R. Hunt, Jr. (#466)
Jason A. Cincilla (#4232)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
*Attorneys for Plaintiffs*

OF COUNSEL:

OGLETREE, DEAKINS, NASH, SMOAK
    & STEWART, PC
John R. Woodrum
W. Gregory Mott
2400 N Street, NW, Fifth Floor
Washington, DC  20037
(202) 887-0855

May 22, 2006

## CERTIFICATE OF SERVICE

I, Jason A. Cincilla, Esquire, hereby certify that copies of **PLAINTIFFS'
REPLY TO DEFENDANTS' OPPOSITIONS TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT** were served on May 22, 2006 as follows:

### BY ELECTRONIC FILING:

Patricia C. Hannigan, Esq.
U.S. Attorney's Office
1007 Orange Street, Suite 700
P. O. Box 2046
Wilmington, DE  19899-2046

Carolyn Shelly Hake, Esq.
Ashby & Geddes, P.A.
222 Delaware Ave., 17th Floor
P. O. Box 1150
Wilmington, DE  19899

Jason A. Cincilla (#4232)

511862