**EXHIBIT A**

FILED

2006 Jun-20  AM 07:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES STEEL CORPORATION and U.S. STEEL MINING COMPANY, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CV-04-HS-0065-S |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) ) ) | |
| Defendant | ) ) | |
| MICHAEL H. HOLLAND, et al., Trustees of the UMWA Combined Benefit Fund, | ) ) ) ) | |
| Defendant-Intervenors. | ) | |

### MEMORANDUM OF DECISION

The court has before it the following motions: (1) defendant's August 5, 2005 motion to dismiss, or in the alternative, for summary judgment (doc. 59); (2) the trustees' October 21, 2005 motion for summary judgment on counts II and III of plaintiffs' second amendment complaint (doc. 64); and (3) plaintiffs' November 21, 2005 motion for summary judgment as to counts II, III, VI, VIII, IX, XII, XIV, XV, XVI, and XVII of the second amended complaint (doc. 67).  The motions

were deemed submitted without oral argument.

## I. Procedural History

Plaintiffs United States Steel Corporation ("USS") and United States Steel Mining Company, LLC ("USSM") commenced this action by filing a complaint in this court on January 12, 2004 alleging that defendant Jo Anne B. Barnhart, Commissioner of the Social Security Administration ("SSA"), violated the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. 9701 et seq. ("Coal Act"), by assigning miners to inappropriate signatory operators. (See Compl.) The Trustees of the United Mine Workers of America ("UMWA") Combined Benefit Fund ("trustees") filed a motion to intervene with respect to counts II and III and a brief in support thereof on August 9, 2005 (docs. 53 and 54). The court granted that motion on September 22, 2005 (doc. 61).[1]

Defendant SSA's August 5, 2005 motion to dismiss, or in the alternative, for summary judgment asserts that (1) plaintiffs have failed to state a claim upon which relief can be granted, and (2) even if plaintiffs had stated a claim upon which relief could be granted, there are no material issues of fact and SSA is entitled to judgment as a matter of law. (See generally Def.'s Mem. Supp. Summ.

---

[1] Although the trustees in this case are technically defendant-intervenors, the court will refer to them only as "the trustees" to avoid confusion. Unless otherwise noted, the term "defendant" only refers to Social Security Commissioner Barnhart.

J.)  The trustees' October 21, 2005 motion for summary judgment asserts that there are no material issues of fact with regard to counts II and III and that defendants are entitled to judgment as a matter of law on those counts.[2]  (See generally Trustees' Mem. Supp. Summ. J.)  Plaintiffs' November 21, 2005 motion for summary judgment asserts that there are no genuine issues of material fact and that plaintiffs are entitled to judgment as a matter of law with regard to counts II, III, VI, VIII, IX, XII, XIV, XV, XVI, and XVII.[3]  (See generally Pls.' Resp. to Def.'s Mem. Supp. Summ. J.)  Plaintiffs also filed a motion asking this court to defer consideration of defendant's motion to dismiss counts IV, V, and VII so that plaintiffs may conduct discovery and fully address the merits of defendant's motion regarding those counts.  (See id.)  That motion was granted and a briefing schedule was set out in a separate order dated May 11, 2006 (doc. 82).

On August 5, 2005, SSA filed a memorandum and evidence (doc. 52) in support of its motion, and it filed a corrected copy of its memorandum (doc. 59) on August 24, 2005.  The trustees filed a brief (doc. 65) in support of their motion on October 21, 2005.  Plaintiffs filed a response to both defendant's and the trustees'

_____

[2] Federal Rule of Procedure 56 explicitly allows for partial summary judgment.

[3] Counts I, X, XI, and XIII were withdrawn in plaintiff's second amended complaint because of actions taken by SSA or because of the decision in the related case of USX v. Barnhart, 395 F.3d 161 (3d Cir. 2004).

motions (doc. 68) and evidence (doc. 69) supporting their position on November

21, 2005.  The trustees filed a reply to plaintiffs' response and an opposition to

plaintiffs' motion for summary judgment (doc. 72) on December 16, 2005.

Plaintiffs, with leave of court, then filed a response to the trustees' reply (doc. 74)

on January 4, 2006.  Defendant filed a response to plaintiffs' motion (doc. 76) and

a reply to plaintiffs' opposition (doc. 77) on January 13, 2006.  Defendant also

made a supplemental evidentiary submission (doc. 78) on January 13, 2006.

Plaintiffs filed a reply to defendant's response (doc. 80) and evidence (doc. 80) on

January 25, 2006.  The court has considered all of the briefs and the evidence.

## II. Standards for Evaluating a Summary Judgment Motions
## and Motions to Dismiss

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229

F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings that the moving party believes

4

demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp.</u>, 477

U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the

nonmoving party to go beyond the pleadings and by her own affidavits, or by the

depositions, answers to interrogatories, and admissions on file, designate specific

facts showing that there is a genuine issue for trial. <u>Id.</u> at 324.

The substantive law will identify which facts are material and which are

irrelevant. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Chapman</u>,

229 F.3d at 1023. All reasonable doubts about the facts and all justifiable

inferences are resolved in favor of the nonmovant. <u>Chapman</u>, 229 F.3d at 1023;

<u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." <u>Anderson</u>, 477 U.S. at 248; <u>Chapman</u>, 229 F.3d at 1023. If

the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted. <u>Anderson</u>, 477 U.S. at 249-50. The method used by the

party moving for summary judgment to discharge its initial burden depends on

whether that party bears the burden of proof on the issue at trial. <u>See Fitzpatrick</u>, 2

F.3d at 1115-17 (citing <u>United States v. Four Parcels of Real Property</u>, 941 F.2d

1428 (11th Cir. 1991) (<u>en banc</u>)). If the moving party bears the burden of proof at

trial, then it can only meet its initial burden on summary judgment by coming

5

forward with positive evidence demonstrating the absence of a genuine issue of material fact (i.e. facts that would entitle it to a directed verdict if not controverted at trial). Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the nonmoving party's case. Fitzpatrick, 2 F.3d at 1115-16. If the movant

6

meets its initial burden by using this second method, the nonmoving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

Although defendant's motion is styled as a motion to dismiss, or in the alternative, for summary judgment, the court treated it as a motion for summary judgment because it considered evidence outside the pleadings.  Fed. R. Civ. P. 12(b) ("If, on a motion . . . to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment . . . .").

### III. RELEVANT UNDISPUTED FACTS[4]

---

[4] When considering a single motion for summary judgment, if the facts are in dispute, the court states them in the manner most favorable to the nonmoving party.  See Fitzpatrick, 2 F.3d at 1115.  However, because both parties are movants in this case, the facts will be presented both ways: as favorable to the plaintiffs when considering defendant's motion and to the defendant when considering plaintiffs' motion.

A. <u>The Language and History of the Coal Act</u>

In this case, plaintiffs U.S. Steel Corporation ("USS") and U.S. Steel

Mining Co., Inc. ("USSM") are challenging a variety of actions taken by

defendant, the commissioner of the Social Security Administration ("SSA"), under

the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), 26 U.S.C. §§

9701-22.  The Coal Act was enacted to avoid the elimination of medical benefits

for United Mine Workers of America ("UMWA") retirees.  See <u>Eastern Enters. v.

