IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PEABODY COAL CO., LLC, and<br>EASTERN ASSOCIATED COAL<br>CORP.,<br><br>   Plaintiffs,<br><br>  v.<br><br>JO ANNE B. BARNHART,<br><br>   Defendant,<br><br>  and<br><br>TRUSTEES OF THE UNITED MINE<br>WORKERS OF AMERICA COMBINED<br>BENEFIT FUND,<br><br>   Intervenor<br>   Defendant. | Civ. No. 05-671-SLR |

Jason A. Cincilla, Esquire, Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: John
R. Woodham, Esquire, and W. Gregory Mott, Esquire, Ogletree,
Deakins, Nash, Smoak & Stewart, P.C., Washington, D.C.

Patricia C. Hannigan, Esquire, United States Attorney's Office,
Wilmington Delaware. Counsel for Defendant. Of Counsel: Eric
R. Womack, Esquire, United States Department of Justice,
Washington, D.C.

Carolyn Shelly Hake, Esquire, Ashby & Geddes, Wilmington,
Delaware. Counsel for Intervenor Defendant. Of Counsel:
Christopher F. Clarke, Esquire, Office of the General Counsel,
UMWA Health & Retirement Funds, Washington, D.C.

**MEMORANDUM OPINION**

Dated: January 11 , 2007
Wilmington, Delaware

ROBINSON, Chief Judge

## I.   INTRODUCTION

On September 14, 2005, Peabody Coal Company, LLC ("Peabody")
and Eastern Associated Coal Corporation ("EACC") (collectively,
"plaintiffs") filed suit against defendant Jo Anne B. Barnhart
("Barnhart"), the Commissioner of the Social Security
Administration ("SSA").  (D.I. 1)  Plaintiffs' complaint alleges
that Barnhart's decision[1] to assign them responsibility for
funding health and death benefits for certain retired coal
industry employees violated both § 9706 of the Coal Industry
Retiree Health Benefit Act of 1992 ("Coal Act"), 26 U.S.C. §§
9701 et seq., and §§ 702 and 706 of the Administrative Procedure
Act ("APA"), 5 U.S.C. §§ 551-559, 701-706.  (D.I. 1, passim)  On
March 10, 2006, the Trustees of the United Mine Workers of
America Combined Benefit Fund ("Trustees") filed an unopposed
motion to join the instant litigation as an intervenor defendant
(D.I. 6), which the court granted.

Presently before the court are defendant Barnhart's motion
to dismiss the complaint for failure to state a claim (D.I. 9),
and defendant Trustees' and plaintiffs' respective motions for
summary judgment.  (D.I. 13, 15)  The court has jurisdiction over

---

[1]The decision currently being challenged by plaintiffs was
actually made by Kenneth S. Apfel, who served as Commissioner of
the SSA from September 29, 1997 to January 20, 2001.  The SSA,
however, under the direction of defendant Barnhart, continues to
enforce and defend Apfel's policy; consequently, for the purposes
of this opinion, the court will attribute the reassignments at
issue in the case at bar to Commissioner Barnhart.

this matter pursuant to 28 U.S.C. § 1331; 5 U.S.C. §§ 701 et
seq.; 28 U.S.C. § 2201; and 26 U.S.C. § 9721.  Venue is proper
under 28 U.S.C. § 1391(e).

## II.  BACKGROUND[2]

### A.  History of Benefits Plans for American Coal Workers[3]

"For a good part of this century, employers in the coal
industry have been involved in negotiations with the United Mine
Workers of America [("UMWA")] regarding the provision of employee
benefits to coal miners."  Eastern Enters. v. Apfel, 524 U.S.
498, 504 (1998) (plurality opinion).  In 1946, after almost a
decade of lobbying by the UMWA which culminated in a nationwide
strike by mine workers, the federal government intervened in the
coal industry.  Id. at 504-05.  The resulting Krug-Lewis
Agreement of 1946 "led to the creation of benefit funds [for mine
workers], financed by royalties on coal produced and payroll
deductions.  The funds compensated miners and their dependents
and survivors for wages lost due to disability, death, or
retirement . . . . [and] provided for the medical expenses of
miners and their dependents . . . ."  Id. at 505.

_____

[2]For an unabridged history of the Coal Act and its
predecessors, see Eastern Enterprises v. Apfel, 524 U.S. 428
(1998) (plurality opinion).

[3]For brevity's sake, the court has omitted, in this
subsection only, the internal citations used by the Supreme Court
in its Eastern opinion.

Soon thereafter, "the UMWA and several coal operators entered into the National Bituminous Coal Wage Agreement of 1947 [("1947 Agreement")], which established the United Mine Workers of America Welfare and Retirement Fund" ("1947 Fund"). Id. Due to disagreements over which kinds of benefits were owed to miners under the 1947 Agreement, "a new multiemployer trust [called] the United Mine Workers of America Welfare and Retirement Fund of 1950" ("1950 Fund") was established. Id. at 506.

> As with the 1947 [] Fund, the 1950 [] Fund was governed by three trustees chosen by the parties and vested with responsibility to determine the level of benefits. . . . Between 1950 and 1974, the 1950 [Agreement] was amended on occasion, and new [agreements] were adopted in 1968 and 1971. Except for the increases in the amount of royalty payments, however, the terms and structure of the 1950 [] Fund remained essentially unchanged.

Id. The 1950 Agreement established a "pay-as-you-go" system, and miners were not promised any specific benefits. See id. at 506-07. According to the Supreme Court, "it is clear that the 1950 [] Fund did not, by its terms, guarantee lifetime health benefits for retirees and their dependents," id. at 508; in fact, "[s]ubsequent annual reports of the 1950 [] Fund reiterated that benefits were subject to change," id. at 507.

The enactment of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., necessitated the abandonment of the 1950 Fund's "pay-as-you-go" process in favor of "specific funding and vesting requirements for pension plans."