Apfel</u>, 524 U.S. 498, 511-14 (1998).  Between 1946 and 1992, benefits were

provided through multi-employer benefit plans that were created by collective

bargaining agreements, mostly in the form of a series of National Bituminous Coal

Wage Agreements ("NBCWAs").  <u>Id.</u> at 504-14.  During the 1970's, these benefit

plans began to suffer as less coal was produced, more miners retired, and

healthcare costs rose.  <u>Id.</u> at 510.  In addition, during the 1970's, many employers

who had signed the NBCWAs began to withdraw from the agreements to use non-

union employees or to leave the coal business altogether.  <u>Id.</u> at 511.  As a result,

"the remaining signatories were forced to absorb the increasing cost of covering

retirees left behind by exiting employers."  <u>Id.</u>  Despite attempts to mitigate the

situation by imposing "withdrawal liability" on NBCWA signatories who

abandoned the plans, by 1990, the 1950 and 1974 NBCWAs had incurred a deficit

of approximately $110 million, a debt that continued to mount as obligations to

beneficiaries continued to surpass revenues. Id.

Congress responded to this situation and to growing unrest among miners

by passing the Coal Industry Retiree Health Benefit Act of 1992. Id. at 514. The

stated purposes of the Act were

> (1) to remedy problems with the provision and funding of health care
> benefits with respect to the beneficiaries of multiemployer benefit
> plans that provide health care benefits to retirees in the coal industry;
>
> (2) to allow for sufficient operating assets for such plans; and
>
> (3) to provide for the continuation of a privately financed self-
> sufficient program for the delivery of health care benefits to the
> beneficiaries of such plans.

Energy Policy Act of 1992, Pub. L. No. 102-486, § 19142 (1992); see also 26
U.S.C. § 9701, Historical and Statutory Notes.

Essentially, the Coal Act merged the 1950 and 1974 NBCWAs into a new multi-

employer benefit plan called the United Mine Workers of America Combined

Benefit Fund ("Combined Fund"). Id.; 26 U.S.C. § 9702(a)(1), (2). The

Combined Fund is financed with annual premiums paid by coal operators who

signed any NBCWA or any other agreement requiring contributions to the 1950 or

1974 benefit plans. Eastern Enters., 524 U.S. at 514; 26 U.S.C. § 9701(b), (c).

Any "signatory operator" that is still "in business," meaning it "conducts or

derives revenue from any business activity, whether or not in the coal industry,"

may be charged premiums. 26 U.S.C. §§ 9701(c)(7), 9706(a). When an operator

is no longer in business, the premiums may be imposed upon a "related person,"

which includes businesses or corporations under common control with the

operator.[5] 26 U.S.C. § 9701(c)(2)(A).

The Commissioner of Social Security is charged with calculating premiums

and assigning miners to signatory operators using the following hierarchy:

> (1) First, to the signatory operator which –
>> (A) was a signatory to the 1978 coal wage agreement or any
>> subsequent coal wage agreement, and
>> (B) was the most recent signatory operator to employ the coal
>> industry retiree in the coal industry for at least 2 years.
> (2) Second, if the retiree is not assigned under paragraph (1), to the
> signatory operator which –
>> (A) was a signatory to the 1978 coal wage agreement or
>> any subsequent coal wage agreement, and
>> (B) was the most recent signatory operator to employ the coal
>> industry retiree in the coal industry.
> (3) Third, if the retiree is not assigned under paragraph (1) or (2), to
> the signatory operator which employed the coal industry retiree in the
> coal industry for a longer period of time than any other signatory
> operator prior to the effective date of the 1978 coal wage agreement.

26 U.S.C. § 9706(a).

If an eligible beneficiary cannot be assigned under one of these three tiers, the

beneficiary is considered "unassigned," and his or her benefits are funded through

asset transfers from the 1950 NBCWA and the Abandoned Mine Land

---

[5] These relationships are determined as of July 20, 1992 "except that if, on July 20, 1992,
a signatory operator is no longer in business, the relationships shall be determined as of the time
immediately before such operator ceased to be in business." 26 U.S.C. § 9701(c)(2)(B).

Reclamation Fund. 26 U.S.C. §§ 9704(d), 9705. If those asset transfers are insufficient, unassigned miners' benefits are funded through premiums that are assessed against all assigned operators. Id. The premiums signatory operators pay are based upon the idea that each operator should assume the cost of providing benefits to its own retirees, if possible, and that all operators should proportionally share the cost of providing benefits to "orphaned" retirees whose former employers are no longer in business. See 26 U.S.C. § 9706.

The Coal Act provides for administrative review of the Commissioner's assignments to signatory operators. See 26 U.S.C. § 9706. Once an operator receives a notice assigning beneficiaries, it has thirty (30) days to request more detailed information from SSA as to the work history of the miner, including the miner's earnings records, and the basis of the assignment. § 9706(f)(1). Once the operator receives the additional information requested, it has thirty (30) more days in which to file a request for review of the assignment(s). § 9706(f)(2). If the operator chooses not to request additional information, it has thirty (30) days from the date on which the notice of assignments was received in which to request a review of the assignment. 20 C.F.R. § 422.605. Once a review is completed, or if the time for review elapses, SSA's decision is final. 26 U.S.C. § 9706(f)(4). The agency's decision is subject to judicial review under the Administrative Procedure

Act.  5 U.S.C. §§ 702, 704.

## B. SSA's Assignments to USS and USSM

USS, formerly USX, signed the National Bituminous Coal Wage Agreement

("NBCWA") prior to 1978.  (AR,[6] Tab 26, at 1465.)  SSA claims USSM signed

the NBCWA in 1978, but USSM claims it did not sign an NBCWA until 1982.

(Id. at 1466.)  On June 1, 1993, USSM sent SSA a tape, composed by the UMWA

funds, "containing the names and social security numbers of those individuals

which [USSM] voluntarily agreed to accept as assignees in accordance with the

Coal Industry Retiree Health Benefit Act of 1992."  (AR, Tab 23, at 840.)  On

September 28, October 7, October 8, October 15, October 16, and October 18,

1993, SSA sent separate letters to USS (which was USX at the time[7]) identifying

miners assigned to it by name, Social Security number, and the period of time the

miner worked for the relevant employers according to SSA records.[8]  (AR, Tab 30,

at 1843-1993.)  Each letter specifically stated that USS, the assigned operator, had

thirty (30) days from the date it received the letter in which "to either request the

---

[6] "AR" indicates a citation to the administrative record.  The pages are consecutively numbered, but it is also arranged into tabs for ease of use because it is rather voluminous.

[7] Regardless of the time period that is referenced, the court will refer to U.S. Steel by its current name, "USS," instead of "USX."

[8] USS disputes the accuracy of several of the listed employers.  (AR, Tab 33, at 2080; USS App. 1.)  "USS App." indicates a citation to the supplemental appendix submitted by USS. It contains information not cited by SSA.

earnings record and the basis for the assignment or ask for a review." (See, e.g., AR, Tab 30, at 1844.) The letter also stated that if an operator requested the earnings records and basis for the assignment, the thirty (30) days to ask for a review began the day after the operator received those records. (Id.) If no such request was made, it began the day after the letter was received. (Id.)

On October 8, 1993, Darrell Lilly, the human resources manager for USSM, sent letters to the Great Lakes Program Service Center ("GLPSC"), the Northeastern Program Service Center ("NEPSC"), and the Western Program Service Center ("WNPSC") requesting copies of the miners' earnings records and the bases for the assignments made in SSA's September 28, 1993 letter.[9] (AR, Tab 33, at 2073-76.) On October 26, 1993, Lilly sent similar letters to the GLPSC, the Southeastern Program Service Center ("SEPSC"), and the WNPSC requesting the earning records and bases of the assignments for the miners assigned in SSA's letters dated October 7 and 8. (AR, Tab 33, at 2077-79.) The letters, which were written on USSM letterhead and indicated that USSM was a subsidiary of USX, did not mention any specific miners or assignments made to

---

[9] The administrative record also contains a letter dated October 8, 1993 to the Southeastern Program Service Center ("SEPSC") that references SSA's letter dated September 27, 1993. (AR, Tab 33, at 2075). This is apparently a typo. There is also a letter from Lilly to the SEPSC dated November 2, 1993 requesting the earnings records and bases for assignments in the September 28, 1993 letter from SSA. (USS App. 2.)