3

Eastern, 524 U.S. at 509.  Compliance with ERISA was achieved

through creation of the National Bituminous Coal Wage Agreement

of 1974 ("1974 Agreement"),

> which created four trusts, funded by royalties on coal
> production and premiums based on hours worked by
> miners, to replace the 1950 [] Fund.  Two of the new
> trusts, the UMWA 1950 Benefit Plan and Trust [("1950
> Plan")] and the UMWA 1974 Benefit Plan and Trust
> [("1974 Plan")], provided nonpension benefits,
> including medical benefits.  Miners who retired before
> January 1, 1976, and their dependents were covered by
> the 1950 [] Plan, while active miners and those who
> retired after 1975 were covered by the 1974 [] Plan.
>      The 1974 [Agreement] thus was the first agreement
> between the UMWA and the [Bituminous Coal Operators'
> Association ("BCOA")] to expressly reference health
> benefits for retirees; prior agreements did not
> specifically mention retirees, and the scope of their
> benefits was left to the discretion of fund trustees. .
> . . Despite the expanded benefits, the 1974 [Agreement]
> did not alter the employers' obligation to contribute
> only a fixed amount of royalties, nor did it extend
> employers' liability beyond the life of the agreement.

Id.

The 1950 and 1974 Plans soon began running into funding

problems, leading to the formation of yet another agreement

("1978 Agreement") which "assigned responsibility to signatory

employers for the health care of their own active and retired

employees.  The 1974 [] Plan remained in effect, but only to

cover retirees whose former employers were no longer in

business."[4]  Id. at 510.  Furthermore,

---

[4]Under the Coal Act, "a person [is] considered to be in
business if such person conducts or derives revenue from any
business activity, whether or not in the coal industry."  26
U.S.C. § 9701(c)(7).

4

> [t]o ensure the [] Plans' solvency, the 1978
> [Agreement] included a "guarantee" clause obligating
> signatories to make sufficient contributions to
> maintain benefits during that agreement, and
> "evergreen" clauses were incorporated into the [] Plans
> so that signatories would be required to contribute as
> long as they remained in the coal business, regardless
> of whether they signed a subsequent agreement.

Id. Only at this point in time did "the coal operators'

liability to the [] Plans shift[] from a defined contribution

obligation, under which employers were responsible only for a

predetermined amount of royalties, to a form of defined benefit

obligation, under which employers were to fund specific

benefits."  Id. at 510-11.

Even after implementing these changes in 1978, financial

troubles continued to plague the Funds as costs rose and an

increasing number of signatories withdrew from the 1978

Agreement.  See id. at 511.  "In 1988, the UMWA and BCOA

attempted to relieve the situation by imposing withdrawal

liability on . . . signatories who seceded from the [] Plans."

Id.  The ameliorative measures employed by the 1988 Agreement

failed to alleviate the 1950 and 1974 Plans' funding problems.

See id.

In 1992, galvanized in part by concerns "that retired miners

might not receive the benefits promised to them," id. at 513,

Congress passed the Coal Act, 26 U.S.C. §§ 9701 et seq., which,

as of February 1, 1993, "merged the 1950 and 1974 [] Plans into a

new[,] [private] multiemployer plan called the United Mine

Workers of America Combined Benefit Fund ('Combined Fund')" and guaranteed that retirees and their dependents would continue to receive "'substantially the same'" benefits as they had under the prior plans, Eastern, 524 U.S. at 514; see also 26 U.S.C. § 9702(a)(1).

## B.   The Coal Act

The Coal Act, which qualifies as an employee benefit plan under ERISA, see 26 U.S.C. § 9702(a)(3)(B), secures health and death benefits for (1) coal industry retirees "who, on July 20, 1992, [were] eligible to receive, and [were] receiving, benefits from the [1950 Plan] or the [1974 Plan], or (2) on such date [were] eligible to receive, and [were] receiving, benefits in either such plan by reason of a relationship to such retiree," id. § 9703(f). Assigned operators (or "[a]ny related person with respect to such an assigned operator"⁵) were made liable for

---

⁵With regard to signatory operators ("a person which is or was a signatory to a coal wage agreement"), the Coal Act defines a "related person" as:

(i) a member of the controlled group of corporations .
. . which includes such signatory operator;
(ii) a trade or business which is under common control
. . . with such signatory operator; or
(iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner.

6

underwriting the Combined Fund through payment of annual

premiums. See id. § 9704(a). The 1950 and 1974 Plans were

charged with covering costs the Combined Fund had incurred before

February 1, 1993. See id. § 9704(i)(3).

Section 9706 of the Coal Act set a deadline of October 1,

1993, by which date the Commissioner of the SSA was required

> [to] assign each coal industry retiree who [was] an
> eligible beneficiary to a signatory operator which (or
> any related person with respect to which) remain[ed] in
> business in the following order:
>
> (1) First, to a signatory operator which –
>
>> (A) was a signatory to the 1978 [Agreement] or any
>> subsequent coal wage agreement and
>>
>> (B) was the most recent signatory operator to
>> employ the coal industry retiree in the coal
>> industry for at least 2 years.
>
> (2) Second, if the retiree [was] not assigned under
> paragraph (1), to the signatory operator which –
>
>> (A) was a signatory to the 1978 [Agreement] or any
>> subsequent coal wage agreement and
>>
>> (B) was the most recent signatory operator to
>> employ the coal industry retiree in the coal
>> industry.

---

A related person shall also include a successor in
interest of any person described in clause (i), (ii),
or (iii).

26 U.S.C. §§ 9701(c)(1), (c)(2)(A). The relationships identified
in the above clauses were to be "determined as of July 20, 1992,
except that if, on July 20, 1992, a signatory operator [was] no
longer in business, the relationships [would] be determined as of
the time immediately before such operator ceased to be in
business. Id. § 9701(c)(2)(B).

7

(3) Third, if the retiree [was] not assigned under
paragraph (1) or (2), to the signatory operator which
employed the coal industry retiree in the coal industry
for a longer period of time than any other signatory
operator prior to the effective date of the 1978
[Agreement].