USS or to USSM.  (<u>Id.</u> at 2073-80.)  In response to Lilly's requests, in letters dated February 7, February 23, February 28, March 1, and March 2, 1994, SSA sent USSM the earnings records for the miners who were assigned to it.  (AR, Tab 35, at 2192-2313.)

After reviewing the earnings records and bases for the assignments, Lilly sent letters dated March 15, 1994 to each of the program service centers that read in pertinent part:  "[W]e are asking you to review the assignment per the attached list.  We have not received an Itemized Statement of Earnings for these individuals.  Therefore, we must disagree with the assignment that U.S. Steel Mining Co. is the responsibility operator."  (<u>See, e.g.</u>, AR, Tab 38, at 2751.)  A list of 323 miners was attached to each letter.  (AR, Tab 38, at 2751-2827.)  The list contained miners who were assigned to USS as well as miners who were assigned to USSM, including two miners who were included in the list that USSM voluntarily accepted in June 1993.  (<u>Id.</u>; USS App. 3.)  In response to the March 15 letters, in letters dated March 31, April 13, and April 15, 1994, the program service centers sent Lilly the earnings records and bases for the assignments of all the miners identified in the March 15 letters.  (AR, Tab 36, at 2553-2628.)  The Western and Northeastern Program Service Centers sent the records for all 1993 USX assignees, regardless of whether they were listed in Lilly's March 15 letters.

14

(USS App. 4.)

On June 30 and September 20, 1995, each program service center sent notices to USSM and USS assigning them additional miners. (AR, Tab 29, at 1789-95(l), Tab 30, at 1994-2033.) The miners assigned to USS were different from those previously assigned to it. (See AR, Tab 30, at 1994-2033.) On September 29, 1995, Lilly sent a letter to the NEPSC requesting the earnings records of the miners assigned to USSM on September 20. (AR, Tab 33, at 2085.) On November 20, 1995, the NEPSC sent USSM a letter acknowledging the request for records. (AR, Tab 34, at 2183.) On December 8, 1995, Lilly sent another letter to the NEPSC stating that he had intended to ask for earnings records for miners assigned to both USSM and USS. (AR, Tab 33, at 2087.) On April 22, 1996, the NEPSC sent USS the records for the miners assigned to it in June 1995, even though it had requested records for miners assigned in September 1995. (AR, Tab 36, at 2629-33; USS App. 5, 6, 9-11.)

SSA subsequently issued notices on September 30, 1998; September 29, 1999; and September 26, 2000 assigning additional miners to USSM. (AR, Tab 29, at 1796-1841.) It also issued notices on September 30, 1998; September 29, 1999; September 26, 2000; and September 25, 2001 assigning additional miners to USS. (AR, Tab 30, at 2034-63.) The September 1999 and September 2000

assignments for both USSM and USS included miners who had been initially assigned to operators who had not signed the 1974 NBCWA or a subsequent wage agreement. USS and USSM requested that SSA review the assignments of 78 miners assigned in 1998, 1999, and 2000. (AR, Tab 39, at 2866-2910.) SSA had an employee who did not make the assignments review them, and it issued final decisions regarding the challenged assignments, resulting in plaintiffs' remaining responsible for some, but not all, of the miners. (AR, Tab 54, at 4719-21, 4728-30, 4731-33, Tab 65, at 4953-5027.)

## C. The Eastern Enterprises Decision and SSA's Subsequent Reassignments

On June 25, 1998, in a plurality opinion, the Supreme Court decided that the Coal Act's system of assigning miners to signatory operators was unconstitutional as applied to operators who had not signed the 1974 NBCWA or a subsequent wage agreement. Eastern Enters., 524 U.S. at 516-17, 529 (plurality opinion); Eastern Enters., 524 U.S. at 535-36 (Breyer, J., dissenting). The Court found that Eastern Enterprises, a coal company that signed an agreement prior to 1974, did not have to contribute funding under the Coal Act because it had not committed itself to providing lifetime benefits, a provision that first went into effect in the 1974 NBCWA. Id.

As a result of the Eastern Enterprises case, SSA unilaterally voided "all

16

assignments made to operators that are exactly 'like Eastern' (e.g., signatories that signed only pre-1974 coal wage agreements, exited the coal industry before 1974, and have no related company that signed a 1974 or later coal wage agreement)." (AR, Tab 18, at 715.) These miners then went into an "unassigned pool" pending further review to determine whether they could be assigned to an appropriate operator. (Id. at 716.) Based on this review, SSA assigned miners to operators who (1) had signed the 1974 NBCWA or a subsequent agreement promising lifetime benefits, (2) had employed the miner, and (3) had the highest priority under the Coal Act's three-tier scheme (with the limitations imposed by Eastern Enterprises). (See generally id.) If a miner could not be assigned, he or she was permanently placed in the unassigned, or orphan, pool. Id.

## D. **Prior Litigation Between the Parties**

A similar case regarding assignments SSA made to USS and USSM has already been decided. On July 2, 1999, plaintiffs filed suit against SSA in the Western District of Pennsylvania challenging certain Coal Act assignments made in 1993 and 1995. (See generally Def.'s Exs. 1-13.) On November 11, 1999, plaintiffs filed an amended complaint, and on May 16, 2001, they filed a second amended complaint. (Def.'s Exs. 1, 4.) In their complaint, plaintiffs raised a number of challenges to the assignments, including that SSA had failed to provide

plaintiffs with earnings records for approximately 500 miners assigned to USS in 1993. (Def.'s Ex. 4.) The district court considered the claims through a series of motions to dismiss, or in the alternative, for partial summary judgment and issued a final judgment for defendant on November 2, 2003. (Def.'s Exs. 3-6, 11-13.) The Court of Appeals for the Third Circuit affirmed the district court's judgment on December 23, 2004. USX Corp. v. Barnhart, 395 F.3d 161 (3d Cir. 2004). On January 23, 2003, plaintiffs also filed an action in the Southern District of West Virginia, raising claims similar to the ones in the instant case. (Def.'s Ex. 14.) That court dismissed the action on July 31, 2003 due to improper venue. (Def.'s Ex. 16.) Plaintiffs commenced the instant action on January 12, 2004.

### IV. Applicable Substantive Law and Analysis

Plaintiff's complaint alleges thirteen separate counts that violate the Coal Act. (See generally 2d Am. Compl.) Consideration of summary judgment on three of those claims has been stayed pending further discovery (doc. 82), and they will be addressed in a separate opinion. Defendant's motion to dismiss, or in the alternative, for summary judgment, as amplified in its memorandum in support thereof, alleges that (1) some of plaintiffs' claims are barred by res judicata, the statute of limitations, laches, or failure to exhaust administrative remedies, and (2) there are no genuine issues of material fact and defendant is entitled to judgment

18

as a matter of law.  (See generally Def.'s Mem. Supp. Mot. Summ. J.)  Each of

plaintiffs' claims is discussed below.

The Coal Act explicitly states that the Social Security Commissioner's

assignments are subject to review "by a court under this subsection."  26 U.S.C. §

9706(f)(5); Sigmon Coal Co., Inc. v. Apfel, 226 F.3d 291, 301 (4th Cir. 2000).