Id. § 9706(a).[6]  Section 9706 also states, however, that

"[e]mployment with (i) a person which is (and all related persons

with respect to which are) no longer in business, or (ii) a

person during a period during which such person was not a

signatory to a coal wage agreement" would not be taken into

account when making said assignments.  Id. § 9706(b)(1)(B).

    In the case of beneficiaries for whom no statutorily-defined

signatory operators exist ("unassigned beneficiaries"), the Coal

Act states that "[t]he unassigned beneficiaries premium for any

plan year for any assigned operator shall be equal to the

_____

    [6]Plaintiff Peabody Coal Co. has already challenged the
Commissioner's statutory authority to make such assignments after
the October 1, 1993 deadline set forth in § 9706 of the Coal Act.
See Barnhart v. Peabody Coal Co., 537 U.S. 149 (2003).   The
United States Supreme Court ruled in favor of the Commissioner:

    To accept the [coal] companies' argument that the
    specified date for action is jurisdictional would be to
    read the Act so as to allocate not the greatest, but
    the least, number of beneficiaries to a responsible
    operator.  The way to reach the congressional objective
    [behind the Coal Act], however, is to read the
    statutory date as a spur to prompt action, not as a bar
    to tardy completion of the business of ensuring that
    benefits are funded, as much as possible, by those
    identified by Congress as principally responsible.

Id. at 172.

applicable percentage [7] of the product of the per beneficiary premium for the plan year multiplied by the number of eligible [unassigned] beneficiaries . . . ." Id. § 9704(d). Assigned operators' contributions to the Combined Fund are supplemented yearly by funds collected under § 1232(h) of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1232(h), a transfer intended "to proportionately reduce the unassigned beneficiary premium . . . of each assigned operator." 26 U.S.C. § 9705(b).

## C. Eastern Enterprises v. Apfel

The petitioner in Eastern, a coal operator named Eastern Enterprises ("Eastern"), was founded in 1929. See Eastern Enters. v. Apfel, 524 U.S. 498, 504 (1998) (plurality opinion[8]). While engaged in the coal mining business, Eastern signed every Agreement enacted between 1947 and 1964, contributing over $60 million to the 1947 and 1950 Funds. See id. at 516. In 1965,

---

[7]"The term 'applicable percentage' means, with respect to any assigned operator, the percentage determined by dividing the number of eligible beneficiaries assigned under section 9706 to all such operators (determined on the basis of assignments as of October 1, 1993)." 26 U.S.C. § 9704(f)(1). The Coal Act also contains a method for redetermining the applicable percentage for each assigned operator "[i]n the case of any plan year beginning on or after October 1, 1994." Id. § 9704(f)(2).

[8]Chief Justice Rehnquist and Justices Thomas and Scalia joined Justice O'Connor's plurality opinion, which addressed only Eastern's Takings Clause argument. Justice Kennedy, whose decision was grounded in substantive due process principles, concurred in the judgment. See Eastern, 524 U.S. at 539-50 (Kennedy, J., concurring in the judgment and dissenting in part).

9

Eastern transferred its coal-related operations to EACC, one of
its subsidiaries. This transfer "was described in Eastern's
federal income tax return as an agreement by EACC to assume all
of Eastern's liabilities arising out of coal mining and marketing
operations in exchange for Eastern's receipt of EACC stock." Id.
Eastern received over $100 million in dividends from its stock
holdings in an EACC subsidiary between 1965 and 1987, when it
sold this interest to Peabody. See id. "Under the terms of the
agreement effecting the transfer, Peabody, CPC [(the EACC
subsidiary)], and EACC assumed responsibility for payments to
certain benefit plans, including the 'Benefit Plan for UMWA
Represented Employees of EACC and Subs.'" Id.

After the Coal Act was enacted in 1992, "the Commissioner
[of the SSA] assigned to Eastern the obligation for Combined Fund
premiums respecting over 1,000 retired miners who had worked for
the company before 1966, based on Eastern's status as the pre-
1978 signatory operator for whom the miners had worked for the
longest period of time." Id. at 517 (citing 26 U.S.C. §
9706(a)). This assignment, if valid, would cost Eastern more
than $5 million per year even though it had not signed any of the
wage agreements enacted after the year 1964. In light of that
fact, Eastern sued the Commissioner of the SSA, the Combined
Fund, and the Combined Fund's trustees, "assert[ing] that the
Coal Act, either on its face or as applied, violate[d]

10

substantive due process and constitute[d] a taking of its
property in violation of the Fifth Amendment.  Eastern also
challenged the Commissioner's interpretation of the Coal Act."
Id.  The United States District Court for the District of
Massachusetts granted, and the Court of Appeals for the First
Circuit affirmed, summary judgment in the Commissioner's favor.
See id. at 517-19.  The United States Supreme Court then granted
a writ of certiorari.

     The Court's analysis of the Coal Act in Eastern "[was]
informed by [its] previous decisions considering the
constitutionality of somewhat similar schemes."  Id. at 524.  One
such decision stated that "'legislative Acts adjusting the
burdens and benefits of economic life come to the Court with a
presumption of constitutionality, and . . . the burden is on one
complaining of a due process violation to establish that the
legislature has acted in an arbitrary and irrational way,'"
although "stricter limits may apply to Congress' authority when
legislation operates in a retroactive manner."  Id. (omission in
original) (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S.
1, 15, 16-17 (1976)).  Upon review of these prior cases, Justice
O'Connor, writing for the plurality, stated that "[o]ur opinions
. . . make clear that Congress has considerable leeway to fashion
economic legislation, including the power to affect contractual
commitments between private parties.  Congress also may impose

                              11

retroactive liability to some degree, particularly where it is 'confined to short and limited periods required by the practicalities of producing national legislation.'"  Id. at 528 (quoting Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 731 (1984)).  Justice O'Connor cautioned, however, that "[o]ur decisions . . . have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience."  Id. at 528-29.