Final determinations by the Social Security Administration, such as the ones at

issue here, are reviewed under the Administrative Procedure Act ("APA").

Sigmon Coal Co., Inc., 226 F.3d at 301; Lindsey Coal Mining Co. v. Chater, 90

F.3d 688, 691 (3d Cir. 1996).  Under the APA, "the reviewing court shall decide

all relevant questions of law, interpret constitutional and statutory provisions, and

determine the meaning or applicability of the terms of an agency action."  5 U.S.C.

§ 706.  The reviewing court must also "hold unlawful and set aside agency action,

findings, and conclusions found to be –

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in
> accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or
> short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections
> 556 and 557 of this title or otherwise reviewed on the record of an
> agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to
> trial de novo by the reviewing court.

5 U.S.C. § 706.

19

Under the APA, a court reviews questions of law de novo. Bama Tomato Co. v.

U.S. Dep't of Agriculture, 112 F.3d 1542, 1546 (11th Cir. 1997); Pollgreen v.

Morris, 770 F.2d 1536, 1544 (11th Cir. 1985). An agency's factual findings must

be supported by "substantial evidence," which is "'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" Bama

Tomato Co., 112 F.3d at 1546; see also Keeton v. Dep't of Health and Human

Services, 21 F.3d 1064, 1066 (11th Cir. 1994).

## A. Counts II and III

In counts II and III, plaintiffs challenge the assignments of approximately

35 miners who were assigned to USS and USSM as a result of the actions SSA

took following the Supreme Court's decision in Eastern Enterprises. In count II,

plaintiffs claim that Alva Fox, Albert Ward, and Hubert Guthrie (and their related

beneficiaries) were incorrectly assigned to USSM on September 27, 1993 because

each of them "had worked more years for another signatory operator who was still

in business." (2d Am. Compl.) However, in all three cases, SSA had assigned the

miners to USSM because the other signatory operator was a "superreachback"

company, meaning it did not sign the 1974 NBCWA or a subsequent wage

agreement committing it to providing lifetime medical benefits for retirees and

their dependents. In count III, plaintiffs challenge the assignments of 32 miners

who were reassigned to USS between 1998 and 2002 when SSA voided

assignments to superreachback companies and reassigned miners to other

operators where possible.  (See 2d Am. Compl.)  Plaintiffs claim that SSA's

actions were not required by Eastern Enterprises and are in fact prohibited by the

plain language of the Coal Act.  Plaintiffs contend that instead of reassigning the

miners whose assignments were made invalid by the Eastern Enterprises decision,

SSA should have left those miners in the unassigned pool, where the costs of their

benefits would have been distributed among all the signatory operators.  They cite

26 U.S.C. § 9704(f)(2)(B) as authority for this contention.  It states that if the

company that a miner is originally assigned to goes out of business, the miner is

not reassigned to another operator but is instead placed in the orphan pool.  This

essentially prohibits SSA from assigning miners to the "next-in-line" operator.

 SSA and the trustees contend that SSA's actions were both necessary and

proper in light of the Supreme Court's decision in Eastern Enterprises.  The

principle of severability, they argue, allows SSA to excise the invalid application

of the Coal Act while continuing to follow the remainder of the Act.  They further

maintain that SSA's actions are consistent with both the Court's decisions in

Eastern Enterprises and Barnhart v. Peabody Coal Co., 537 U.S. 149 (2003), and

with the congressional intent that "the number of unassigned beneficiaries [under

the Coal Act be] kept to an absolute minimum." Peabody Coal Co., 537 U.S. at

165 (quoting 138 Cong. Rec. 34003 (1992) (statement of Senator Wallop)).  SSA

argues that § 9704(f)(2)(B) is irrelevant in this case because Eastern Enterprises

applies retroactively, meaning that the initial, unconstitutional assignments "do not

count" and "plaintiffs are the first operators to which premium liability has been

constitutionally assigned for these miners."  (Def.'s Opp'n and Reply Br. 10.)

Since the challenged decisions in these two counts involve questions of law, the

court reviews them de novo.

    With one exception that is no longer good law,[10] every federal court that has

addressed this issue has held that SSA's actions represent a permissible

construction of the statute in light of the Eastern Enterprises decision.  Sidney

Coal Co. v. Soc. Sec. Admin., 427 F.3d 336, 350 (6th Cir. 2005) ("Given

Congress's stated purpose in enacting the Coal Act – to identify persons most

responsible for plan liabilities – the SSA's construction of the statute post-Eastern

Enterprises effectuated this intent by reassigning the Eastern beneficiaries to the

most responsible operator, as opposed to stretching the unassigned category to

--------------------------------------------------

    [10] Only the District Court for the Eastern District of Kentucky has held that SSA exceeded
its authority by reassigning beneficiaries assigned to Eastern-type companies after the Supreme
Court's decision in Eastern Enterprises.  Sidney Coal Co., Inc. v. Massanari, 221 F. Supp. 2d
755, 780-82 (E.D. Ky. 2002).  That decision, however, was overturned in relevant part by the
Sixth Circuit.  Sidney Coal Co., Inc. v. Soc. Sec. Admin., 427 F.3d 336 (6th Cir. 2005).

cover non-"orphaned" beneficiaries."); <u>Elgin Nat'l Indus. v. Barnhart</u>, Nos. 04-

5243 and 04-7094, 2005 U.S. App. LEXIS 7361 (D.C. Cir. April 27, 2005)

(rejecting coal operator's challenge to reassignments for reasons stated in

<u>Pittston</u>); <u>Pittston Co. v. United States</u>, 368 F.3d 385, 403-04 (4th Cir. 2004)

(upholding SSA's reassignment of miners after <u>Eastern Enterprises</u>); <u>Nell Jean</u>

<u>Indus., Inc. v. Barnhart</u>, 224 F. Supp. 2d 10, 26 (D.D.C. 2002) (same); <u>Wheeling-</u>

<u>Pittsburgh Steel Corp. v. Barnhart</u>, 229 F. Supp. 2d 539, 554 (N.D. W. Va. 2002)

(same).  The Fourth Circuit succinctly stated why SSA's construction of the statute

and its subsequent actions were permissible:

> When <u>Eastern Enterprises</u> held that it was unconstitutional to assign
> retirees to Eastern under the Coal Act, the ruling effectively held that
> the Commissioner *should never have assigned* retirees to Eastern *in
> the first place*.  Because the Commissioner's assignments were
> invalid from the beginning, she had to start over to assign the
> beneficiaries to comport with the terms of the statute as well as the
> Constitution.
> . . .
> In applying § 9706 to the retirees left unassigned as the result of the
> decision in <u>Eastern Enterprises</u>, the Commissioner has not violated or
> disturbed the structure of the Coal Act.  She merely removed from the
> pool of possible contributors those coal operators that could not
> constitutionally be required to contribute.  Among the remaining
> contributors, she followed the Coal Act's assignment structure to the
> letter.  In short, in making reassignments, the Commissioner did not
> change the wording of the statute, but merely followed the Supreme
> Court's ruling that the Coal Act may only apply to a narrower group
> of persons than previously thought.

<u>Pittston Co.</u>, 368 F.3d at 403-04 (emphasis in original).

The courts have also recognized – as the Supreme Court did in <u>Peabody Coal Co.</u>

– that SSA's construction of the statute is in keeping with the congressional intent

underlying the Coal Act:

> This much is certain: the Coal Act rests on Congress's stated finding
> that it was necessary to "identify persons most responsible for plan
> liabilities," and on its express desire to "provide for the continuation
> of a privately financed self-sufficient program for the delivery of
> health care benefits." In the words of Senator Wallop's report
> delivered shortly before enactment, the statute is "designed to allocate
> the greatest number of beneficiaries in the Plans to a prior responsible
> operator. For this reason, definitions are intended by the drafters to
> be given broad interpretation to accomplish this goal."