In determining that "the Coal Act's allocation scheme, as applied to Eastern, present[ed] such a case" of unconstitutional retroactive liability, the plurality "appl[ied] the three factors that traditionally have informed [the Court's] regulatory takings analysis," id. at 529:  "'[t]he economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action,'" id. at 523-24 (quoting Kaiser Aetna v. United States, 444 U.S. 164, 175 (1979)).[9]  Ultimately, the plurality found that

_____

[9]According to the plurality, "the process for evaluating a regulation's constitutionality involves an examination of the 'justice and fairness' of the governmental action."  While such determination "is essentially ad hoc and fact intensive" and "does not lend itself to any set formula," the three above-listed factors "have particular significance."  Eastern, 524 U.S. at 523 (citations omitted).

12

> the nature of the governmental action in this case is
> quite unusual.  That Congress sought a legislative
> remedy for what it perceived to be a grave problem in
> the funding of retired coal miners' health benefits is
> understandable . . . . When, however, that
> [legislative] solution singles out certain employers to
> bear a burden that is substantial in amount, based on
> the employers' conduct far in the past, and unrelated
> to any commitment that the employers made or to any
> injury they caused, the governmental action implicates
> fundamental principles of fairness underlying the
> Takings Clause.  Eastern cannot be forced to bear the
> expense of lifetime health benefits for miners based on
> its activities decades before those benefits were
> promised.  Accordingly, in the specific circumstances
> of this case, we conclude that the Coal Act's
> application to Eastern effects an unconstitutional
> taking.

Id. at 537.  Because it had already "determined that the third

tier of the Coal Act's allocation scheme violate[d] the Takings

Clause as applied to Eastern," the plurality declined to address

the petitioner's due process claim, nor did it "consider the

first two tiers of the Act's allocation scheme, 26 U.S.C. §§

9706(a)(1) and (2), as the liability that [had] been imposed on

Eastern [arose] only under the third tier[,]" id. § 9706(a)(3).

Eastern, 524 U.S. at 538.

Justice Kennedy "disagree[ed] with the plurality's Takings

Clause analysis" because he deemed it "incorrect and quite

unnecessary for decision of the case"; despite this, he concurred

in the plurality's judgment because he found, under a due process

analysis, that the Coal Act was "arbitrary and beyond the

legitimate authority of the government to enact."  Id. at 539

(Kennedy, J., concurring in the judgment and dissenting in part).

13

## D.  Post-**Eastern** Developments[10]

After the Eastern decision was handed down in 1998, "the
Commissioner voided [the] assignments she had previously made to
Eastern Enterprises pursuant to section 9706(a)(3).  Consistent
with judicial retroactivity principles, she also voided
assignments to other 'similarly situated' coal operators, i.e.,
those who had not signed a 1974 or later [Agreement]" or were not
a "related person" to such a signatory operator.  (D.I. 17 at 8-
9)  At first, the Commissioner reallocated those beneficiaries
affected by the Eastern decision ("Eastern Beneficiaries") to the
"unassigned" pool.  In 1999, however, the SSA began reexamining
the Eastern Beneficiaries' work histories in order to determine
whether they could be reassigned to signatory operators other
than Eastern in a manner consistent with both the three-tiered
scheme set forth in § 9706 of the Coal Act and the Supreme
Court's decision in Eastern.  (Id. at 9)  The Commissioner
subsequently reassigned a large number of Eastern Beneficiaries
to operators (including the plaintiffs in the case at bar) which

---

[10]While the facts and quotations in this subsection were
taken from plaintiffs' opening brief, they are generally
consistent with the "Statement of Facts" presented in the opening
brief of each defendant.

14

had, unlike Eastern, signed a coal wage agreement in or after the year 1974.  (Id. at 10)

Plaintiffs aver that, "in 1999, SSA assigned 83 UMWA retirees to Peabody and 9 UMWA retirees to EACC. . . . [U]nder the Coal Act each [plaintiff] is responsible for the premium obligations of the other."  (D.I. 16 at ¶ 7)  According to plaintiffs, these 92 assignees "collectively accounted for 122 individuals who were" alive as of February 1993 and whose benefits plaintiffs were responsible for funding.  (Id. at ¶ 8)  Plaintiffs calculate that, "through and including [Fiscal Year] 2006, [plaintiffs] have been assessed $2,433,806 in premiums by the Combined Fund with respect to the beneficiaries SSA assigned to them in 1999."  (Id.)

The instant litigation questions the propriety of the Commissioner's decision to reassign as many "orphaned" Eastern Beneficiaries as possible to those signatory operators (or their related persons) who, after Eastern-type operators were removed from consideration, had the closest relationship to those Beneficiaries under the hierarchical scheme set forth in the Coal Act.  Plaintiffs' complaint "demand[s] judgment against the Commissioner and pray[s] for the following relief":

> (1) an order "declaring that the Commissioner's policy of treating the statutorily designated signatory of Eastern Beneficiaries as constructively out of business is ultra vires [and] violates § 9706 of the Coal Act";

15

(2) an order vacating the Commissioner's assignment to plaintiffs of any <u>Eastern</u> Beneficiaries;

(3) an order "requiring the Commissioner to inform the UMWA Combined [] Fund that the <u>Eastern</u> Beneficiary assignments to [plaintiffs] are void <u>ab initio</u> and have been revoked";

(4) an order "enjoining the Commissioner from making any future assignments of <u>Eastern</u> Beneficiaries to [plaintiffs] or to any related person to [plaintiffs]"; and

(5) any additional relief that the court "deems equitable and just."