<u>Id.</u> at 404-05 (quoting <u>Peabody Coal Co.</u>, 537 U.S. at 171-72 (internal citations
omitted)); <u>see also</u> <u>Sidney Coal Co.</u>, 427 F.3d at 349; <u>Nell Jean Industries, Inc.</u>,
224 F. Supp. 2d at 24.

Although the above-cited precedent is not binding, it is extremely

persuasive, and this court is loathe to go against the great weight of authority on

this issue. SSA's construction of the statute post-<u>Eastern Enterprises</u> is consistent

with both the letter of the Coal Act and the legislative intent underlying it, and the

assignments and reassignments plaintiffs challenge were therefore permissible as a

matter of law. The post-<u>Eastern Enterprises</u> assignments do not exceed SSA's

statutory authority under the Coal Act, were not arbitrary or capricious, did not

constitute an abuse of discretion, and were not otherwise in opposition with the

law. Thus, no genuine issue of material fact remains, and defendants are entitled

to summary judgment on counts II and III.

## B. Count VI

_____In count VI, plaintiffs challenge the assignment to USS of Hubert Guthrie

and sixteen (16) other miners[11] who were longtime employees of Black Diamond

Coal Company.  (See 2d Amended Compl.)  Although plaintiffs concede that these

miners could not have been assigned to Black Diamond because it went out of

business before the initial assignments were made, they contend that the miners

should have been assigned to Argyle Investments because it was a "related

person" to Black Diamond and was in existence at the time the miners were

initially assigned.  SSA claims that because Argyle Investments is a direct

successor of Black Diamond, it is not a "related person" within the meaning of the

Coal Act.  See Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 452-53 (2002).

Plaintiffs counter by asserting that Argyle is a related person not because it was a

successor-in-interest but because it was Black Diamond's parent company.  SSA

argues that even if Argyle was a related person to Black Diamond, it could not

have assigned the miners to Argyle under the Coal Act because it was not in

---

[11] The miners last names and social security numbers are attached to the Second Amended Complaint as Exhibit GG and are also included as Exhibit 14 accompanying plaintiffs' memorandum in support of their motion for summary judgment. The assignment of one of the miners, Clyde Cooper, is no longer at issue because SSA reassigned him in 2004 for other reasons.

business when SSA reviewed the assignments. Plaintiff claims that (1) Argyle is still "in business" because it still derives significant revenue from investments, and (2) even if Argyle was no longer in business at the time the assignments were reviewed, Coal Act assignments are determined as of October 1, 1993, and Argyle should have been assigned those miners since it was in existence at that time. This count involves a question of fact, and SSA's decision is thus entitled to deference under the APA.

The "related persons" section of the Coal Act provides as follows:

(c) **Terms relating to operators.** – For the purposes of this section –

(1) **Signatory operator.** – The term "signatory operator" means a person which is or was a signatory to a coal wage agreement.

(2) **Related persons.** –

(A) **In general.** – A person shall be considered to be a related person to a signatory operator if that person is –

(i) a member of the controlled group of corporations (within the meaning of section 52(a)) which includes such signatory operator;

(ii) a trade or business which is under common control (as determined under section 52(b)) with such signatory operator; or

(iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner.

26 U.S.C. § 9701(c)(2).

An operator or related person is considered to be "in business" if it "conducts or derives revenue from any business activity, whether or not in the coal industry." § 9701(c)(7). The Third Circuit has adopted a broad definition of the phrase "in business" as it is used in the Coal Act. <u>Lindsey Coal Mining Co. v. Chater</u>, 90 F.3d 688 (3d Cir. 1996). It held that the "derives revenue from any business activity" prong of the definition is separate from the "conducts . . . any business activity" prong. <u>Id.</u> at 692. This means, essentially, that an operator may derive revenue from the actions of a third party (i.e. investments) and still be "in business" under the Coal Act. <u>Id.</u>

The court will assume, without deciding, that Argyle and Black Diamond are "related persons" within the meaning of the Coal Act. It appears from the evidence that the two companies probably did have a parent-subsidiary relationship. The SSA's review determination dated January 16, 1998 states that Argyle owned 100 percent of Black Diamond's stock and that "Argyle was the parent corporation at the time that Black Diamond dissolved." (USS App. 8.) In addition, the relationship between Argyle and Black Diamond meets the requirements of a parent-subsidiary relationship as outlined in SSA's guidelines on determining whether companies are "related persons" under the Coal Act

27

because Argyle owned more than 50 percent of the stock in Black Diamond.  (AR, Tab 18, at 728.)  The critical issue on this count, then, is whether Argyle was "in business" within the meaning of the Coal Act and thus could have been assigned miners that would have been assigned to Black Diamond had it been in business as of October 1, 1993.[12]

Plaintiffs' contention that a "related person" need have only been in business on October 1, 1993 to be assigned premium liability flies in the face of one of the main legislative purposes behind the Coal Act, which is to "identify persons most responsible for plan liabilities" and "allocate the greatest number of beneficiaries in the Plans to a prior responsible operator."  Peabody Coal Co., 537 U.S. at 171-72.  Plaintiffs' interpretation, which would not require that the related person be in business at the time the assignment is reviewed by SSA, would result in a greater number of miners being assigned to the orphan pool.  SSA's interpretation, on the other hand – that a company must be "in business" at the time it is reviewing a challenged assignment – is in line with the policies underlying the Coal Act.  It does not mean that miners would be assigned to the "next in line" operator, as plaintiffs argue.  Instead, it simply means that miners

---

[12] Plaintiffs presented no evidence that Argyle is currently "in business."  Plaintiffs contention that it still derives revenue from passive income is certainly not enough to create a genuine issue of material fact on this issue.

are assigned to the most closely "related person" that is in existence at the time the decision is reviewed.  This is an acceptable interpretation of the statute and cannot be considered arbitrary, capricious, or otherwise not in accordance with law. Therefore, no genuine issue of material fact remains on this issue, and defendant is entitled to judgment as a matter of law.

## C. Count VIII

In count VIII, plaintiffs claim SSA failed to furnish earnings records in violation of 26 U.S.C. § 9706.  As outlined in the relevant facts section of this opinion, on September 20, 1995, SSA's Northeasten Program Service Center sent out notices assigning eight (8) miners to USSM and twenty-nine (29) miners to USS.  On September 29, 1995, USSM human resources manager Darrell Lilly requested earnings records for the miners assigned on September 20.  On November 25, 1995, SSA sent Lilly a letter acknowledging receipt of his request that indicated SSA thought he was only requesting records for the miners assigned to USSM and not those assigned to both USSM and USS.  To be perfectly clear about his request, on September 20 Lilly sent the NEPSC a letter stating that he wanted the records for miners assigned to both USS and USSM.  In response, on April 22, 1996, plaintiffs contend that SSA sent Lilly earnings records for the miners assigned to USS on June 30, 1995 rather than the miners assigned to both

companies on September 20, 1995. Plaintiffs did not discover the mistake until

several years later, in 2002. On August 26, 2002, plaintiffs once again requested

the records of the miners assigned on September 20, 1995. SSA did not respond

to this request, and plaintiffs filed count VIII to ask this court to require SSA to

furnish the records. SSA claims that the error apparently stemmed from the wrong

records being attached as part of the administrative record in prior litigation

between the parties, but it maintains that whether plaintiffs received the wrong

records is irrelevant because this count is barred by the statute of limitations, the

doctrine of laches, and plaintiffs' failure to exhaust their administrative remedies.