(D.I. 1 at 5-6)

In support of their position, plaintiffs argue that:  (1) under the three-part scheme laid out in § 9706 of the Coal Act, Eastern and the other super reachback operators[11] are the proper assigned operators for the <u>Eastern</u> Beneficiaries; (2) the Supreme Court has held that super reachback operators cannot constitutionally be held accountable for funding the <u>Eastern</u> Beneficiaries' benefit plans; (3) "[u]nlike other federal statutes . . . the Coal Act does not provide for 'next-in-line' or 'drop back' assignments"; (4) "Congress neither authorized nor directed the Commissioner to search for an alternate assignee" for the <u>Eastern</u> Beneficiaries; and (5) "the Coal Act clearly provides that where a beneficiary cannot be assigned to a particular operator under the specific assignment rules laid down in section 9706[,] he is allocated to the unassigned pool," not

---

[11]Plaintiffs define "super reachback companies" as former employers of coal workers "that did not sign a 1974 or later UMWA coal wage agreement."  (D.I. 17 at 1 n.1)

to an alternate assignee.  (D.I. 17 at 2-4)  According to plaintiffs, when the Court's decision in <u>Eastern</u> invalidated the way § 9706 had been applied to super reachback operators, the Commissioner was not subsequently free to pretend, for reassignment purposes, that those operators had never existed.[12] (<u>Id.</u> at 28)  "For purposes of construing the assignment rules post-<u>Eastern</u>," plaintiffs contend, "the Commissioner cannot simply ignore section 9706(a)(3), which states that the **only** responsible operator for super reachback beneficiaries is the former employer who employed the miner longest."  (<u>Id.</u> (emphasis added))  "Accordingly," plaintiffs state,

> allocating the [<u>Eastern</u> Beneficiaries] to the unassigned pool is not only required by the language of section 9706, it is also the only result consistent with the congressional goal of moderating the financial impact of the legislation on the 1978 and subsequent [Agreement] signatory companies.  The Commissioner's unilateral decision to shift to [p]laintiffs the very financial burden that Congress determined should be assigned to pre-1978 signatories like Eastern Enterprises undercuts the compromise financing scheme Congress delineated in section 9706.

(<u>Id.</u> at 34)

---

[12] "Plaintiffs agree that the effect of retroactivity jurisprudence means the super reachback companies were never eligible to receive assignments, and that those assignments were invalid from the beginning.  However, [they argue,] this provides no insight or guidance as to what happens to those beneficiaries post-<u>Eastern</u>.  That is a separate question which can be resolved only by examining the statutory provisions unaffected by the <u>Eastern</u> decision."  (D.I. 17 at 28)

17

Defendant Barnhart maintains that, after Eastern, "the
Commissioner was forced to react to a decision of the Supreme
Court declaring one express application of the statute
unconstitutional. Because Congress did not predict such an
outcome[,] the only question for the Court is whether the
Commissioner's action in light of Eastern Enterprises was
consistent with the intent of Congress and the purpose of the
Coal Act." (D.I. 19 at 4) Defendant Trustees likewise asserts
that

> severability jurisprudence teaches that there is only
> one question that this court needs to answer to
> determine whether SSA properly assigned Eastern
> beneficiaries to Peabody. That question is whether
> Congress's intent is best served by assigning Eastern
> beneficiaries to coal operators such as Peabody for
> whom they worked (as SSA concluded and the Trustees
> contend), or by leaving those beneficiaries permanently
> unassigned and having their health care costs covered
> by transfers from [alternate sources, including] . . .
> coal operators who did not employ them.

(D.I. 14 at 11-12) According to Trustees, "the plain language of
the Coal Act cannot resolve this issue"; therefore, it contends,

> this [c]ourt can take one of two alternative
> approaches. The first approach is for this [c]ourt to
> construe the Coal Act in the light of Eastern in the
> manner that will best effectuate the manifest purposes
> of Congress in enacting the Coal Act. The second
> approach is for this [c]ourt to conclude that such a
> task is more appropriately left to SSA, the agency
> charged with making assignments under the Coal Act.

(Id. at 12) Defendants also contend that the decision of the
Commissioner, the head of the agency charged with administering

18

the Coal Act, is entitled to deference. (D.I. 10 at 16; D.I. 14
at 18)

Plaintiffs have filed a motion for summary judgment against
both defendants (D.I. 15), arguing that "[t]he Commissioner
exceeded her authority when, in the wake of Eastern, she
administratively allocated to [p]laintiffs the $2.4 million (to
date) financial burden of providing health care benefits for 92
retirees that Congress directed be assigned to super reachback
companies" (D.I. 17 at 4 ¶ 6). Defendant Barnhart filed a motion
to dismiss plaintiffs' claims; this was followed by intervenor
defendant Trustees' motion for summary judgment. (D.I. 9, 13)
Both defendants contend that the Commissioner's method for
reassigning Eastern Beneficiaries was a valid reading of both
congressional intent with respect to the Coal Act and the Supreme
Court's holding in Eastern. (See generally D.I. 10, 14)

## III. STANDARD OF REVIEW

### A. Motion to Dismiss

In analyzing a motion to dismiss pursuant to Fed. R. Civ. P.
12(b)(6), the court must accept as true all material allegations
of the complaint and it must construe the complaint in favor of
the plaintiff. See Trump Hotels & Casino Resorts, Inc. v. Mirage
Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998). "A complaint
should be dismissed only if, after accepting as true all of the
facts alleged in the complaint, and drawing all reasonable

19

inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." Id. Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The moving party has the burden of persuasion. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).

## B. Motion for Summary Judgment

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come

20

forward with 'specific facts showing that there is a genuine
issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R.
Civ. P. 56(e)). The court will "view the underlying facts and
all reasonable inferences therefrom in the light most favorable
to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63
F.3d 231, 236 (3d Cir. 1995). The mere existence of some
evidence in support of the nonmoving party, however, will not be
sufficient for denial of a motion for summary judgment; there
must be enough evidence to enable a jury reasonably to find for
the nonmoving party on that issue. See Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party
fails to make a sufficient showing on an essential element of its
case with respect to which it has the burden of proof, the moving
party is entitled to judgment as a matter of law. See Celotex
Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Persuasive Case Law

At present, six federal courts have upheld the power of the
Commissioner of the SSA to make assignments such as the ones at
issue in the case at bar.[13] The most recent such case was

_____

[13]See Sidney Coal Co., Inc. v. SSA, 427 F.3d 336, 347 (6th
Cir. 2005) (reversing decision of the United States District
Court for the Eastern District of Kentucky) ("By assigning each
Eastern beneficiary to the operator to whom they should have been
assigned in 1993 . . . , the SSA applied the criteria in a manner
that allowed the Act to 'function effectively and serve [its]
purpose even after the invalid application has been excised.'"