The statute of limitations governing civil actions against the United States

(other than tort claims) requires that "the complaint is filed within six years after

the right of action first accrues." 28 U.S.C. § 2401(a). This statute does not begin

to run and an agency's action is not subject to review under the APA until the

action becomes "final." Bennett v. Spear, 520 U.S. 154, 177-78 (1997); Georgia

Power Co. v. Teleport Commc'ns Atlanta, Inc., 346 F.3d 1047, 1050 (11th Cir.

2003). Two requirements must be met before an agency action becomes final:

"First, the action must mark the 'consummation' of the agency's decisionmaking

process – it must not be of a merely tentative or interlocutory nature. And second,

the action must be one by which 'rights or obligations have been determined,' or

from which 'legal consequences will flow.'" Bennett, 520 U.S. at 177-78 (internal citations omitted).

Plaintiffs contend that count VIII is not barred by the statute of limitations because there was no final agency action under these facts. This is incorrect. The review procedure under the Coal Act specifically provides that operators have thirty (30) days in which to request earnings records after they receive a notice of assignment. 26 U.S.C. § 9706(f)(1). Once an operator receives those earning records, it has thirty (30) more days in which to request a review of the assignments. § 9706(f)(2). If the operator fails to request such a review within those thirty (30) days, SSA's decision becomes final. § 9706(f)(4). Thus, SSA's decision became final thirty days after the records it sent on April 22, 1996 were received by plaintiffs – regardless of whether they were the correct records. If plaintiffs had examined the records sent on April 22, 2006 *at all*, they would have realized that they had received the wrong ones. Then, they could have immediately notified SSA, requested the correct records, and would have had thirty days from the date they received the correct records in which to file a request for review of the September 20, 1995 assignments. This is the only way that SSA's sending the wrong records might have allowed plaintiffs more time. SSA's sending the wrong records did not toll the statute of limitations with regard

31

to whether there was a final agency action.  However, instead of notifying SSA of

the mistake in a timely fashion, plaintiffs waited more than six years from the time

SSA's determination became final to even look at the records it had received and

then waited two more years to file a claim.  Plaintiffs knew, or should have known,

about this error in April 1996, and they failed to take any action for more than six

years.  Thus, plaintiffs' claim is clearly barred by the statute of limitations.

    The court also agrees that plaintiffs failed to exhaust their administrative

remedies by failing to timely file a request for the earnings records of the USS

miners.  In his September 29, 1995 letter, Mr. Lilly did not explicitly request

records for both USS and USSM.  His letter was written on USSM letterhead and

referenced only "your *letter* dated September 20, 1995."  (AR, Tab 33, at 2084)

(emphasis added).  USS and USSM were sent separate assignment letters; thus, it

would stand to reason that he would reference the "letters" if he were requesting

records for both companies, which have separate employer identification numbers.

The only indication that USSM and USS are related in any way is, of course, their

names and the small print on the USSM letterhead that states it is a subsidiary of

U.S. Steel Corporation.  (See id.)  This is not enough to establish that Mr. Lilly

was requesting records for both companies.  Thus, his request for records of

miners assigned to USS on September 20, 1995 was untimely since it was made on

December 8, 1995. Because it is barred by the statute of limitations and because plaintiffs failed to exhaust their administrative remedies, no genuine issue of material fact remains, and defendant is entitled to judgment as a matter of law on count VIII.

## D. Count IX

In count IX, plaintiffs contend that the Western Program Service Center failed to send them the earnings records of eight miners assigned to USS in October 1993, resulting in a violation of 26 U.S.C. § 9706. Three of the miners – Frederico Lipperini, William Nixon, and Virgil Shawley – were assigned to USS on October 8, 1993. (AR, Tab 30, at 1975-76.) The other five – Leroy Davis, Wilbur Hicks, Fred Kennedy, Otto Laucher, and Mike Makuta – were assigned to USS on October 18, 1993. (AR, Tab 30, at 1991-93.) USS concedes that its claim is barred by the doctrine of res judicata with regard to Lipperini, Nixon, and Shawley, the three miners assigned on October 8. (Pls.' Reply to Def.'s Opp'n 10.) SSA claims that the claim is also barred as to the other five miners by the statute of limitations, the doctrine of laches, and plaintiffs' failure to exhaust their administrative remedies.[13]

---

[13] SSA appears to abandon its res judicata defense with respect to the remaining five miners, focusing instead on the other three defenses. (See Def.'s Opp'n and Reply Br. 19.)

To support this claim, plaintiffs primarily rely on a March 31,1994 letter from the Western Program Service Center promising to send the earnings records of the eight miners at a later date. However, plaintiffs have offered no evidence that they actually ever requested the records of the five miners who were assigned on October 18. Plaintiffs apparently keep copies of such requests because the record contains dozens of other requests from Mr. Lilly to various SSA service centers, and plaintiffs cite to such letters from Mr. Lilly requesting records for miners assigned on September 28 and October 8, 1993 to support count IX. However, neither those two letters nor any of the other ones in the record contain requests for the earnings records of miners who were assigned to USS on October 18, 1993. The Coal Act clearly requires operators to file such a request within thirty (30) days of receiving an assignment. 26 U.S.C. § 9706(f)(1). Plaintiffs apparently failed to do so, and thus failed to exhaust their administrative remedies with regard to these five miners. Therefore, no material issue of fact remains, and defendant is entitled to judgment as a matter of law on count IX.

### E. Counts XII, XV, and XVI

_____In these three counts, plaintiffs challenge the review decisions upholding the assignments of Lee Jones (count XII), Victor Hribar (count XV), and Woodrow Stewart (count XVI). Specifically, plaintiffs dispute, as a matter of law,

34

the validity of a rebuttable presumption SSA uses when assigning miners. When

making assignments, SSA utilizes a rebuttable presumption that a miner who

otherwise qualified for benefits under the Coal Act was employed "in the coal

industry" for purposes of 26 U.S.C. § 9706(a) if (1) his employer was a coal mine

operator that signed a national coal wage agreement, and (2) his employment

occurred during the employer's participation in the national coal wage agreement.

Essentially, this means that SSA assumes such employees worked in UMWA-

covered positions in the coal industry. Plaintiffs contend that (1) SSA acted

arbitrarily and capriciously when it upheld the assignments of these three miners

because it disregarded evidence rebutting the presumption, and (2) the

presumption itself is invalid as a matter of law because it shifts the burden of proof

– not just the burden of production – to the coal operator, forcing it to positively

show that the employee was not employed in the coal industry.

This court is persuaded by the Third Circuit's decision in USX Corp. v.

Barnhart, 395 F.3d 161, 171-72 (3d Circuit 2004). That court held that

> [p]resumptions may, of course be established both by legislative
> bodies and by administrative agencies, but their validity depends as a
> general rule upon a rational nexus between the proven facts and the
> presumed facts. . . . The Commissioner's rebuttable presumption is
> entirely reasonable. As appellants note, beneficiaries' personnel files
> can date back fifty to sixty years, and even a miner's own employer
> can have difficulty retrieving them. The Commissioner's rebuttable

> presumption is a sensible response to this problem. . . . Furthermore, though appellants may do business in other industries, they are (or are related to) signatory operators, i.e., businesses that signed collective bargaining agreements governing the wages to be paid UMWA workers by employers in the coal industry. They are therefore in a position to correct any misapprehensions. The presumption is rebuttable and therefore avoids problematic mechanical operation.

USX Corp., 395 F.3d at 171-72 (internal quotations and citations omitted).