21

decided by the United States District Court for the Northern

District of Alabama.  See U.S. Steel Corp. v. Barnhart, No. CV-

04-HS-0065-S, slip op. (N.D. Ala. June 20, 2006).  The plaintiffs

in U.S. Steel

> claim[ed] that [the] SSA's actions [in reassigning the
> Eastern Beneficiaries] were not required by Eastern
> Enterprises and [were] in fact prohibited by the plain
> language of the Coal Act. . . . They cite[d] 26 U.S.C.
> § 9704(f)(2)(B) as authority for this contention.  It
> states that if the company that a miner is originally
> assigned to goes out of business, the miner is not
> reassigned to another operator but is instead placed in
> the orphan pool.  This essentially prohibits SSA from
> assigning miners to the "next-in-line" operator.

Id. at 21.  The SSA, in turn, "argue[d] that § 9704(f)(2)(B)

[was] irrelevant in this case because Eastern Enterprises applies

retroactively, meaning that the initial, unconstitutional

---

(alteration in original) (citation omitted)), cert. denied, 126
S. Ct. 1608 (2006); Elgin Nat'l Indus. v. Barnhart, Nos. 04-5243
& 04-7094, 2005 U.S. App. LEXIS 7361 (D.C. Cir. Apr. 27, 2005)
(upholding the Commissioner's reassignments for the reasons set
forth in Pittston Co. v. United States, 368 F.3d 385, 401-05 (4th
Cir. 2004)); Pittston, 368 F.3d at 404 ("[I]n making
reassignments, the Commissioner did not change the wording of the
[Coal Act], but merely followed the Supreme Court's ruling [in
Eastern] that the Coal Act may only apply to a narrower group of
persons than previously thought."), cert. denied, Brink's Co. v.
United States, 554 U.S. 904 (2005); U.S. Steel Corp. v. Barnhart,
No. CV-04-HS-0065-S, slip op. (N.D. Ala. June 20, 2006)
(discussed further in the body of this opinion); Nell Jean
Indus., Inc. v. Barnhart, 224 F. Supp. 2d 10, 26 (D.D.C. 2002)
("[T]he Commissioner fulfilled her duty [of properly reassigning
the Eastern Beneficiaries] by applying the assignment criteria in
the Act as if the Eastern-type companies had never been available
for assignment."); Wheeling-Pittsburgh Steel Corp. v. Barnhart,
229 F. Supp. 2d 539, 554-55 (N.D.W.V. 2002) ("[T]he Commissioner
had the authority to reassign beneficiaries in response to the
Eastern Enterprises [decision] and, thus, . . . acted within the
bounds of the law.").

assignments 'do not count' and '[the] plaintiffs [were] the first operators to which premium liability [had] been constitutionally assigned for" the Eastern Beneficiaries in question. Id. at 22. The Alabama court noted that, "[w]ith one exception that is no longer good law, every federal court that has addressed this issue has held that [the] SSA's actions represent a permissible construction of the [Coal Act] in light of the Eastern Enterprises decision," and that those same courts "[had] also recognized . . . that [the] SSA's construction of the statute is in keeping with the congressional intent underlying the Coal Act." Id. at 22, 24 (footnote omitted). The court in U.S. Steel, therefore, found itself "loathe to go against the great weight of authority on this issue" and adjudged the Commissioner's post-Eastern reassignments "permissible as a matter of law." Id. at 24.

## B.   Statutory Construction

Plaintiffs argue that "[t]here is no statutory difference between beneficiaries whose responsible employer [cannot] pay premiums because they are [now] defunct, and beneficiaries whose responsible employer [cannot] be compelled to pay premiums because the Judicial Branch [will not] enforce the premium obligation." (D.I. 20 at 16) Barnhart dismisses this argument because, in her opinion, it "ignores the fact that the [Eastern] assignments were void ab initio. When assigning the

23

beneficiaries in the present case to the plaintiffs, the
Commissioner was, according to standard principles of
retroactivity, making an initial assignment." (D.I. 19 at 14)
Therefore, Barnhart maintains, it was proper for the Commissioner
to make the post-Eastern reassignments in question because she
was merely "reinitiating the search through the [§ 9706(a)]
hierarchy for an initial, accurate assignment."  (Id. at 6)

> [T]he Coal Act is not [a "next-in-line"] scheme because
> it provides for a single valid assignment.  For each
> beneficiary here, however, that single valid assignment
> is to one of the plaintiffs.  Although the
> beneficiaries were initially assigned to Eastern-like
> operators, those initial assignments were
> unconstitutional and therefore erroneous.   The
> Commissioner corrected these erroneous assignments by
> voiding them ab initio and retroactively reassigning
> the beneficiaries to the **correct** assignees, namely
> plaintiffs.  There is no "next in line" assignment,
> which would entail changing correct assignments over
> time. . . .  [T]he assignments to plaintiffs are thus
> similar to the corrected assignments provided for in 26
> U.S.C. § 9706(f) [14] . . . .

(Id. at 13-14 (emphasis in original) (internal citation omitted))

Defendant Trustees adopts Barnhart's position on this matter:

> In holding in Eastern that it was unconstitutional
> to assign Combined Fund beneficiaries to Eastern
> Enterprises, the Supreme Court was not stating merely
> that from that point forward it would be
> unconstitutional to assign beneficiaries to Eastern
> Enterprises, but that it had never been constitutional
> to do so.  Eastern-type operators were not suddenly
> removed from the Coal Act equation after the Supreme

---

[14]"If the Commissioner of Social Security determines . . .
that an assignment was in error . . . the Commissioner shall
review the beneficiary's record for reassignment under" the §
9706(a) hierarchy.  26 U.S.C. § 9706(f)(3)(A).