Based on this reasoning, the presumption is not invalid as a matter of law. The presumption is a reasonable response to SSA's administrative difficulties with locating certain records. Because the operators are more likely to have access to such records, SSA requires they produce that evidence to rebut the presumption, which is perfectly reasonable under the circumstances.

Plaintiffs appears to argue that the Third Circuit's holding in USX I only applies to making initial assignments, not to reviewing them. This argument does not make sense, however, because operators are not given a chance to rebut any presumption until the assignment is under review. See 26 U.S.C. § 9706(f). Operators have no input into the initial assignment. Under the terms of the statute, once the operator receives the initial assignment and disagrees, the burden is on the operator to present "a prima facie case of error" supported by evidence. § 9706(f)(2). Then, SSA reviews the assignment based on its records, UMWA's records, and the additional evidence submitted by the operator. Nothing in the

Third Circuit's opinion suggests that it is impermissible to use the rebuttable presumption at that point. In fact, that is the only time an operator would have a chance to rebut the presumption. If an operator fails to offer evidence sufficient to rebut it, the presumption stands.

Alternatively, plaintiffs assert that they did in fact rebut the presumption in these three cases because they submitted sufficient evidence to show these employees did not work in UMWA positions, and SSA upheld the assignments anyway, resulting in final decisions that are arbitrary and capricious.

### 1. Count XII – Lee Jones

USSM contends that Mr. Jones worked for USSM in an oil well warehouse, not in a coal mine. USSM submitted no employment records indicating this fact. USSM did submit the affidavit of a USS representative stating that he spoke with Mr. Jones' nephew, Mr. Vincent Coleman, who spoke with his aunt, Mr. Jones' widow. According to the USS representative, Mr. Coleman stated that his aunt did not believe Mr. Jones had ever worked in a coal mine owned by USS. Further, Mr. Coleman told USSM that the Joneses lived in Charleston, West Virginia during the time Mr. Jones was employed by USS. USSM also submitted the affidavit of the director of employee relations for USSM, who stated that USS did not own any coal mines in the Charleston, West Virginia area during the time Mr.

Jones was employed by USS and that it would not have been feasible for him to commute to any of the other mines USS did own in West Virginia. They also submitted a list of USS facilities from the 1950's, reflecting that there was an oil well warehouse located in Charleston at the time. Despite this evidence, SSA determined that Mr. Jones was properly assigned to USSM. The final review decision provides as follows:

> A review of the earnings records show that the miner listed below [Lee Jones] worked for you for the periods shown. In addition, the UMWA Combined Benefit Fund records show that you were a signatory to an UMWA agreement for the periods shown below. Based on this, we determined that you were a signatory to a 1978 or later UMWA agreement, and the last signatory operator, still in business, to employ the miner in the coal industry under an agreement for at least two years. After working for you, the miner did not work for any other coal industry employer.

(AR, Tab 54, at 4758.)

Even though this court might find plaintiffs' evidence persuasive, under the APA's arbitrary and capricious standard, it "'may not substitute [its] judgment for that of the agency and can set aside an agency's decision only if the agency relied on improper factors, failed to consider important relevant factors, or committed a clear error of judgment that lacks a rational connection between the facts found and the choice made.'" Legal Envtl. Assistance Found., Inc. v. U.S. EPA, 276 F.3d 1253, 1265 (11th Cir. 2001) (quoting Arango v. U.S. Dep't of the Treasury,

38

115 F.3d 992, 928 (11ᵗʰ Cir. 1997)).

In this case, there is no evidence that SSA relied on improper factors, failed

to consider important relevant factors, or committed a clear error of judgment that

lacks a rational connection between the facts and the choice made.  The

Commissioner applied the rebuttable presumption, which is a valid way for an

agency to make a decision.  SSA simply did not believe that USSM met its burden

of rebutting the presumption.  As the Third Circuit pointed out, requiring an

operator to furnish employment records or other evidence to rebut the presumption

is acceptable because the operator is in the best position to provide such evidence.

When an operator cannot provide such evidence and SSA deems the circumstantial

evidence provided by the operator to be insufficient, the presumption is not

rebutted, and SSA's decision stands.  That is apparently what happened in this

case, and this court cannot find that SSA's decision was arbitrary or capricious.

Therefore, no material issue of fact remains, and defendant is entitled to judgment

as a matter of law on count XII.

### 2. Count XV – Victor Hribar

_____Plaintiffs also claim that Victor Hribar did not work for USS or a related

company in a UMWA position.  In support of their appeal to SSA, plaintiffs

submitted evidence that the Combined Fund's records did not show any

39

employment by USS. They also submitted evidence that the Fund's records

indicated that Mr. Hribar was continuously employed by Hillman Coal & Coke in

1952, the year that SSA records showed he worked for USS. Because a miner may

only accrue UMWA-classified service with one employer at a time, USS claims

this evidence dispositively shows Mr. Hribar did not work for USS. Plaintiffs also

submitted the affidavits of (1) a USS employee who spoke with Mr. Hribar's

daughter and reported that she could not recall her father ever working for USS or

a related company, although she did remember that he worked for Hillman in 1952

and (2) record custodians from both USS and USSM stating that neither of them

found employment records indicating that Mr. Hribar had ever worked for either

company. Plaintiffs also claim that SSA sent them an erroneous earnings record

for Mr. Hribar, which interfered with their ability to provide direct evidence

concerning his employment. The first record, which was sent to USS during the

administrative appeal, showed that he worked for Carnegie Illinois Steel

Corporation (a USS subsidiary), while the second record, which was not sent to

USS during the administrative proceedings, indicated that he worked for American

Bridge (a division of U.S. Steel not engaged in the coal industry).

SSA claims that the Combined Fund may not have a record of Mr. Hribar's

work for USS because he did not claim that work for purposes of his pension

benefits. It explains that "the fact that an employee did not list the employment

does not mean that he did not work for the plaintiffs as a miner; it may simply

indicate that he did not need the work credits in order to get full benefits." (Def.'s

Opp'n and Reply Br. 30.)  Further, SSA points out that the first record they sent

USS, a microfiche copy of a page from USS's wage report filed with the IRS for

the fourth quarter of 1952, is more reliable than the second document, a query

extract from SSA's record system identifying one of the many employer

identification numbers used by plaintiffs in filing their wage reports.  In its final

decision, SSA stated in part:

> Review of Hribar's earnings record shows that he had only three
> employers between 1946 and 1976, the last year for which any wages
> are posted.  One employer is not a coal industry employer, one is
> CISC [Carnegie Illinois Steel Corporation], and the other is not an
> assignable company based on the Supreme Court's decision in
> *Eastern*.  Therefore, CISC is the only operator that employed Hribar
> under an UMWA agreement, and (although inactive) is the only
> company related to an assignable company under the provisions of
> the Coal Act.
>
> SEPSC asked the Funds to verify any covered work for CISC for
> 1952.  The Funds replied that the only evidence it has is the miner's
> earnings record which shows posted earnings from the 4th quarter of
> 1952 for CISC.  They had no record to indicate the type of work
> performed, and the miner did not claim the work. . . .
>
> Absent evidence to the contrary, work for a signatory operator during
> a signatory period is assumed to be covered.  Therefore, the evidence

41

> USSM provided does not refute the assumption that Hribar's work for
> CISC was in an UMWA classified position. CISC is not in business.
> However, it is related to USSM.

(AR, Tab 64, at 4938-39.)