Court decided <u>Eastern</u>; they had never constitutionally been part of that equation and, therefore, were never eligible to receive assignments.

(D.I. 14 at 16)

According to the United States Supreme Court, if a statute

"is silent or ambiguous with respect to the specific issue [being addressed by an administrative agency]," [a court] must sustain the Agency's interpretation if it is "based on a permissible construction" of the [statute].  Hence [the court] must decide (1) whether the statute unambiguously forbids the Agency's interpretation, and, if not, (2) whether the interpretation, for other reasons, exceeds the bounds of the permissible.

<u>Barnhart v. Walton</u>, 535 U.S. 212, 218 (2002) (internal citations omitted).  <u>See</u> <u>also</u> <u>Barnhart v. Thomas</u>, 540 U.S. 20 (2003) (reversing the Third Circuit's decision in <u>Thomas v. Comm'r of Soc. Security</u>, 294 F.3d 568 (3d Cir. 2002), and finding the SSA's construction of the Social Security Act in that case reasonable and entitled to deference).  In its discussion of the issue presently before this court, the United States Court of Appeals for the Sixth Circuit opined that

the Coal Act contains no language as to how the SSA should have handled the precise question raised by the <u>Eastern Enterprises</u> holding.  Without explicit guidance, the SSA, working with a newly narrowed group of qualified coal operators, assigned each <u>Eastern</u> [B]eneficiary to the coal operator that had employed that [B]eneficiary for the longest time prior to the effective date of the 1978 [Agreement], but who had also signed a 1974 or later [Agreement].  The question becomes, then, whether the SSA, in its effort to comply with <u>Eastern Enterprises</u>, permissibly construed the statute.  <u>See</u> <u>Pittston Co. v. United States</u>, 368 F.3d 385, 402 (4th Cir. 2004) ("Because Congress provided no explicit instructions, the question presented is

25

whether the Commissioner's reassignments under §
9706(a) are 'based on a permissible construction of the
statute.'") (citing [Chevron USA, Inc. v. Natural Res.
Def. Council, Inc., 467 U.S. 837, 843 (1984)]).

Sidney Coal Co., Inc. v. SSA, 427 F.3d 336, 346 (6th Cir. 2005)
(internal parallel citations omitted).

The court agrees with the reasoning employed by the other
federal courts which have addressed this issue and finds that the
Commissioner's interpretation of the Coal Act after Eastern, as
well as her subsequent decision to reassign Eastern Beneficiaries
to plaintiffs, was neither unambiguously forbidden by the statute
nor beyond the bounds of the permissible.  See Barnhart v.
Walton, 535 U.S. 212, 218 (2002).  Despite plaintiffs'
protestations to the contrary, there is a clear difference
between beneficiaries who were legitimately assigned to operators
that have since gone out of business, and the Eastern
Beneficiaries, who had never validly been assigned to **anyone**.

Section 9706 of the Coal Act directs the Commissioner to
"assign each coal industry retiree who is an eligible beneficiary
to a signatory operator which (or any related person with respect
to which) remains in business" in the order laid out in the
section's three-tiered scheme.  26 U.S.C. § 9706(a).  The Supreme
Court's decision in Eastern effectively declared that the
constitutionally permissible definition of "signatory operator"
was (and, due to retroactivity principles, always had been) "a
signatory to a **post-1973** coal wage agreement."  As a result,

plaintiffs were the proper initial designees for certain Eastern Beneficiaries under the language of § 9706(a) and the Commissioner was simply following the language of the statute when she made the post-Eastern reassignments in question.

## C.   Chevron Deference

The parties disagree over the level of deference the court should give the Commissioner's decision. Defendants contend that, under Chevron USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984), which affords administrative agencies a good deal of latitude in interpreting and administering statutes, the Commissioner's decision to reassign Eastern Beneficiaries to signatories like plaintiffs is entitled to deference. (D.I. 10 at 16; D.I. 14 at 18)  Plaintiffs counter that the Commissioner's decision is not entitled to deference because "Congress did not delegate rule-making or interpretive authority to the [SSA]," and, "absent such delegation[,] Chevron is not controlling." (D.I. 17 at 35, citing United States v. Mead Corp., 533 U.S. 218 (2001)[15])

---

[15]"[A]dministrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.  Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent."  Mead, 533 U.S. at 226-27.

27

As the Third Circuit explained in <u>Robert Wood Johnson</u>

<u>University Hospital v. Thompson</u>, 297 F.3d 273 (3d Cir. 2002),

> the <u>Mead</u> Court refused to apply <u>Chevron</u> deference
> because it was clear that Congress did not intend to
> delegate authority to the United States Customs Service
> to issue rulings with the force of law.   [<u>Mead</u>, 533
> U.S. at 226-27] . . . . Similarly, in [<u>Bowen v.</u>
> <u>Georgetown University Hospital</u>, 488 U.S. 204 (1988),]
> the Court held that little deference was owed to the
> Secretary's position as it was unsupported by agency
> practice. [<u>Id.</u>] at 212-13.  Unlike <u>Mead</u>, in the case
> before us, there is adequate indication of
> congressional intent in the statute to demonstrate
> substantial delegation of authority to the Secretary,
> including authority to promulgate guidelines for the
> reclassification process.

<u>Robert Wood Johnson</u>, 297 F.3d at 281.  Indeed, the Third Circuit

found, "[t]he broad deference of <u>Chevron</u> is even more appropriate

in cases that involve a 'complex and highly technical regulatory

program,' such as Medicare, which require[s] significant

expertise and entail[s] the exercise of judgment grounded in

policy concerns."  <u>Id.</u> at 282 (alterations in original)

(citations omitted).  Ultimately, the Third Circuit held that

courts

> must give deference to [a Secretary's] interpretation
> of a statute that [s]he is charged with administering
> unless that interpretation is contrary to the plain
> language of the statute, <u>Thomas Jefferson Univ. v.</u>
> <u>Shalala</u>, 512 U.S. 504, 512 (1994), or to congressional
> intent as manifested in the legislative history, <u>Pauley</u>
> <u>v. BethEnergy Mines, Inc.</u>, 501 U.S. 680, 696-98 (1991).