Once again, even if the court is persuaded by the evidence plaintiffs

submitted in support of their administrative appeal, there is simply no evidence

before the court at this stage of the proceedings to indicate that SSA relied on

improper factors, failed to consider important relevant factors, or committed a

clear error of judgment that lacks a rational connection between the facts and the

choice made. SSA applied its presumption and considered all of the evidence

submitted by USSM and available from the Combined Funds. In light of that

evidence, it arrived at a conclusion plaintiffs view as unfavorable. However, it is

neither arbitrary nor capricious. Therefore, no material issue of fact remains, and

defendant is entitled to judgment as a matter of law on count XV.

### 3. Count XVI – Woodrow Stewart

_____Plaintiffs contend that Mr. Stewart, like Mr. Lee and Mr. Hribar, never

worked for USS in the coal industry. In support of their appeal of his assignment,

plaintiffs submitted a letter from UMWA indicating that Mr. Stewart only claimed

work for Black Band Company and Jackson Mining Company, and never for USS.

They also submitted the affidavit of the director of employee relations for USSM,

who stated that USS did not own any coal mines in the Charleston, West Virginia area during the time Mr. Stewart was employed by USS and that it would not have been feasible for him to commute to any of the other mines USS did own in West Virginia. That affidavit further stated plaintiffs believed that, like Mr. Jones, Mr. Stewart worked in the oil drilling equipment warehouse in Charleston, where USS suspected Mr. Stewart lived for most of his life because his earnings records contain almost exclusively Charleston employers. In addition, just as they did in Mr. Jones' case, plaintiffs submitted a list of USS facilities from the 1950's, reflecting that there was an oil well warehouse located in Charleston at the time.

As it did in Mr. Hribar's case, SSA counters that the fact employment is not listed in the Combined Fund's records is not determinative, especially because Mr. Stewart's earnings records indicate he worked for companies in Cleveland, Chicago, and New York.[14]  (See AR, Tab 24, at 1104-09.) It also points out that USSM did have coal mines in Filbert, Gary, and Thorpe, West Virginia,[15] all three

---

[14] Plaintiffs argue, and reasonably so, that the locations listed on his earnings records may not be indicative of where Mr. Stewart actually worked but instead reflect the corporate headquarter locations for the companies. While this argument is certainly persuasive, it does not rise to the level of showing that SSA's decision was arbitrary or capricious.

[15] Plaintiffs argue that both Mr. Stewart and Mr. Jones could not have lived in Charleston, West Virginia and feasibly commuted to any of these mines. While this certainly seems to be a plausible argument considering the distance between Charleston and these locations (Filbert is 140 miles away, Gary is 137 miles away, and Thorpe is 134 miles away), there is not enough evidence to show that Mr. Stewart and Mr. Jones did not work in these mines. Perhaps they

of which were NBCWA signatories from January 1, 1951 through December 6,

1977.  (See AR, Tab 26, at 1465-66.)  SSA's final review decision of Mr.

Stewart's assignment stated as follows:

> A review of the earnings record shows that the miner listed below
> worked for USX for the period shown below.  In addition, the
> UMWA Combined Benefit Fund records show that USX was a
> signatory to an UMWA agreement for the period shown below.
> Based on this, we determined that USX employed the miner in the
> coal industry under an UMWA agreement, and employed the miner
> under an UMWA agreement for the longest period of time before
> 1978.  We also determined that USSM is related to USX.  Although
> USX is still in business, we assigned USSM the responsibility for
> payment of the health and death premiums for the miner listed below.
> Under the Coal Act, each related company is jointly and severally
> liable for the payment of those premiums.  After working for USX,
> none of that subsequent employment was with a signatory operator
> that is assignable under the provisions of the [C]oal Act.

(USS App. 31, at 197.)

As in the cases of Mr. Jones and Mr. Hribar, there is no evidence that SSA

relied on improper factors, failed to consider important relevant factors, or

committed a clear error of judgment that lacks a rational connection between the

facts and the choice made.  Once again, SSA applied its presumption and

considered all of the evidence submitted by USSM and available from the

---

lived in a rural area halfway between Charleston and one of these cities, or perhaps they
maintained a separate, part-time residence and worked a swing shift at the mines (7 days on, 7
days off).  This is merely circumstantial evidence and conjecture and is not enough to show that
SSA's decision is arbitrary and capricious.

Combined Funds. In light of that evidence, it arrived at a conclusion plaintiffs view as unfavorable. However, it is neither arbitrary nor capricious. Therefore, no material issue of fact remains, and defendant is entitled to judgment as a matter of law on count XVI.

## F. Count XIV

In count XIV, plaintiffs challenge SSA's assignment of Peter Sabrese on the ground that he worked for USS in the steel industry, not the coal industry. Mr. Sabrese was employed by U.S. Steel from 1951 through 1964 in their Dearth Plant, which was a beehive coke operation that produced "coke," a product made from coal that is used to make steel. USS claims that this employment does not qualify as employment "in the coal industry" for purposes of the Coal Act. In support of their appeal, they submitted (1) evidence that Mr. Sabrese only worked in a beehive coke oven and (2) the affidavit of a USS manager responsible for job description and classification stating that work in a coke oven is a job in the steel industry, not in the coal industry.

SSA verified Mr. Sabrese's employment with the Combined Funds, and their records showed that (1) Mr. Sabrese was an eligible beneficiary, (2) he was covered by an UMWA wage agreement while employed by USSM's related person, Frick Coal & Coke, (3) he claimed his work for USSM when he filed for

his pension, and (4) his work was considered by UMWA in determining his

eligibility for pension and health benefits under the coal wage agreement. (See

AR, Tab 51, at 4623; USS App. 34, at 215.) While it might be questionable

whether working in a coke oven is classified as employment "in the coal industry"

or "in the steel industry," plaintiffs have offered no evidence that SSA relied on

improper factors, failed to consider important relevant factors, or committed a

clear error of judgment that lacks a rational connection between the facts and the

choice made. SSA's decision was perfectly reasonable based upon the

information verified by UMWA. Thus, the decison is neither arbitrary nor

capricious, no material issues of fact remain, and defendant is entitled to judgment

as a matter of law on this claim.

## G. Count XVII

_____In count XVII, plaintiffs challenge the assignment of Curtis Anderson to

USSM on the grounds that Mr. Anderson should have been assigned to another

signatory operator because he worked for another company longer than he worked

for USSM. Plaintiffs readily admit that Mr. Anderson did work for USSM in the

coal industry between 1946 and 1948. However, they also claim that his SSA

earnings records show that he worked for Navistar International, formerly

International Harvester, between 1949 and 1963. Because he worked for Navistar

longer, plaintiffs claim that Mr. Anderson's assignment to USSM violated the

three-tier assignment system mandated by the Coal Act. SSA counters that neither

Navistar nor a related company was a signatory to an UMWA agreement, and thus

the company cannot be assigned liability under the Coal Act. Plaintiffs offered no

evidence to dispute this contention. Thus, SSA's decision upholding the

assignment of Mr. Anderson was neither arbitrary nor capricious, no material issue

of fact remains, and defendant is entitled to judgment as a matter of law on count

XVII.

In conclusion, no material issues of fact remain and defendant is entitled to

judgment as a matter of law on counts II, III, VI, VIII, IX, XII, XIV, XV, XVI, and

XVII. Defendant-intervenors are also entitled to summary judgment on counts II

and III. Accordingly, plaintiffs' motion for summary judgment is denied. A

separate order to this effect will be entered. Consideration of summary judgment

as to counts IV, V, and VII is stayed pending additional discovery, and a separate

opinion will be issued regarding those claims. (See doc. 82.)

_____DONE this 20th day of June, 2006.

VIRGINIA EMERSON HOPKINS
United States District Judge

47