<u>Robert Wood Johnson</u>, 297 F.3d at 284 (internal parallel citations

omitted).

The Commissioner's interpretation of the Coal Act in the wake of Eastern went against neither the plain language of, nor the legislative intent behind, the statute.  After the Supreme Court declared that Eastern-type operators were ineligible for assignment under the Coal Act, it was proper for the Commissioner to remove those operators from the equation entirely and reassign the Eastern Beneficiaries to the first constitutionally permissible operator who qualified under the language of § 9706(a) (i.e., plaintiffs and their ilk).  Plaintiffs' contention that there may only be one possible designee under the statute and, if such designee is constitutionally impermissible (and the assignment, therefore, was void ab initio), that the statute forbids those beneficiaries to be assigned to anyone else, is illogical.

Plaintiffs' proposed interpretation of the Coal Act would frustrate the legislative purpose behind the statute, as expressed by Congress, which passed the Coal Act because it found that "in order to secure the stability of interstate commerce, it is necessary to . . . identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees."  Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, tit. XIX, subtit. C, § 19142(a)(2), 106 Stat. 3036, 3037 (1992)

29

(prior to 1994 amendment[16]).  Congress also identified the policy
concerns which had spurred the Coal Act's creation:

> (1) to remedy problems with the provision and funding
> of health care benefits with respect to the
> beneficiaries of multiemployer benefit plans that
> provide health care benefits to retirees in the coal
> industry;
>
> (2) to allow for sufficient operating assets for such
> plans; and
>
> (3) to provide for the continuation of a privately
> financed self-sufficient program for the delivery of
> health care benefits to the beneficiaries of such
> plans.

Id. § 19142(b).

Shifting every single Eastern Beneficiary into the

unassigned pool would undoubtedly tax the resources available

from the Combined Fund, which is underwritten first by funds

collected under the Surface Mining Control and Reclamation Act,

then from all signatory operators.  The goal of the Coal Act was

to create a "privately financed self-sufficient program" with

"sufficient operating assets."  These goals would best be served

by reassigning Eastern Beneficiaries to the first

constitutionally permissible operators who qualify under the

language of the statute (operators which did, after all, employ

those beneficiaries at one time), rather than significantly

---

[16]In 1994, the Coal Act was amended in order to transfer
responsibility for its administration from the Secretary of
Health and Human Services to the Commissioner of the SSA.  Pub.
L. No. 103-296, § 108(h)(9)(B), 108 Stat. 1464, 1487-88 (1994).

depleting the resources available for funding the benefits of
retirees whose companies have since gone out of business.  To do
otherwise would place an unnecessary (and unfair) burden on
operators who never employed the Eastern Beneficiaries and who
have their own retirees to worry about.  With this in mind, the
court finds that the Commissioner's actions were a reasonable
construction of the Coal Act's assignment hierarchy and should
therefore be accorded deference under the standard set forth in
Chevron.

## D.  The Administrative Procedure Act

Plaintiffs allege that the Commissioner's decision violated
§§ 702 and 706 of the APA, which allow for judicial review of
administrative agency actions.  See 5 U.S.C. §§ 702, 706.  Under
the APA, a court reviewing the final decision of an
administrative agency (such as that of the Commissioner of the
SSA in the case at bar) "'shall decide all relevant questions of
law, interpret constitutional and statutory provisions, and
determine the meaning or applicability of the terms of [the]
agency action.'"  U.S. Steel Corp. v. Barnhart, No. CV-04-HS-
0065-S, slip op. (N.D. Ala. June 20, 2006) (quoting 5 U.S.C. §
706).  See also Lindsey Coal Mining Co. v. Chater, 90 F.3d 688,
691 (3d Cir. 1996).  "Accordingly, the issue is whether the
administrative determination was 'arbitrary, capricious, an abuse
of discretion, or otherwise not in accordance with law.'"  Anker

31

Energy Corp. v. Consolidation Coal Co., 177 F.3d 161, 169 (3d
Cir. 1999) (quoting 5 U.S.C. § 706(2)(A)).

Because the court finds that the Commissioner's decision was
within her authority and entitled to deference, the fact that she
followed the statutory hierarchy laid out in § 9706 indicates
that her decision was neither arbitrary nor capricious and did
not, therefore, violate the APA.

### E.    The Parties' Motions

The court has determined that the Commissioner acted within
her authority in reassigning some of the Eastern Beneficiaries to
plaintiffs in 1999.  Because plaintiffs cannot "make a sufficient
showing on an essential element of [their] case with respect to
which [they have] the burden of proof," Celotex Corp. v. Catrett,
477 U.S. 317, 322 (1986), defendant Trustees is entitled to
judgment as a matter of law; its motion for summary judgment
(D.I. 13) is thereby granted.  Similarly, because defendant
Barnhart has demonstrated that there exists no "set of facts that
would entitle [plaintiffs] to relief," Conley v. Gibson, 355 U.S.
41, 45-46 (1957), her motion to dismiss (D.I. 9) is granted.
When "view[ing] the underlying facts and all reasonable
inferences therefrom in the light most favorable to
[defendants]," Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d
Cir. 1995), plaintiffs are unable to show that they are entitled
to judgment as a matter of law, Fed. R. Civ. P. 56(c);

32

consequently, their motion for summary judgment (D.I. 15) is denied.

**V.  CONCLUSION**

For the reasons stated above, defendant Trustees' motion for summary judgment is granted; defendant Barnhart's motion to dismiss is granted; and plaintiffs' motion for summary judgment is denied.  An appropriate order shall issue.

33